**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

D. PORTHAULT USA LLC, D. PORTHAULT DESIGN HOLDINGS LLC, PORTHAULT HOLDINGS LLC, and BERNARD CARL,

Plaintiffs,

v.

ARLETTIE PARIS SAS, ARLETTIE SAS, D. PORTHAULT SAS, D. PORTHAULT PARIS LTD, DESCAMPS SAS, ASTRANCE CAPITAL SA, ASTRANCE CAPITAL SAS, and JOEL DAVID BENILLOUCHE,

Defendants.
_________________________________/

CASE NO. 1:25-cv-23346

# COMPLAINT

Plaintiffs, D. Porthault USA LLC ("DP-USA"), D. Porthault Design Holdings LLC ("DP-Design"), Porthault Holdings LLC ("DP-Holdings"), and Bernard Carl (collectively, the "Plaintiffs"), by and through undersigned counsel, bring this Complaint against Defendants, Astrance Capital S.A., Astrance Capital S.A.S. (together, the "Astrance entities"), D. Porthault S.A.S. ("DP-France"), D. Porthault Paris Ltd ("DP-UK"), and Descamps S.A.S. ("Descamps") (collectively, the "Astrance Group"), DP-France's U.S. distributor(s), Arlettie S.A.S. (d/b/a Arlettie Paris) and Arlettie Paris S.A.S. (together, the "Arlettie entities"), and the Astrance entities' Chairman, Joel David Benillouche, and in support thereof allege the following:

**NATURE OF THE ACTION**

1. The Plaintiffs are the only licensed and official distributor in the U.S. of luxury household linens under the world-famous brand, D. ***Porthault***, known for its high-end products that bear certain iconic patterns. Plaintiffs have the exclusive right to operate the brand's business in the U.S., hold the associated trademark rights to the "D. PORTHAULT" label and "D. ***Porthault*** PARIS" tradename, and also hold the copyrights to two original designs, *Mariage* and *Fleurs d'Avril*, first created and published in the U.S. between 2014 and 2019. Defendants tortiously sabotaged Plaintiffs' growing domestic business by severing it from key suppliers in its supply chains, smearing its name with actionable lies to its U.S. customers, and usurping its credibility, customer demand, and legitimacy, through deceptive and misleading advertising that misrepresented the ownership of the iconic patterns and the origin of products bearing those patterns. Defendants also infringed Plaintiffs' trademarks and copyrights and diluted the brand.

2. Defendant Astrance Capital S.A. is a Euro-centric private investment fund with a network of Western European affiliates. It operates what is commonly referred to as a "venture fund," which targets and acquires distressed businesses and, after the expiration of the court-mandated or regulatory lockup period post-restructuring, often makes the majority of the workforce redundant and absconds with the company's intellectual property ("IP"); in essence, gutting the company for its vital organs and leaving it for dead, rather than resuscitating it. And using this playbook, it has already crossed the finish line once, with the unfortunate demise of Descamps in 2009. Now the Astrance Group is back again and, this time, taking aim across the Atlantic, they have their eyes set on two related Florida-based companies, DP-Design and DP-Holdings, and a New York-based sister company, DP-USA, all managed by Bernard Carl, a Florida-based retired attorney and private equity executive, and Joan Carl, his wife and a retired retail executive.

3. At a meeting in Paris on September 1st or 2nd, 2023 between the Chairman of Astrance Capital S.A. and its CEO (these two individuals also doubled as the Chairman and Managing Director, respectively, of co-defendant Astrance Capital S.A.S.), the two executives announced their plan to sabotage the rival American companies and put them out of business so that they could acquire its IP at a fire sale price. Executing this top-down directive from the heads of the two Astrance entities (hereinafter, "Astrance"), the Astrance Group launched a three-prong offensive to starve, smear, and usurp Plaintiffs' business and IP. The first element was to lay siege to DP-USA by interfering with its supply chain and pressuring its suppliers with lawsuits and boycotts, thereby depriving it of any products to sell. The second was to sow confusion and doubt among DP-USA's customers as to its continued legitimacy and identity. And the third element was to weaponize social media and government administrative proceedings to usurp the value of DP-USA's IP.

4. First, in an effort to isolate DP-USA and cut off its supply chain, members of the Astrance Group tried to intimate and bully several of DP-USA's suppliers into halting their sales to DP-USA and actually drove one supplier into insolvency and liquidation through meritless litigation in France. The Astrance Group intimidated countless other suppliers and DP-USA was forced to give guarantees of indemnity to two of those suppliers before they would resume their longstanding business relationship. To the suppliers and anyone else who would listen, the Astrance Group in bad faith accused suppliers to DP-USA of infringing several French common law copyrights purportedly held by a member of the group. However, on information and belief, most (if not all) of the DP-France-asserted copyrights had already expired years earlier and DP-USA owned at least the U.S. (if not also the counterpart foreign) copyrights on the others.

5. The anticompetitive misconduct by the Astrance Group to undermine DP-USA's business and disparage the brand did not stop there. Members of the Astrance Group falsely stated on record to public agencies in multiple countries that DP-USA's website is not the official website for the brand and that DP-Design does not rightfully own its brand (despite DP-USA's predecessor in interest having assigned the U.S. trademark rights on "D. PORTHAULT" to it in 2010 and DP-USA's subsequent assignment of those rights to DP-Design in late 2020); and that the Astrance Group was now the one and only worldwide purveyor of goods bearing the D. PORTHAULT name and designs (despite acknowledging in court filings that it knew this to be untrue).

6. Members of the Astrance Group also set up a competing website accessible to Floridians that plagiarizes entire sections from DP-USA's website; prominently displays images that reproduce DP-Design's copyright-protected visual artwork and designs without the rightsholder's permission; and offers for sale competing products that reproduce visual artwork and designs copyrighted by DP-Design. Competing sales and deliveries (directly or through Defendants' proxies, such as the Arlettie entities) to U.S.-based consumers use logos in commerce that are identical or confusingly similar to DP-Design's trademarks and/or patterns protected by DP-Design's valid copyrights, in violation of U.S. intellectual property and trade laws. In addition, members of the Astrance Group have systematically engaged in a social media campaign to blur and distort the truth about DP-USA's brand to the U.S. market, duplicitously taking credit for DP-USA's genuine trademarked goods in the hands of U.S. customers ("reverse passing off") on a near weekly basis to insinuate a partnership with or sponsorship of the Astrance Group by DP-USA that just is not there. The Astrance Group misleads consumers and freeloads off DP-USA's website in other ways. The chicanery and abuses by the Astrance Group abound, many of which are purposefully directed at U.S. consumers, including to DP-USA's current and potential clients

in Florida, and their negative net effect felt most significantly in Florida, where Bernard Carl is domiciled and where the IP rightsholder—whose exclusive licensee's financials are severely impacted—has operated for more than two decades.

7. After many months and multiple failed attempts to resolve Defendants' territorial encroachment upon Plaintiffs' U.S. customer base, Plaintiffs through counsel issued a cease and desist letter dated March 5, 2025 (Ex. 1 hereto) to Defendants DP-France and Astrance Capital S.A., again placing the Astrance Group on notice of DP-Design's federally registered copyrights and trademark and other intellectual property rights in the U.S. and of the group members' infringing sales and deliveries. Despite receiving this warning and actual notice of infringement, the Astrance Group continued its existing business practices and—now, willfully—infringe Plaintiffs' registered U.S. intellectual property, to the detriment of Plaintiffs' domestic sales. The Astrance Group's non-compliance with the cease and desist letter led to the filing of the instant action.

8. As a result of Defendants' unlawful and anticompetitive acts, Plaintiffs, their brand, their business, and their customers have been injured, with staggering losses in earnings around $3 (three) million up through the end of 2024 alone, as well as the loss in corporate market (enterprise) value in excess of $10 (ten) million by industry-accepted multiples based on turnover for luxury brands or in excess of $12 (twelve) million by conservative multiples based on earnings. Plaintiffs have been forced to seek legal redress to protect U.S. consumers from the harms of unchecked intellectual property theft; protect the interests of Floridian citizens; vindicate Plaintiffs' domestic business and protect the "D. ***Porthault***" and "D. ***Porthault*** PARIS" brands from reputational harm; recover Plaintiffs' substantial monetary losses, including the loss of Plaintiffs' corporate market value, caused by the Astrance Group's concerted actions; ward off the Astrance Group's attack on

the Floridian design company and prevent its U.S. IP rights from falling into the Astrance Group's hands.

9. Accordingly, this is an action for civil remedies, including injunctive relief and damages, for predatory and unfair competition, injurious falsehood, trade libel, commercial disparagement, business defamation, and tortious interference with business relations under common law; and violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, and Florida's false or misleading advertising laws, Fla. Stat. § 817.41; and for damages, disgorgement of profits, injunctive relief, and declaratory judgment of trademark infringement, trademark dilution, reverse passing off, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c), and for copyright infringement, 17 U.S.C. § 502.

## THE PARTIES

10. D. Porthault USA LLC ("DP-USA") is a limited liability company organized under the laws of the state of New York with its principal place of business located at 470 Park Avenue, New York, NY 10022.

11. D. Porthault Design Holdings LLC ("DP-Design") and Porthault Holdings LLC ("DP-Holdings") are limited liability companies organized under the laws of the state of Florida with their respective registered headquarters and principal place of business located at 100 Worth Avenue, Winthrop House, Unit 610, Palm Beach, FL 33480.

12. Bernard Carl is U.S. citizen domiciled in Palm Beach, Florida, and a managing member of each DP-Design and DP-Holdings.

13. Arlettie Paris S.A.S. is a simplified corporation organized under the laws of the Republic of France with its registered headquarters and principal place of business located at 17 Av. Raymond Poincaré, Paris (75016), France. Its company registration in the Register of

Commerce and Companies lists Arlettie S.A.S. as its Chairman (*Président*). (Ex. 2 hereto (machine-generated translation)).

14. Arlettie S.A.S., d/b/a Arlettie Paris is a simplified corporation organized under the laws of the Republic of France with its registered headquarters and principal place of business located at 17 Av. Raymond Poincaré, Paris (75016), France, the same address as co-defendant Arlettie Paris S.A.S.'s. The Managing Director of Arlettie S.A.S. is also the Managing Director of co-defendant Arlettie Paris S.A.S. (Ex. 3 hereto (machine-generated translation)).

15. D. Porthault S.A.S. ("DP-France") is a simplified corporation organized under the laws of the Republic of France with its registered headquarters and principal place of business located at 71 Av. Franklin D. Roosevelt, Paris (75008), France. Its company registration in the Register of Commerce and Companies lists co-defendant Astrance Capital S.A.S. as its Chairman (*Président*). (Ex. 4 hereto (machine-generated translation)).

16. D. Porthault Paris Ltd ("DP-UK"), is a private limited company organized under the laws of the United Kingdom with its registered headquarters and principal place of business located at 5th Floor North Side, 7/10 Chandos Street, Cavendish Square, London, UK, W1G 9DQ. Its company registration in the Registrar of Companies lists co-defendant Joel Benillouche as one of its two Directors and co-defendant Astrance Capital S.A. of Luxembourg as a major shareholder. (Ex. 5 hereto).

17. On information and belief, Descamps S.A.S. ("Descamps") is a simplified corporation organized under the laws of the Republic of France with its registered headquarters and principal place of business located at 72 Rue Du Commerce, Paris (75015), France. Its company registration in the Register of Commerce and Companies lists co-defendant Astrance

Capital S.A.S. of France as its Chief Executive Officer (*Directeur Générale*). (Ex. 6 hereto (machine-generated translation)).

18. Astrance Capital S.A. is a private limited company organized under the laws of the Grand Duchy of Luxembourg with its registered headquarters and principal place of business located at 74 Route de Thionville – 2610, Luxembourg. (Ex. 7 hereto (machine-generated translation)).

19. Astrance Capital S.A.S. is a simplified corporation organized under the laws of the Republic of France with its registered headquarters and principal place of business located at 71 Av. Franklin D. Roosevelt, Paris (75008), France, the same address as co-defendant DP-France's. (Ex. 8 hereto (machine-generated translation)).

20. Joel David Benillouche is a citizen of Republic of France and is listed as the Chairman (*Président*) of co-defendant Astrance Capital S.A.S. In judicial proceedings in 2023 he held himself out as chairing (*présidée*) co-defendant Astrance Capital S.A. Further, he is listed as one of three Directors (*Administrateur/Gérant*) of Astrance Capital S.A. He is also listed as one of two Company Directors of co-defendant DP-UK.

21. On information and belief, there is complete diversity between the U.S.-based Plaintiffs and the European Defendants, as well as between the members of the limited liability companies that comprise Plaintiffs and Defendants respectively.

## JURISDICTION AND VENUE

22. Defendants have advertised and imported products that infringe U.S. copyrights and trademarks. Pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (trademark and copyright) and 15 U.S.C. § 1121 (Lanham Act), this Court has subject matter jurisdiction over Plaintiffs' Lanham Act claims for trademark infringement (15 U.S.C. § 1114), trademark dilution (15 U.S.C. § 1125(c)), unfair competition (15 U.S.C. § 1125(a)), reverse passing off (15 U.S.C. §

1125(a)), and false advertising and designation of origin (15 U.S.C. § 1125(a)), and Plaintiffs' U.S. Copyright Act claim for copyright infringement (17 U.S.C. § 501), in that said claims arise under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 *et seq.*, and the Copyright Laws of the United States 17 U.S.C. §§ 101 *et seq*.

23. Pursuant to 28 U.S.C. § 1367, this Court has supplemental and pendent subject matter jurisdiction over Plaintiffs' claims for deceptive and unfair trade practices, false and misleading advertising, tortious interference with business relations, injurious falsehood, trade libel, commercial disparagement, business defamation, common law unfair competition, common law trademark infringement, trademark dilution, and unjust enrichment claims, because the claims are so related or flow from the federal claims within the Court's original jurisdiction as to form the same case and controversy under Article 3 of the U.S. Constitution.

24. Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction over Plaintiffs' U.K. copyright infringement claims and French copyright infringement claims, because the claims are so related or flow from the federal copyright claims as to form the same case and controversy. Courts in this judicial District have recently held "[t]here is 'no principled reason to bar, in absolute fashion, copyright claims brought under foreign law for lack of subject matter jurisdiction.'" *Kinon Surface Design, Inc. v. Hyatt Corp.*, No. 18-81065, 2019 WL 4731771, at *2 (S.D. Fla. Jan. 29, 2019) (Middlebrooks, J.) (citing *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 130 (D.D.C. 2011)). Quite the opposite, "[d]ue to the transitory nature of causes of action for copyright infringement, substantial precedent exists for the proposition that infringement cases 'may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.'" *Kinon Surface Design*, 2019 WL 4731771, at *2 (citing *London Film Prods. Ltd. v. Intercontinental Commc'ns, Inc.*, 580 F. Supp. 47, 49 (S.D.N.Y. 1984)).

25. In the alternative, pursuant to 28 U.S.C. § 1332(2), this Court has subject matter jurisdiction over Plaintiffs' claims because each Plaintiff is a citizen of a U.S. State and the Defendants are citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.

26. This Court has personal jurisdiction over Defendants, because: (i) they have minimum contacts within the state and this judicial District; (ii) they have purposefully availed themselves of the privileges of conducting business in the state and in this judicial District; and (iii) many of Plaintiffs' causes of action arise directly from Defendants' business contacts and other activities in the state and in this judicial District.

27. Pursuant to this state's long-arm statute, Fla. Stat. §§ 48.193(1)(a)(2) and 48.193(1)(a)(6), this Court has personal jurisdiction over Defendants, because each Defendant, singly and/or in concert with the other Defendants, has performed acts subjecting itself to the jurisdiction of the courts of the state of Florida by committing tortious acts within this state and/or causing injury to persons or property within this state arising out of an act or omission by the Defendant outside this state, as discussed throughout this Complaint.

- Defendant DP-France's acts and omissions include but are not limited to:
    - (1) operating a commercial website (an online storefront) accessible to and accessed by individuals in Florida and which (i) uses an identical or confusingly similar mark as trademarks owned by a Florida-based plaintiff, (ii) makes unauthorized display and reproduction of registered U.S. copyrighted visual works owned by a Florida-based plaintiff, and (iii) reproduces without permission photos of the interior of Bernard Carl's second home to imply a sponsorship or affiliation with the Florida citizen for DP-France's own commercial gain;

  - (2) operating an online social media account that drives traffic to the online storefront, which account also (i) uses an identical or confusingly similar mark as trademarks owned by a Florida-based plaintiff, also (ii) makes unauthorized display and reproduction of registered U.S. copyrighted visual works owned by a Florida-based plaintiff, and also (iii) reproduces without permission photos of the interior of Bernard Carl's second home to imply a sponsorship or affiliation with the Florida citizen for DP-France's own commercial gain;
  - (3) through Defendants' distributor(s): (i) offering for sale to potential customers in Florida household linens and textile goods that infringe one or more trademarks and/or U.S. copyrights owned by a Palm Beach, Florida-based Plaintiff and (ii) shipping and delivering such goods with infringing trademarks to Florida;
  - (4) participating, assisting, or otherwise enabling Astrance's threat, made to Plaintiff DP-USA's supplier, threatening a group boycott involving affiliates of the Astrance Group, which caused episodic disruptions to Plaintiff's supply chain and reduced inventory available for sale in Florida; and
  - (5) its attempt to initiate a course of dealing with designers and influencers based in Palm Beach, Florida and subsequent misuse of their laudatory content about Plaintiff DP-USA's licensed products to instead sponsor DP-France's unlicensed products and deceive and mislead potential customers in Florida.
- Defendant Descamps's acts and omissions include but are not limited to:
  - (1) operating a commercial website (an online storefront) accessible to and accessed by individuals in Florida and which (i) uses an identical or confusingly similar mark as trademarks owned by a Florida-based plaintiff, (ii) makes unauthorized display

and reproduction of registered U.S. copyrighted visual works owned by a Florida-based plaintiff, and (iii) reproduces without permission photos of the interior of Bernard Carl's second home to imply a sponsorship or affiliation with the Florida citizen for Descamps's own commercial gain; and

  - (2) participating, assisting, or otherwise enabling Astrance's threat, made to Plaintiff DP-USA's supplier, threatening a group boycott involving affiliates of the Astrance Group, which caused episodic disruptions to Plaintiff's supply chain and reduced inventory available for sale in Florida;

- The Arlettie entities' acts and omissions include but are not limited to:
  - (i) offering for sale to potential customers in Florida household linens and textile goods that infringe one or more trademarks owned by a Florida-based Plaintiff; and
  - (ii) shipping and delivering such goods with infringing trademarks to Florida.

28. Further, Defendants DP-France, Descamps, and the Astrance entities disrupted Plaintiffs' supply chain upstream by threatening suppliers with meritless lawsuits and illegal boycotts and confused Plaintiffs' customers downstream by tortiously interfering with the Florida Plaintiffs' business relations, defaming the integrity of Plaintiffs' business, and making false statements libelous of the Plaintiffs' products. On information and belief, Defendants committed these tortious acts at Defendant Joel Benillouche's direction. On information and belief, Defendant DP-UK also confused Plaintiffs' customers downstream by tortiously interfering with the Florida Plaintiffs' business relations, defaming the integrity of Plaintiffs' business, and making false statements libelous of the Plaintiffs' products. Joel Benillouche also defamed the integrity of Plaintiffs' business.

29. Through these and Defendants' other predatory, deceptive, and unfair trade practices, infringements, and other tortious acts or omissions, Defendants have caused injury to Plaintiffs in Florida (DP-USA's second largest market) and to Plaintiffs' customers and potential customers in Florida, with the brunt of the lost sales and lost profits nationwide felt by the Florida-based corporate Plaintiffs, including significant losses from the Florida market alone. Further, these injuries occurred either while products manufactured by DP-France were used in the ordinary course of commerce, trade or use in Florida or while Defendants solicited business or customers in Florida.

30. Additionally, DP-France and the Arlettie entities are foreign business entities that have sold and delivered tangible personal property directly and/or indirectly (through distributors) to individuals in Florida and, therefore, are conclusively presumed to be engaged in substantial and not isolated activities within this state. Fla. Stat. §§ 48.181(5). Pursuant to Fla. Stat. § 48.193(2), therefore, this Court has personal jurisdiction over Defendant DP-France, because it, singly or in concert with the other Defendants, is engaged in substantial and not isolated activity (including interstate activity) within the state of Florida—including its distribution, marketing, solicitation, sales and shipments in or to Florida, including to this District. On information and belief, the same is true for DP-UK.

31. Moreover, this Court has personal jurisdiction over the Defendants pursuant to FED. R. CIV. P. 4(k)(2), because of their multiple infringing shipments to and/or other extensive tortious contacts with the U.S., including: Defamatory communications made to U.S. customers; rewriting third-party promotions of the U.S.-based Plaintiffs to falsely promote Defendants; deceptive promotional emails that misuse Plaintiffs' U.S. website without authorization; as well as the many other systematic acts, misleading advertisements targeting a U.S. audience whose subject matter

focuses exclusively on personal property located in the U.S. and supplied by Plaintiffs to their U.S. customers, and both one- and two-way communications to or with intended commercial collaborators in the U.S., which give rise to the federal claims in this action under the Lanham Act and U.S. Copyright Act.

32. This Court's exercise of personal jurisdiction over Defendants in Florida is consistent with constitutional due process and notions of fair play and substantial justice, at least because Defendants have sufficient minimum purposeful contacts with this state and its citizens. Defendants committed intentional torts aimed at Plaintiffs which caused Plaintiffs damages in Florida. Since 2005, Plaintiffs have the exclusive right to market, sell, and distribute D. ***Porthault*** and D. ***Porthault*** PARIS brand goods in the U.S. As part of the Astrance Group's plot orchestrated by Joel Benillouche to eliminate Plaintiffs and take over their U.S. IP, Defendant Descamps set up a competing website and storefront for co-defendant DP-France that plagiarized substantial portions of Plaintiffs' website, used other IP belonging to Florida-based Plaintiff DP-Design, and showed photos of the interior of the Florida citizen Bernard Carl's second home. Descamps did this with the purpose of falsely implying that the Defendants' business was endorsed by or affiliated with Plaintiffs and their businesses' goodwill. This misuse by Descamps was not negligent, but intentional, its purpose being to make money from Plaintiffs' implied endorsement of Defendant DP-France and its products. Descamps' co-conspirator DP-France ratified this conduct and used the website to offer for sale competing and infringing goods. In addition, Defendant DP-France repeated this infringing activity on its Instagram account, intentionally misusing Florida-based Plaintiff DP-Design's U.S. IP and photos from the Florida citizen Bernard Carl's home. With its Instagram account and postings directed to a U.S. audience, DP-France has engaged in a weekly social media campaign to contact Plaintiffs' U.S. customers on the platform

and attempt to claim credit for having sourced the genuine goods trademarked by Florida-based DP-Design (reverse passing off). DP-France even communicated and tried to establish a course of dealing with an Ocean Ridge, Florida-based photography studio and misused its photo (that captured the design work of a Palm Beach, Florida-based designer) to perpetuate Defendant's scheme of reverse passing off and false sponsorship of the Defendant. Defendant DP-France chose to target these Florida-based influencers and personalities and commandeer their work for the purpose of commercial gain. With its Instagram account and postings directed to a U.S. audience, DP-France also marketed for sale certain goods that misuse Plaintiffs' IP, on behalf of its co-defendant DP-UK. DP-France and its co-defendants in the Astrance Group intentionally directed these and many other efforts into sabotaging the Florida-based Plaintiffs' businesses, undermining their corporate market value in Florida, tarnishing their domestic brand name, and compromising their exclusivity in this geographic market (and certain Asian markets). On information and belief, their acts were done at Joel Benillouche's instruction or direction.

33. Based on the local impact of the offenses committed by the Defendants against the Florida-based Plaintiffs, and/or the locally situated interests and property commandeered by the Defendants, Defendants could reasonably expect to be haled into Florida's courts to remedy their offenses. Plaintiffs' March 5, 2025 cease and desist letter, which Defendants chose to ignore, outlined many of these and other grievances, from unfairly copying Plaintiffs' website content, to misusing Plaintiffs' IP and photos of Bernard Carl's personal quarters; from surreptitiously delivering infringing goods, to causing customer confusion as to the source and origin of authentic domestic label products. The Florida market was embraced within Defendant DP-France's lengthy and ongoing nationwide scheme of targeting numerous American architects, stylists, influencers, designers, and photographers in U.S. cities to pass off DP-USA's genuine goods as DP-France's,

some of those photographers and designers based in this District.[1] The Plaintiffs' business in Florida and the Florida-based Plaintiffs' overall business were diminished by defamatory statements disseminated into this forum by Defendants Astrance, DP-France, and/or DP-UK. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (out-of-state defendants who "knowingly cause the injury" suffered in the forum must "answer for the truth of the statements made in their article" there). The Plaintiffs' exclusivity in Florida to deal in the branded luxury linen products, as well as the Florida-based Plaintiffs' associated IP, were both impaired by Defendants DP-France's and the Arlettie entities' marketing and competing sales. Florida is where the Astrance Group's extra-territorial actions and threatened actions blockaded, starved, and besieged the Plaintiffs, who were cut off from their supply chain. Florida is where Joel Benillouche and the Astrance Group intended for their punches to land. For at least these and other purposeful contacts with Florida, Defendants have purposefully availed themselves of the benefits and privileges of this state, should have been prepared to follow Florida law, and should be judged here when finally "caught."

34. With respect to Plaintiffs' claims arising under the Copyright Act, venue is proper in any district in which a Defendant or its agent resides or may be found. 28 U.S.C. § 1400(a). A defendant "may be found" anywhere where a court's exercise of personal jurisdiction over that defendant is proper (*Palmer v. Braun*, 376 F.3d 1254, 1259-60 (11th Cir. 2004)), as it is here, for at least the bases set forth in the preceding paragraphs.

35. Defendants who are not resident in the U.S. may be sued in any judicial district, including this District. 28 U.S.C. § 1391(c)(3). Because Defendant Joel Benillouche is not

[1] Some U.S.-based American influencers received illegitimate, infringing deliveries from DP-France, in what appears to be an attempt by DP-France to buy favor with persons who could influence current and prospective U.S. purchasers of ***Porthault*** goods, including those in the state of Florida.

resident in the U.S., and Defendants DP-UK, DP-France, Descamps, the Astrance entities, and the Arlettie entities are foreign corporations that are not resident to any district in the U.S., venue is proper in this District.

36. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the copyright claims occurred, or a substantial part of the property interests that is the subject of the action, including Plaintiffs' copyrights, are situated in this District. While advertising co-defendant DP-UK's and its own sales, Defendant DP-France's public social media posts infringed copyrights held by Palm Beach-based Plaintiff DP-Design by unauthorized display of the material, and those posts are accessible to and were accessed by individuals in this District. Defendants DP-France's and Descamps's co-owned public website similarly infringed copyrights held by Palm Beach-based Plaintiff DP-Design, and their website is accessible to and was accessed by individuals in this District. Defendants Descamps, the Astrance entities, and Joel Benillouche are vicariously liable for DP-France's unauthorized display and copying of Plaintiffs' copyrighted works.

37. Similarly, with respect to Plaintiffs' Lanham Act claims and remaining claims, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District. Defendants DP-France and the Arlettie entities have engaged in infringing activities and caused harm to Plaintiffs and consumers within this District by advertising, promoting, reproducing, offering for sale, selling, delivering and/or distributing goods into this District that incorporate and infringe Plaintiff DP-Design's trademarks. Defendants DP-UK, Descamps, and other Defendants are, upon information and belief, also engaging in infringing activities and causing harm to Plaintiffs and consumers within this District by advertising, promoting, reproducing, offering for sale, selling, delivering

and/or distributing goods into this District that incorporate and infringe Plaintiff DP-Design's trademarks. Defendant DP-France is contributorily liable for the Arlettie entities' misuse of Plaintiffs' trademarks. Defendant Descamps is contributorily liable for DP-France's misuse of Plaintiffs' trademarks. Defendants Descamps, the Astrance entities and Joel Benillouche are vicariously liable for DP-UK's and DP-France's misuse of Plaintiffs' trademarks.

38. Venue is also proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the property that is the subject of the action, including Plaintiffs' IP and goodwill, are situated in this District. With respect to Plaintiffs' claim against Defendant DP-France for reverse passing off in violation of the Lanham Act (15 U.S.C. § 1125(a)), substantial property interests are tied to this District. On its Instagram account, Defendant DP-France hijacked a photograph taken by an Ocean Ridge-based photographer capturing the design work of a Palm Beach-based designer and used it to perpetuate the reverse passing off of Palm Beach-based Plaintiff DP-Design's tradename and its licensee's trademarked products. Further, the resulting injuries suffered by Plaintiffs in terms of loss of goodwill, reputational harm, loss of business, and loss of corporate market value from this and other acts or omissions by Defendants are directly traceable to this District, because Plaintiffs DP-Design's and DP-Holdings' principal places of business are both located in Palm Beach and because southern Florida is Plaintiffs' second largest geographic market.

39. Finally, in the alternative, if this Court finds that there is no judicial district in which this action may be brought, then venue would be proper in this District pursuant to 28 U.S.C. § 1391(b)(3), because Defendants are subject to this Court's personal jurisdiction.

## FACTS

### The Origin of the Brand and Its Success in the U.S. under the Carl Family's Stewardship

40. For over thirty years, Bernard Carl's wife, Joan Carl, was a client of the French luxury linen house D. ***Porthault*** of great and century-long renown. In 2005, Bernard and Joan

Carl (collectively, "the Carl family") invested in the company and Mrs. Carl joined its Board of Directors as Vice Chairman to work with its Chairman, the son of the original founders ("the Porthault family"). In 2009, Mrs. Carl was awarded one of France's most prestigious honors, the *Chevalier de la Légion d'honneur*, in part for her work in restoring the house of D. ***Porthault***. That same year, Mrs. Carl formed New York-based DP-USA, whose website reaches and attracts online sales from its target U.S. consumer base.

41. By an agreement between the founders' family and Bernard Carl on May 20, 2005, the Carl family formed The Porthault Corporation, which was granted exclusivity to promote the prestigious brand in the U.S. and certain Asian markets. The then-owner (Porthault Linens, Inc.) of the intellectual property rights associated with the brand transferred the U.S. rights (and rights in various jurisdictions in Asia) to The Porthault Corporation to enable its exercise of exclusivity as the official brand ambassador.

42. After a series of assignments between The Porthault Corporation and DP-USA around 2009/2010 and subsequently from DP-USA to DP-Design in 2020, Plaintiff DP-Design became the exclusive and sole lawful owner of the D. ***Porthault*** and D. ***Porthault*** PARIS (hereinafter, simply "***Porthault***") brands within territories of the United States, as well as the sole rights holder of the associated U.S. intellectual property to enable it to operate as the exclusive official brand ambassador in the U.S. DP-USA remained authorized to market, sell, and distribute in the U.S. as DP-Design's exclusive licensee through a grant-back license.

43. The Carl family formed Florida-based DP-Holdings in 2019 and Bernard Carl established Florida-based DP-Design in 2020, in part so that the Carl family could continue to restore and grow the famous brand of high-end household linens from their residence in Palm Beach.

44. With the Carl family at the helm of these U.S.-based companies and promoting the brand, the American business thrived, with consistent growth in sales revenues and earnings nearly each year through the end of 2022,[2] including significant revenue from sales in southern Florida. By 2012, DP-USA had established a sales point at Gattle's Fine Linens on 3rd Street in Naples and became the featured brand at the Leta Austin Foster Design boutique store on Via Mizner in Palm Beach. DP-USA also opened a sales point at the A Mano boutique on 13th Avenue South in Naples. To this day, Gattle's, Leta Austin Foster Design, and the A Mano boutique still maintain the DP-USA-supplied D. ***Porthault*** ware as their featured luxury home linen brand. South Florida is DP-USA's second largest market within the U.S.

## How the Astrance Group Came to Take Over Certain Rights to the Brand in Europe and the Current State of the Acquired European Company in the Astrance Group's Hands

45. By the same May 20, 2005 agreement between the Porthault family and Bernard Carl, the associated territorial rights to the brand in the European market were assigned to a newly formed joint venture company between the Porthault family and the Carl family, Société Nouvelle D Porthault France SAS ("SNDPF"). This was followed, unfortunately, by several successive takeovers of SNDPF's assets in the recent decades.

46. Unable to recover from the 2008 financial crisis, SNDPF went into liquidation in 2012, and its assets were sold to a third party, Maison D Porthault ("MDP"), who in turn, entered bankruptcy proceedings in 2015, wherein the assets were sold to Maison et Atelier D Porthault ("MAP"). In 2019, MAP in turn was put into bankruptcy. This led to a French Court awarding DP-USA the right to purchase back the European intellectual property ("IP") and other assets from MAP on October 24, 2019, which DP-USA exercised.

[2] Within the overall upward growth trajectory, there was a spike in 2021 stemming from stronger than normal home goods sales due to COVID-19.

47. Later, upon realizing that the court's October 24, 2019 judgment did not fully and accurately reflect DP-USA's offer, the Carl family and the 2019 bankruptcy's administrator jointly applied to modify the judgment in early 2020. On August 13, 2020 the French Court modified its judgment and substituted specially formed non-party D. Porthault Paris SAS in place of DP-USA.

48. In the years that followed, the business of D. Porthault Paris SAS faltered, with the COVID-19 pandemic taking a heavy toll on its operations. In the autumn of 2022, the Carl family and Co-Plaintiff DP-USA undertook the negotiation of a Conciliation Agreement between the financially struggling D. Porthault Paris SAS and its only major creditor—besides DP-USA—the CIC bank, which was the leaseholder of D. Porthault Paris SAS's factory in Cambrai. By April 2023, the creditors of D. Porthault Paris SAS had reached agreement. Just before the Conciliation Agreement was to be signed, however, the President of D. Porthault Paris SAS, Julien Goudard-Lemoine, withdrew from the negotiation, put the company into bankruptcy, and cut off communications with its shareholders.

49. In the 2023 bankruptcy, the two serious bids against which DP-USA competed were from the head of the Rhône group (Robert Agostinelli) and Astrance Capital S.A.[3] After meeting with Mr. Agostinelli to discuss the situation, the Carl family learned that the Astrance entities' Chairman, Joel David Benillouche, had been perpetuating misinformation in the bankruptcy proceedings with or to the administrator and other bidders. For example, it was reported to Bernard Carl that Joel Benillouche had falsely told Mr. Agostinelli that the Plaintiffs did not own the trademarks in the U.S. and that the U.S. IP rights would be vested in the French company within

[3] There were also two French bidders, but they dropped out early.

24 months.[4] After the Carl family showed Mr. Agostinelli the well-documented proof supporting Plaintiffs' exclusive IP rights in the U.S. and set the record straight, Mr. Agostinelli pulled out of the bidding process, leaving Astrance Capital S.A. as the only other potential buyer.

50. DP-USA had managed to put together a proposal that would allow D. Porthault Paris SAS to keep all or nearly all of its employees, but the damage from the Astrance entities' Chairman's lies to the bankruptcy's administrator had already been done. She received the bid submitted by DP-USA, but failed to present it to the French Court. Instead, on information and belief, she told a third party, "Come hell or high water, I'm not taking their [the Americans'] offer." And after the court awarded the company and certain of its European IP assets to Astrance on August 31, 2023, the administrator resigned.

51. In a nutshell, this is how Plaintiffs were denied the opportunity to save the jobs of nearly all of the 63 employees at the struggling French company and were unfairly deprived of the chance to reunite the brand under the same roof again. And this is how Astrance Capital S.A. alleges it acquired control of non-party D. Porthault Paris SAS, its sales records, and some of the European IP assets;[5] how it subsequently transferred those assets to its specially formed subsidiary,

---

[4] Astrance's Chairman had also spoken with Bernard Carl in August 2023 and insisted that the Carl family should sell the U.S. companies and the U.S. IP to him at a fire sale price. Plaintiffs refused.

[5] In parallel, the Astrance entities own and control 100% of co-defendant Descamps, directly or indirectly through the Italian company Vincenzo Zucchi SpA and its subsidiaries. From 2011 to 2022, Astrance Capital S.A., either directly or indirectly through its French affiliate and co-defendant Astrance Capital S.A.S., had been increasing its stake in Descamps and its Descamps brand, either directly or through Descamps' parent company, Vincenzo Zucchi SpA. In 2024, it was reported that CONSOB, the government authority of Italy responsible for regulating the Italian securities market, had administratively sanctioned both Vincenzo Zucchi SpA and its CEO and Chairman, Joel Benillouche (who is also the Chairman of both Astrance entities) individually, for lack of transparency in the company's commercial dealings with Descamps, when both Vincenzo Zucchi and Descamps were indirectly controlled by Astrance Capital. (*see* Ex. 13 (original language) (https://finanza.repubblica.it/News/2024/10/15/

DP-France;[6] and how it listed its French affiliate and co-defendant Astrance Capital S.A.S. as the Chairman (*Président*) of DP-France.

52. The acquired European IP did not include, however, any French or U.K. common law rights in the protectable works of original and creative authorship *Mariage* or *Fleurs d'Avril* (which Plaintiff DP-USA had created and applied for copyright registration in the U.S. and subsequently assigned to Co-Plaintiff DP-Design). Nor did the transferred assets include any IP rights in the U.S. Astrance and Joel Benillouche were fully aware of these limitations when they chose to undertake acquisition of the distressed assets of non-party D. Porthault Paris SAS.

53. On August 31, 2025, the 2-year lock-up period from D. Porthault Paris SAS's bankruptcy proceedings will expire, after which there will be no restraint against the Astrance-controlled DP-France laying off the remaining employees of the acquired company; and no further restriction against Astrance transferring DP-France's European IP assets to a third party in a different country potentially beyond the reach of this Court's inherent power and jurisdiction to preemptively insulate those assets from a final judgment from this Court, and leaving non-party D. Porthault Paris SAS an empty shell.[7]

54. On information and belief, Astrance has already started to hollow out D. Porthault Paris SAS, by substantially reducing payroll at its primary factory (located in Cambrai[8]) and, at its

zucchi_sanzioni_consob_per_criticita_in_disclosure_al_mercato_e_operato_collegio_sindacale-53/) *and* Ex. 14 hereto (its Italian-to-English language machine translation)).

[6] DP-France lists co-defendant Astrance Capital S.A.S. as its Chairman (*Président*). Both entities share the same registered headquarters and principal place of business, located at 71 Av. Franklin D. Roosevelt, Paris (75008), France.

[7] Such a sale or transfer to a non-American or non-French entity could exacerbate the brand confusion issues already plaguing DP-USA and put its global reputation at further risk.

[8] This is the same factory that the Carl family helped design and had built around 2006 and 2007; that the Carl family rescued by recapitalizing the Defendants' predecessor-in-interest in its 2019 bankruptcy; that the Carl family offered to purchase in the Conciliation Agreement which the

only other French factory and printing site (located in Argentan), ceasing rent payments there. It is reported that DP-France owes a sizeable back-rent of several months at the Argentan factory; that the Cambrai factory had no heat throughout the previous winter; that DP-France has failed to pay substantial amounts of severance to multiple employees it dismissed; that French bailiffs and bill collectors are repeatedly coming to DP-France's offices but none of the staff there is willing to accept their correspondence. Further, on information and belief, today, only one of D. Porthault Paris SAS's formerly employed designers remains in DP-France's employ, but she is on long-term leave. The second-to-last designer was fired by Joel Benillouche a couple of months prior. On information and belief, DP-France does not have any employees manning the acquired design studio, which means few, if any, special orders are being fulfilled. Those orders previously accounted for about 80% of the work at D. Porthault Paris SAS. On information and belief, DP-France has cut its staff at its boutique shop in Paris, leaving a skeleton team only. Taken together, the inference is that DP-France has so few workers left at the Cambrai factory that production at its site is minimal; that DP-France has completely halted production at the Argentan site; and therefore DP-France has ceased producing or printing any of its goods in France beyond small quantities.

55. On information and belief, Astrance has successfully reduced DP-France's operational overhead to a shoestring, but it is still bleeding money and accumulating debt to landlords, former employees, and other creditors. On information and belief, Astrance may try to

---

family successfully negotiated with the CIC and other creditors in 2022 (but which the President of non-party D. Porthault Paris SAS refused to execute and instead put the company into bankruptcy); and that the Carl family again tried to rescue by submitting a proposal that would have brought in enough work to preserve almost all of the existing factory jobs in Cambrai (but which the 2023 bankruptcy administrator refused to submit to the French bankruptcy court).

further insulate DP-France's remaining assets from an adverse judgment, while biding its time in its war of attrition and misinformation against Plaintiffs.

56. In sum, a member of the Astrance Group alleges ownership of certain IP rights to the ***Porthault*** brand within Europe, while Plaintiff DP-Design continues to exclusively own the IP rights of the ***Porthault*** brand in the U.S. (in addition to Plaintiff's other copyrights in the U.S., *e.g.*, in *Mariage* and *Fleurs d'Avril*, and corresponding common law rights in France and the U.K.) as well as certain jurisdictions in Asia. These territorial boundaries are of critical importance to the United States' control and regulation of economic activity at and within its borders and to the retention of innovation, design, creativity, and quality within the U.S. It also has a direct effect on Plaintiffs' economic growth trajectory, focused on its American customer base.

57. At multiple points along this unbroken line of transfers starting in 2005, the predecessors-in-interest to the European IP assets had repeatedly reaffirmed DP-USA as the sole owner of the exclusive rights to the ***Porthault*** brand and associated IP rights in the U.S. and/or certain Asian territories (Japan, Taiwan, Hong Kong, and the People's Republic of China ("PRC")).[9] Just shy of the two-decade mark, in October 2023, the Astrance-controlled DP-France would be the first to break faith. With the directive coming from the top executives at Astrance, Defendants would implement a Starve, Smear, and Usurp strategy.

---

[9] In a 2013 memorandum of understanding between DP-USA and MDP (one of the Defendant DP-France's predecessors-in-interest), MDP acknowledged DP-USA's exclusive right to the "D. PORTHAULT" trademark in the U.S. and the identified Asian territories (Japan, Taiwan, Hong Kong, and the PRC) and, in return for a license to sell hospitality goods bearing the trademark and tradename in those Asian territories, MDP agreed to pay a 10% royalty on those sales to DP-USA. The agreement specifically bound each party's successors and assigns.

In 2020, non-party D. Porthault Paris SAS (Defendant DP-France's immediate predecessor-in-interest) sought and received a limited, revocable license from DP-USA to sell to a department store in Japan and to a distributor in Taiwan, which D. Porthault Paris SAS accepted in 2021. This license was not renewed upon the company's bankruptcy and Astrance's takeover in 2023.

**<u>The Astrance Group Conspires to Harm and Bankrupt Plaintiffs and Seize the U.S. IP</u>**

58. Up until this point, with the Carl family managing the brand and exercising exclusivity in the U.S., the American business had thrived. But Plaintiffs' U.S. sales revenues (including revenue derived from southern Florida) suffered stark decreases in 2023 and 2024, near contemporaneous with Astrance's acquisition of the European business arm, after which the Astrance Group began to interfere with Plaintiffs' supply chain and compete for U.S. market share.

59. Dissatisfied with the territorial demarcation and with ambitions beyond the European Continent, Defendants have engaged in concerted efforts to sabotage and topple the American corporate entities with the goal of buying their exclusive U.S. IP rights over the ***Porthault*** brand for a mere fraction of their true value. When the Carl family turned down Astrance's Chairman's overture to sell the U.S. companies or sell their IP to him outright at prices far below market value, he began his concerted campaign to bankrupt them. The Astrance Group resorted to highly predatory means and scorched earth tactics to burn and pillage what it could not freely buy. On information and belief, on either September 1st or 2nd of 2023, the heads of Astrance met and conspired to "starve" (or suffocate) "the American company" and put it out of business so that the Astrance Group could take over and assume the U.S. IP. On information and belief, this conversation occurred at 45, av Marceau in Paris, France, between Astrance's Chairman Joel Benillouche and Astrance's co-founder and CEO, Florian Cyril Jean René Gayet, [10] in the public entryway of D. Porthault Paris SAS's showroom, within earshot of the studio's employees and customers, shortly before the two principals retreated to the company's former president's vacant office and closed the door behind them with a bottle of champagne in hand.

[10] In addition to being executives of Defendant Astrance Capital S.A., Joel Benillouche and Florian Gayet also hold the positions at Astrance's French affiliate and co-defendant, Astrance Capital S.A.S., as its Chairman and Managing Director, respectively.

**<u>Defendant DP-France's Unfounded or False Accusations of French Copyright Infringement by DP-USA and its European Suppliers Include Expired Copyrights</u>**

60. DP-France holds itself out as the owner of the French common law copyrights to designs such as *Les Coeurs*, *Les Trèfles*, and *New York Mille Fleurs*, among others.

61. On information and belief, most (if not all) of DP-France's purported French common law copyrights are invalid, expired, and/or have fallen into the public domain, because at least 70 years have passed since the date of first sale of an embodying product. [11]

62. On information and belief, products embodying these designs were sold more than 70 years ago, thereby negating any valid French common law copyright on those designs in the present day.

63. On information and belief, *New York Mille Fleurs* was created following the original founder's trips to New York in the late 1940's and early 1950's.

64. On information and belief, *Les Coeurs* was created for the Duke and Duchess of Windsor in the early 1950's and a linen bearing the design was sold to Marilyn Monroe.

65. On information and belief, *Les Trèfles* was inspired by and created for Louise de Vilmorin in the late 1940's based on the signature she used on letters to her brothers during World War II.

66. DP-France previously acknowledged that sales of linens of the *Les Coeurs* and *Les Trèfles* designs date back to the earliest boutique shop that the founders' family opened in the U.S., which opened in New York in 1948.

[11] Conversely, the French common law copyrights to the creative and original works of Plaintiff DP-USA, *Mariage* and *Fleurs d'Avril*, have not expired, as the works were first created and published between 2014 and 2019. The U.S. copyright and counterpart French and U.K. common law copyrights to each of these two works are held by co-plaintiff DP-Design. To the extent DP-France holds itself out as also having rights to use, copy, and reproduce these two designs, it is wrong and it does not, because Plaintiffs have not authorized any of the Defendants to do so.

67. Upon winning the bid in non-party D. Porthault Paris SAS's 2023 bankruptcy, Astrance Capital S.A. gained possession and sole custody and control over the company's (and those of its European predecessors, *e.g.*, SNDPF's) historical sales records, which would indicate whether the earliest sale date of each of the DP-France-asserted copyrighted designs pre-date 1954, *i.e.*, at least 70 years earlier than Astrance's and DP-France's recent infringement assertions.

68. Nonetheless, neither Astrance nor DP-France has been able or willing to demonstrate that these designs are still protected today by valid copyright in France. For instance, when DP-USA's Italian printed fabric supplier Stamperia Olonia SRL ("Olonia") confronted Astrance and DP-France about these dates and the dearth of evidence of DP-France's purported rights, the Defendants refused to provide the relevant information.

69. Instead, without regard to—and likely in spite of—the first sale dates, both Astrance and DP-France have proceeded to communicate to multiple suppliers in DP-USA's supply chain that DP-USA and its suppliers are infringing those French copyrights. DP-France has even asserted those likely expired copyrights in a foreign legal proceeding against DP-USA and one of its suppliers, Bignon-Dervaux 1878 ("Bignon-Dervaux").

**Defendant DP-France's and Defendant Astrance's Falsehoods Injured DP-USA and Tortiously Interfered with DP-USA's Business Relations Upstream**

70. The Astrance Group implemented a three-part offensive to starve, smear, and usurp their American rivals. As one does when laying siege to an enemy, Defendants attempted to starve DP-USA by cutting it off from any supplies. In furtherance of the first part of that plan, to starve DP-USA, Defendants' predatory and unfair business practices systematically targeted DP-USA's suppliers. DP-France's threats of litigation against them (or actual litigation and seizure of their inventory) have interfered with DP-USA's supply chain for goods to be sold in the U.S., impeded

its ability to secure inventory, and resulted in at least one supplier declaring bankruptcy and shutting down.

71. For example, DP-USA's supplier, Bignon-Dervaux, is one of only a handful of surviving European craftsmen specializing in the confecting of luxury linens. In June 2024, DP-France requested the Lyon Judicial Court to raid Bignon-Dervaux's registered office to seize inventory and in July 2024, DP-France sued the French manufacturer in the Paris Judicial Court of First Instance.

72. Although Bignon-Dervaux's transactions with DP-USA were not infringing DP-France's intellectual property rights, Bignon-Dervaux could not afford to maintain and defend itself in the lawsuit by DP-France. Receivership proceedings for Bignon-Dervaux were formally opened on September 13, 2024 by judicial order. Bignon-Dervaux's insolvency and compulsory liquidation proceedings were a direct result of DP-France's tortious interference with DP-USA's supply chain.

73. DP-France's lawsuit in France and its threats against other French and Italian suppliers of DP-USA were equally meritless. Central to its claims are that DP-USA and its European suppliers have infringed certain French common law copyrights purportedly belonging to DP-France, such as the aforementioned *Les Coeurs*, *Les Trèfles*, and *New York Mille Fleurs* designs. In response to DP-USA's preliminary evidence that DP-France's asserted French copyrights have fallen into the public domain, however, DP-France has refused to reveal the earliest sales date (of an embodying product) for each design, which would help confirm DP-USA's informed, good faith belief and vindicate its maligned suppliers.

74. DP-France's actions that culminated in the loss of Bignon-Dervaux have directly impacted DP-USA's ability to secure inventory and critically affected its bottom line. Certain

materials and stock previously supplied by Bignon-Dervaux to DP-USA were needed to create its luxury goods. These became unavailable and DP-USA was unable to find an alternative source to replace them for seven months.

75. The crippling impact on DP-USA's ability to do business in the U.S. is not limited to the loss of one wronged supplier. Other suppliers, aware of the misfortune brought about by DP-France on Bignon-Dervaux and wary of the specter of potential lawsuits and administrative actions from DP-France, however meritless, have been alarmed by DP-France's hardhanded litigation tactics and extra-judicial maneuvers. Multiple suppliers became reluctant to continue doing business with DP-USA and were ready to terminate the supplier-customer relationship until they received guarantees and indemnity from DP-USA. Providing this insurance necessitated by DP-France's actions has increased DP-USA's operational and business costs and reduced its profitability. [12]

76. Outside of France, ever since around 2008, the Italian firm Olonia has been the primary source of many printed fabrics to DP-USA (and its predecessors-in-interest). DP-USA used Olonia's printed fabrics in many product lines, including in bed and table linens, children's clothing, and accessories, among other products.

77. In late 2023, DP-France and Astrance sent a "no-go" list to Olonia, forbidding it from filling any of DP-USA's orders to print designs from that list, even though they were crucial to DP-USA's business. This "no-go" list included the familiar designs whose copyrights have expired or otherwise fallen into the public domain, such as the *Les Trèfles* and *Les Cœurs* designs.

[12] DP-France's obstructionist tactics have also made it difficult for DP-USA to include French manufacturers in its production chain, and thus more difficult to support European craftsmanship.

Astrance threatened Olonia with a French copyright infringement lawsuit for massive damages and injunctive relief.

78. Astrance also applied pressure on the business side to tighten its stranglehold over DP-USA's printed fabric supply chain. Olonia had other customers besides DP-USA. These customers included the Italian company Vincenzo Zucchi and its many subsidiaries that were also affiliated with Descamps. Astrance's control of the Vincenzo Zucchi group and Descamps' sister companies gave it considerable sway over Olonia. Astrance threatened Olonia that the Vincenzo Zucchi entities under Astrance's control would boycott Olonia's services and products, should Olonia continue to fill orders for DP-USA. The threat of Astrance's group-boycott by DP-France's and Descamps's affiliated sister companies was directed towards Olonia with the aim of suffocating and eliminating Descamps' and DP-France's horizontal competitor, [13] DP-USA.

79. In response to these threats, Olonia initially delayed for several months its production of orders for DP-USA but eventually rejected Astrance's and DP-France's meritless claims and ultimately resumed production. Several reasons led to Olonia's rejection of Defendants' infringement arguments. Most critically, Astrance and DP-France could not meet Olonia's request for proof of valid French copyrights. Defendants were unable or unwilling to provide evidence as to the authorship, date of creation, and sales data (to show whether the earliest sale occurred prior to 1954) of any of the "no-go" designs.

80. Despite Olonia's resuming production in 2024, however, those initial delays in late 2023 and early 2024 left DP-USA with depleted inventory for much of the first half of 2024,

[13] Astrance previously made representations that Descamps is in the household linen business and that Astrance's Basetti brand within its controlled Vincenzo Zucchi group included a high-end household linen segment.

disrupting and severely impacting DP-USA's historically high-volume sales periods, including sales to its second largest domestic market, Florida.

81. DP-France's threats towards several of DP-USA's suppliers as well as DP-France's overt actions towards Bignon-Dervaux and Olonia impacted and jeopardized DP-USA's relationships with all of its suppliers. And because DP-France was able to take down Bignon-Dervaux and took Olonia offline for several months, this resulted in DP-USA's lack of inventory to sell. The Astrance Group's disruptions caused delays in different phases of DP-USA's supply chain for different products at different times. These delays often occurred episodically and caused a cascading effect of further delays down the line each time. These delays began in or around August 2023 and continued, on and off, for most of 2024.

82. In 2024, DP-USA suffered its first full-year loss (negative earnings) in over a decade, due to Defendants' malicious interference with its supply chains. Astrance's and DP-France's concerted interference with DP-USA's terrycloth and printed fabric supply chains have caused about $1 million in lost sales in the second half of 2023 and about $2 million in sales in 2024. Of these losses, about $100,000 is attributable to the Florida market in the second half of 2023, and roughly an additional quarter million in 2024. In addition to lost earnings of about USD three million through the end of 2024, Plaintiffs have suffered losses to their corporate market value in excess of USD ten or twelve million from Defendants' misconduct.

83. Through bad faith and illegitimate means, Astrance and DP-France triggered the bankruptcy of one of DP-USA's supply partners; made DP-USA's proper dealings with its other longtime suppliers more difficult and precarious; and anticompetitively imperiled the amount of inventory available to U.S. customers from DP-USA.

**Defendant DP-France's Misrepresentations to the Hong Kong Intellectual Property Department Defamed DP-Design and Libeled DP-USA's Products**

84. DP-France attempted to register Plaintiff DP-Design's D. ***Porthault*** trademark in Hong Kong. DP-Design opposed the registration, and DP-France submitted a counter-statement in support of its registration.

85. On December 6, 2024, despite operating almost exclusively in the EU—with the exception of the infringing shipments to the U.S.—DP-France made the following public misrepresentations to the Hong Kong Intellectual Property Department, self-proclaiming DP-France's worldwide exclusivity to the brand and the associated IP (Ex. 9 hereto):[14]

- "[DP-France] is **the owner of the D. Porthault brand (the "Brand")** which was first created in 1920 by Daniel Porthault." (*Id.* ¶ 2) (emphasis added);
- "By virtue of a judgment in 2023 …, [DP-France] has become the **sole rightful owner** of the ["D. Porthault"] Brand and is entitled to operate and manage the business under the Brand … **around the world**." (*Id.*) (emphasis added);
- "[DP-France] expressly avers that **it is the true and rightful owner of the Brand, including the trademark 'D. Porthault' and its variants thereof**." (*Id.* ¶ 7) (emphasis added);
- "[T]he assets and business under **the Brand have solely and ultimately been vested** under [DP-France]." (*Id.* ¶ 3(d)) (emphasis added);
- "The Applicant [DP-France] avers that **it is the sole rightful owner of the Brand** and the Applicant's **official website at <https://www.dporthault.fr/en> is the only legitimate official website of the Brand**." (*Id.* ¶ 9) (emphasis added); and
- "[DP-France] expressly denies that [DP-Design's] website at <*https://*dporthaultparis.com> is the official website of the Brand. Rather, [this] use of the Brand by [DP-Design] is without authorization from **the rightful owner of the Brand**, namely [DP-France]." (*Id.*) (emphasis added).

[14] Hong Kong Intellectual Property Dept., Counter-Statement, https://esearch.ipd.gov.hk/nis-pos-view/#/tm/tmFileActions/docviewer/DOC_1_3454227_306504264/1 (last visited July 24, 2025) (Ex. 9) (after verifying user is not a bot, document appears after clicking on link a second time).

86. In the same public statement, DP-France denigrated the quality and nature of DP-USA's products, attacking them as illegitimate or unlawful:

- "[DP-France] **expressly denies that [DP-Design's] website at <*https://***dporthaultparis.com> is the official website of the Brand.** Rather, [this] use of the Brand by [DP-Design] is without authorization from the rightful owner of the Brand, namely [DP-France]." (*Id.*) (emphasis added);

- "[DP-Design]'s claim that it is the **true owner of the trade marks relating to the Brand** . . . is **denied**." (*Id.* ¶ 10) (emphasis added); and

- "[DP-France] avers that [DP-Design] is a company subsequently created by a former chief executive officer of [DP-France], and that **[DP-Design] has falsely claimed itself to be the true owner of the brand**." (*Id.*) (emphasis added).

87. DP-France's misleading and false public statements are accessible to and have been accessed by individuals residing in Florida, including in this District.

**DP-Design's Ownership of Registered U.S. Trademark and**
**DP-USA's Ownership of Registered U.S. Copyrights and the D. Porthault Paris Website**

88. Plaintiff DP-Design is the owner of the valid issued trademark for D. PORTHAULT (Registration No. 2808276) from the U.S. Patent and Trademark Office ("USPTO"), whose registration date is January 27, 2004. (Ex. 10 hereto). After many years of continuous use in the U.S., the mark's incontestability status was recognized by the USPTO on October 28, 2010. As an incontestable trademark, its validity, registration, ownership, and owner's right to its exclusive use in the U.S. are conclusively presumed.

89. DP-Design is also the owner of the pending U.S. trademark application for the stylized D. ***Porthault*** PARIS mark reproduced below (U.S. Serial No. 98187655):




**Figure 1**: Screen-capture from the main page of DP-USA's website

90. DP-USA owns and operates a website (https://dporthaultparis.com/) prominently featuring its Co-Plaintiff DP-Design's stylized D. ***Porthault*** PARIS mark in teal-colored font in the upper left-hand corner on each page and sub-page.




**Figure 2**: Screen-capture from the main page of DP-USA's website

91. Both the registered D. PORTHAULT mark (hereinafter, "***Porthault*** trademark") and the pending stylized trademark application are live. DP-Design is listed as the current and sole owner of both marks on the USPTO's website.

92. DP-Design's ***Porthault*** trademark protects goods in international classes 3, 4, 18, 21, 24, 25, and 28. Among these, international class 24 covers linens, home goods, and bed and bath items, etc., namely "SHAMS, COMFORTERS, COMFORTER COVERS, PILLOW CASES, TOWELS, WASH CLOTHS, CRIB LINENS, CRIB BUMPERS, GUEST TOWELS, HOODED TOWELS FOR INFANTS, HANDKERCHIEFS, TABLE LINENS, TABLECLOTHS, RUNNERS, NAPKINS, PLACE MATS AND SHEETS"; and class 25 covers apparel-type textiles and garments such as "MEN'S AND WOMEN'S BATHROBES, PAJAMAS, AND SLIPPERS;

WOMEN'S NIGHT SHIRTS; APRONS; BABIES' CLOTH BIBS, BABIES' DRESSES, BABIES' HEAD SCARVES, BABIES' BATHING SUITS, BABIES' TEE-SHIRTS, BABIES' SHORTS, BABIES' PAJAMAS, BABIES' SLEEPING GOWNS, AND BABIES' ROBES." (Ex. 10)

93. DP-Design's pending stylized trademark application is similarly directed to goods in international classes 4, 18, 21, 24, 25 and 28.

94. DP-Design is also the current and sole owner of the live registered copyright for the two-dimensional artwork design titled "*Mariage*" (Registration No. VA0002374272) from the U.S. Copyright Office. (Ex. 11 hereto). The creative work was originally authored by DP-Design's affiliate, Co-Plaintiff DP-USA. The copyright-protected design captures the author's creative expression, an example of which is shown here:



**Figure 3**: Exemplar of the copyright-protected two-dimensional artwork *Mariage*

95. DP-Design is also the current and sole owner of the live registered copyright for the two-dimensional artwork design titled "*Fleurs d'Avril*" (Registration No. VA0002372615) from the U.S. Copyright Office. (Ex. 12 hereto). The creative work was originally authored by

DP-Design's affiliate, DP-USA. The copyright-protected design captures the author's creative expression, an example of which is shown here:



**Figure 4**: Exemplar of the copyright-protected two-dimensional artwork *Fleurs d'Avril*

96. Each of these two original and creative works of authorship were first created by or for DP-USA and published in the U.S. between 2014 and 2019, giving rise to corresponding common law copyright protection for each work in France and the U.K. as fellow Berne Convention signatories.[15] Co-plaintiff DP-Design is, by assignment from DP-USA in 2020, the rightful owner of the U.S. copyrights and their counterpart U.K. and French common law copyrights. DP-USA has permission from DP-Design to use these designs.

97. In conjunction with DP-USA's main website (https://dporthaultparis.com/) for its sale of authorized branded goods, Plaintiffs also maintain an Instagram account (@dporthaultparis) whose bio is labeled with the following descriptors and identifiers: "Official USA Account," "Luxury Home Linens." Plaintiffs' official account has garnered the support of nearly 47,000 loyal followers.

[15] Unlike in the U.S., neither France nor the U.K. has an official copyright registration system.

D Porthault
https://dporthaultparis.com

D Porthault: Official Website

Since 1920, **D. Porthault** has created luxurious embroidered and printed linens. Discover the finest French bedding, towels, table linens, lingerie, ...

**Figure 5**: Screen-capture of first hit from Google search for "dporthault" and "official"

Instagram · dporthaultparis
46.7K+ followers

D. Porthault Paris (@dporthaultparis)

47K followers · 721 posts · Official USA Account **Luxury Home Linens** Hand Printed & Woven in France since 1920 Fanciful Prints & Refined Embroideries.

**Figure 6**: Screen-capture of second hit from Google search for "dporthault" and "official"

**Defendant DP-France's and/or Defendant Descamps' Unfair and Deceptive Practices Directed to the U.S. Market Downstream**

98. In furtherance of their plan to starve the Plaintiffs, Defendants launched a predatory marketing campaign to encroach upon Plaintiffs' U.S. customer base in a clear encroachment upon Plaintiffs' domestic IP rights. For example, through Co-Defendants DP-France's and Descamps's website, as well as other distribution channels, Defendants have advertised, sold and delivered, and continue to advertise, sell and deliver, household linens and other home furnishing goods under the ***Porthault*** brand into the U.S. to domestic customers without Plaintiffs' authorization and despite Plaintiffs' protests.

99. DP-France usurps the demand for DP-USA's legitimate products through DP-France's competing, lookalike website.[16] DP-France also seeks to divert customers who would have otherwise purchased the distinctively designed and patterned linens of the well-known ***Porthault*** brand from DP-USA's official website.

[16] https://www.dporthault.fr/en/ (hereinafter "DP-France's website") (English version) (last visited July 24, 2025).

100. Defendant Descamps maintains this sales website for Defendant DP-France, but the exact division of ownership of the site's content (and its misuse by them) is unclear. Defendants' website includes the following notice, holding itself out as the owner of the content and visual designs of Co-Defendant DP-France's website:

> *The Website and its contents (including in particular creations relating to the Website's structure, tree structure, trademarks, logos, domain names, graphics, musical works, photographs, animations, texts, descriptions and more generally all elements whether visual (animated or not) and/or sound) are the property of the Descamps company . . .* [17]

101. The Defendants' website has the same "look and feel" as DP-USA's.[18] The color scheme for both websites is dominated by an ivory background and supplemented by teal-colored icons or banners. In addition, the introductory remarks and messaging on the main page of both sites are nearly identical.




**Figure 7a**: Screen-capture from the main page of DP-USA's website




**Figure 7b**: Screen-capture from the main page of DP-USA's website

---

17 https://www.dporthault.fr/en/legal-information (under the sub-heading "Propriété intellectuelle") (last visited July 24, 2025).

18 https://dporthaultparis.com/ (hereinafter "DP-USA's website") (last visited July 24, 2025).




**Figure 7c**: Screen-capture from the main page of DP-USA's website




**Figure 7d**: Screen-capture from the main page of DP-USA's website




**Figure 7e**: Screen-capture from the main page of DP-USA's website

102. The icons and buttons in the upper right-hand corner of DP-USA's website are teal-colored. As **Figures 7a** to 7**e** above show, the slow auto-scrolling (but manually toggle-able) banner across the top in the center of the main page delivers the iconic message over five iterations:

> *Since 1920, D. Porthault has been inspired to create fine linens. With a focus on craftsmanship, quality and innovation, Years of creativity and passion developed a savoir faire. We invite you to experience the world of D. Porthault. And to experience the private luxury of fine linens.* [19]

103. In comparison, on the competing website co-owned by Defendants DP-France and Descamps and managed by the latter, the message featured across the middle reads nearly identically to DP-USA's message:

> *Welcome to D. Porthault. Since 1920, D. Porthault has been inspired to create fine linens. Years of creativity and passion developed a savoir-faire with a focus on craftsmanship, quality and innovation. We invite you to*

---

[19] DP-USA's website (last visited July 24, 2025).

> *experience the world of D. Porthault and to experience the private luxury of fine linens.* [20]




**Figure 8a**: Screen-capture from bottom portion of main page of Defendants' website

104. In addition, against the ivory background, across the top of the Defendants' website's main page is a teal-colored banner, which resembles the teal used in DP-USA's website.




**Figure 8b**: Screen-capture from top portion of main page of Defendants' website

105. The messaging, color scheme, and overall "look and feel" of Defendants' website are so similar to DP-USA's website that users who navigate to Defendants' website would be

[20] DP-France's website (English version) (last visited July 24, 2025).

easily confused as to the actual source of the linens depicted there for sale, *i.e.*, that they were purchasing the linens from DP-USA.

106. The misleading advertising on Defendants' website (and on DP-France's other promotional materials) harms Plaintiffs' business and brand recognition in the U.S.

107. Defendants' website is accessible to and has been accessed by individuals residing in Florida, including in this District.

108. When sales are made to the U.S. customers, Defendants' illegitimate gray-market deliveries directly compete in the domestic U.S. market with Plaintiff DP-USA's exclusively authorized ***Porthault*** goods. In addition, Defendants' business operations and promotional materials confuse customers and potential customers of DP-USA as to the true source of DP-France's unauthorized goods.

109. But even Defendants' misleading advertising is dwarfed by the injurious nature of their copycat website and free-riding practices, which are not merely deceptive but also unfair, especially where Defendants plagiarize large sections of DP-USA's website, either verbatim or nearly verbatim, as further detailed in paragraphs 112 – 119, *infra*.

110. On information and belief, Joel Benillouche's brother has been and still remains in charge of Descamps' and DP-France's website. It was Joel Bennillouche who was overhead plotting with Astrance's co-founder and CEO, Florian Gayet, to starve the Plaintiffs until their U.S. business went under and their IP became ripe for taking.

**Defendant DP-France's and/or Defendant Descamps' Website Plagiarizes Content From DP-USA's Website and Unfairly Competes with DP-USA**

111. DP-USA's website contains a sub-page titled "Terms," which sets forth conditions for the public's use of its website.[21] Those terms include various prohibitions against the theft of Plaintiffs' "Intellectual Property," including, for example: "You may not reproduce, by any means or process (except as expressly provided herein), in full or in part, distribute, publish, transmit, create derivative works based on, modify or sell any such material contained on the DPorthaultparis.com website."

112. DP-USA's website has another sub-page dedicated to answering actual and anticipated Frequently Asked Questions ("FAQs") from its customers and prospective customers.[22] (Ex. 15 hereto). There, DP-USA provides eighteen important FAQs in a numbered list and also DP-USA's sometimes lengthy response to each one.

113. DP-France's website—managed and purportedly co-owned by Descamps[23]—also contains a sub-page dedicated FAQ (and answer) section[24] (Ex. 16 hereto) that plagiarizes DP-USA's website's corresponding FAQ section, demonstrating DP-France's bad faith and deliberate attempt to capitalize on potential customer confusion, namely, confusion as to the source and origin of the products on DP-France's website. Comparing their answers, the ordinary web-surfing

[21] DP-USA's website, "Terms" sub-page, https://www.dporthaultparis.com/pages/terms (last visited July 24, 2025).

[22] DP-USA's website, "Frequently Asked Questions" sub-page, https://dporthaultparis.com/pages/frequently-asked-questions (last visited July 24, 2025).

[23] DP-France's website, "Legal information" sub-page, https://www.dporthault.fr/en/legal-information (last visited July 24, 2025) (under sub-heading "PROPRIÉTÉ INTELLECTUELLE": "The Website and its contents . . . are the property of the Descamps company . . ."). *See also* ¶ 100, *supra*.

[24] DP-France's website, "FAQ" sub-page, https://www.dporthault.fr/en/services/faq (last visited July 24, 2025).

consumer would be hard-pressed to identify whose site he or she was shopping from and to tell the two online stores apart.

114. DP-France's sub-page goes beyond mere resemblance. Whole responses are unabashedly pirated. While DP-France does not number its FAQs, of DP-USA's eighteen FAQs, DP-France deleted three and kept the remaining fifteen FAQs, *in the same sequential order*. Neither DP-France nor Descamps bothered to rearrange or reorder the content that it purloined. Moreover, all of them still share the same exact title phrasing as DP-USA's original FAQs.

115. Nor are the FAQs copied by DP-France merely run-of-the-mill, boilerplate FAQs, but rather they are uniquely attributable to DP-USA. Some examples include:

a. HOW DO YOU PRONOUNCE PORTHAULT AND WHAT DOES THE 'D' STAND FOR?

b. WHY IS D. PORTHAULT OFTEN CALLED BOTH THE BEST KEPT SECRET AND THE CHOICE OF ROYALTY?

c. WHY DOES D. PORTHAULT HAVE A REPUTATION FOR INNOVATION AND WHIMSY AS WELL AS FOR LUXURY?

116. Of the answers to DP-France's fifteen FAQs, eight are identical to DP-USA's. The responses to the remaining seven are nearly identical—merely changing or moving a handful of words but otherwise identical to DP-USA's.

117. For example, compare DP-USA's answer to FAQ no. 18 (asking "HOW LONG WILL MY LINENS LAST?"), "*D. Porthault linens have been passed down from one generation to the next. Loving care and the ability to breathe through regular use are the only prerequisites!*" (Ex. 15, p.4) against DP-France's only slightly rearranged version, "*D. Porthault linens, with loving care and regular use allowing them to breathe, have been known to last for generations.*" (Ex. 16, p.3).

118. As another example, compare DP-USA's answer to FAQ no. 2 (asking "WHY IS D. PORTHAULT OFTEN CALLED BOTH THE BEST KEPT SECRET AND THE CHOICE OF ROYALTY?"):

> *D. Porthault has built a reputation offering products that speak quietly but passionately of luxury, becoming a 'brand' long before brands were advertised as such. At once elegant and personal, luxurious and authentic, D. Porthault prides itself as much on its heritage of quality as on its discretion and loyalty to its clients.*

(Ex. 15, p.1) against DP-France's closely replicated answer:

> *D. Porthault has earned a reputation for offering products that quietly yet passionately speak of luxury, becoming a recognized brand long before brands were widely advertised. Balancing elegance with a personal touch, luxury with authenticity, D. Porthault takes pride not only in its heritage of quality but also in its discretion and loyalty to clients.*

(Ex. 16, p.1).

119. A side-by-side comparison readily reveals the magnitude of DP-France's blatant, unauthorized and gross copying of DP-USA's carefully crafted web content. (Ex. 17 hereto). Perhaps the most egregious example would be the lengthy 242-word response that DP-France's website recycled in its entirety, verbatim, from DP-USA's answer to FAQ no. 12 (asking "WHAT IS A SHEET SET AND WHAT ARE D. PORTHAULT'S STANDARD SIZES?"), where DP-France copied and pasted all six paragraphs, reciting:

> *In France, a standard 4-piece full/queen set is composed of a top sheet, a flat bottom sheet and two European square shams. In the US and the UK, two standard size shams replace the Euro shams in a full/queen set.*
>
> *In France, a standard 4-piece king or super king set is composed of a top sheet, a flat bottom sheet and two European square shams. In the US and the UK, two king size shams replace the Euro shams in a king set.*
>
> *In France, a standard 3-piece twin set is composed of a top sheet, a flat bottom sheet and one European square sham. In the US and the UK, one standard size sham replaces the Euro sham in a twin set. Please note that in both Europe and the US, twin bed sets are available in limited quantities*

> *in our D. Porthault boutiques, but they are always available by special order.*
>
> *In the European tradition, D. Porthault bottom sheets are not fitted. Mattress depths vary greatly, and if desired, our boutiques will custom fit bottom sheets for an additional charge.*
>
> *All D. Porthault sheets are sold in sets. Rivoli is the only collection where sheets and shams can be purchased individually, rather than as a set. Currently, Rivoli is available exclusively in our boutique. Please contact us for more information.*
>
> *All sheet set collections can be augmented with separate duvet covers and extra pillow shams of all sizes and designs.*

(Ex. 16, p. 2; *compare* Ex. 15 (DP-USA's sub-page), p. 3).

120. The first three paragraphs of DP-France's answer above to this FAQ are directed to the U.S. market and prospective customers there, explaining how to convert standard bed sizes from Europe to the bedframes available in the U.K, ***and in the U.S.***, ostensibly so that the U.S. customer may proceed to order the correctly sized linen product from DP-France.

121. Tellingly, DP-France's answer above admits the existence of U.S. stores and DP-France's ability to fill special orders and deliver to the U.S.: "Please note that ***in*** both Europe and ***the US***, twin bed ***sets are available*** in limited quantities ***in our D. Porthault boutiques***, but ***they are always available by special order***." (Ex. 16, p.2) (emphasis added).

122. Given the deliberate attempt by Defendants to mimic the look and feel of—and even the language in—DP-USA's website, it is not surprising that U.S. customers would be confused as to the source of the linens that are advertised on Defendants' website, believing that they were purchasing from DP-USA. In fact, instances of actual sales by DP-France of such unauthorized products bearing the registered D. PORTHAULT mark and/or protected ***Porthault*** brand designs into the U.S. are further documented in paragraphs 186, 187, and 193, *infra*. Sales

and shipments of unauthorized products were also shipped by its distributor, Arlettie, some into this District, as described in paragraphs 207 – 221, *infra*.

**<u>Defendant DP-France's Unfair and Deceptive Practices</u>**
**<u>Extend to Its Instagram Account (@dporthault.official)</u>**

123. Defendant DP-France has launched a social media campaign on Instagram that has caused actual customer confusion, misleads the audience into mistaking DP-France as the official, licensed vendor in the U..S, confuses other potential customers as to the origin of the depicted unlicensed products (which unfairly compete with DP-USA's products), and further dilutes Plaintiffs' ***Porthault*** brand in the U.S.

124. In competition with Plaintiff DP-USA's official Instagram account (@dporthaultparis), Defendant DP-France misleadingly named its Instagram account handle "@dporthault.official," despite not being the official vendor for ***Porthault*** products in the U.S. This naming convention is likely to confuse consumers to mistakenly believe that DP-France is the rightful and sole distributor of ***Porthault*** goods in the United States, even more so because DP-France's Instagram bio and landing page, in turn, feed the viewer to DP-France's and Descamps' website (via hyperlink). Once the viewer arrives at Descamps' website it, he or she is greeted with the prominently displayed words, "INTERNATIONAL SHIPPING," on a banner stretching across the site's front page.




**Figure 9**: Screen-capture of third hit from Google search for "dporthault" and "official"




**Figure 10**: Screen-capture from top portion of main page of Defendants' website

125. Also in competition with DP-USA's official Instagram page (@dporthaultparis), DP-France set its Instagram profile picture to an image of the words "D. Porthault Paris." Further, deliberately mirroring the profile name of DP-USA's Instagram account ("D. Porthault Paris"), DP-France chose "D. Porthault paris," merely changing the "P" in "Paris" to lower case. (*see* **Figure 11**, *infra*) The identicality of the three words in Defendant's selected Instagram profile picture and its profile name with the three words in DP-USA's Instagram handle and its profile name further amplifies the likelihood of customer confusion as to the true source of the unlicensed goods depicted in DP-France's Instagram's posts.

126. Additionally, like DP-USA's verified Instagram page, DP-France obtained a blue checkmark verification badge for its Instagram page. Because the verification badge signals to a consumer that an Instagram page is the official account for a brand, this will substantially magnify the growing risk of a U.S. consumer mistaking DP-France's account as the official account for the U.S. market, to whom so many of DP-France's frequent Instagram posts are purposefully directed.

127. DP-France also copied the layout of DP-USA's Instagram page, which serves to confuse and mislead customers. DP-USA's Instagram bio contains unique identifiers and language that DP-France replicated in a manner that tends to mislead consumers. For example, DP-USA's Instagram bio has the following descriptors: "Official USA Account, "Luxury Home Linens," and

"Hand Printed & Woven in France since 1920." DP-France formatted its Instagram bio to include misleadingly similar descriptors: "Official Account from France," "D.Porthault Fine Linens," and "Handmade in France since 1920." DP-USA places an address and website link in the bottom two lines of its bio, and DP-France adopted this format as well.




**Figure 11**: Screen-captures of DP-France's Instagram account landing page vs. DP-USA's

128. Since the screen-capture in **Figure 11**, *supra*, was taken, DP-France's Instagram account has continued to gain followers which, as of the time of this filing, are 520 in number. These followers are potential customers in a niche industry.

129. DP-France's Instagram account posts and stories are accessible to and have been accessed by individuals residing in Florida, including in this District.

**<u>Defendant DP-France's Defamatory and Misleading Omissions in Its Advertising</u>**

130. At certain points in time, DP-France's Instagram even falsely announced itself to be the "One & Only D. ***Porthault*** Fine Linens" account, which misleading language would be picked up by search engines. But DP-France is not an authorized seller or distributor of ***Porthault*** brand linens in the U.S.




**Figure 12**: Screen-capture of Defendant DP-France's previous Instagram account landing page




**Figure 13**: Screen-capture of Google search results showing DP-France's Instagram page with its misleading description "The One & Only D.Porthault"

131. The likelihood of reasonable customer confusion as to whether DP-France is the legitimate rightsholder and purveyor of ***Porthault*** goods in the U.S.—DP-France is not—is exacerbated by the lack of a prominent, express disclaimer on DP-France's Instagram or on Descamps' website (to which DP-France's Instagram page directs its audience) against shipping and delivery of the advertised ***Porthault*** products to the U.S.

132. In addition, leaning into the Astrance Group's agenda of encroaching on DP-USA's exclusive rights and territory, DP-France recently launched a barrage of misleading posts on DP-France's Instagram page (@dporthault.official) comprising of well over a dozen posts already, wherein DP-France specifically targets American consumers by posting and/or reposting images of genuine DP-USA-supplied ***Porthault*** goods used by American designers and media outlets to

decorate American homes. Throughout the ongoing nationwide campaign targeting individuals and locations from Alabama, Connecticut, Florida, Illinois, Maine, Massachusetts, New York, South Carolina, Tennessee, Texas, etc., DP-France thanks these designers and media outlets for their creative use of ***Porthault*** goods (in the vast majority of instances having been supplied by DP-USA), as if to take credit for having produced or provided those products directly into the homes of the U.S. cities, or imply a non-existent affiliation with the actual supplier, DP-USA. [25]

133. And in many of these Instagram posts, DP-France goes beyond that, using intentionally misleading language to lay claim over the underlying visual design in the depicted ***Porthault*** products, even though DP-France had no hand in their creation or authorship. These instances occurred in, *e.g.*, DP-France's flurry of Instagram posts on April 6 ("***our*** patterns"), April 12 ("***our*** creations"), May 16 ("***our*** creations" and "***our*** savoir faire"), May 30 ("***our*** creations"), June 12 ("***our*** prints" and "***our*** Pois de Senteur print"), June 16 ("***our*** floral design"), and July 17, 2025 ("***our*** 'Pois de senteur' print") (emphases added).

134. On Instagram, as well as in many other public or administrative forums, DP-France represents that those designs are "our" creations, prints, designs, patterns, etc., but in truth those designs predate the existence of DP-France, which was only formed in August 2023, sometimes antedating it by many decades.

135. DP-France's deliberate choice of words further creates the false impression that DP-France is the legitimate rightsholder to the iconic ***Porthault*** designs in the U.S. that appear on the pictured ***Porthault*** products in its Instagram posts or doctored re-posts; and misleads consumers to erroneously believe that DP-USA's sale of domestic goods—including the very ones

[25] Such instances occurred in DP-France's Instagram posts on at least April 20 ("***our*** towels"), April 26 ("***our*** linens"), May 16 ("***our*** linens"), and May 19, 2025 ("***our*** Petits Trèfles and Cœurs Bleus bedding") (emphases added).

featured in the DP-France's posts—bearing those same designs are, at best, illegitimate at best or, at worst, acts of piracy or counterfeiting.

136. DP-France's false claims of authorship or attribution strike at the heart of DP-USA's right to operate exclusively in the U.S. to distribute authentic ***Porthault*** brand goods that portray these well-known designs from the founder's family. DP-France's false claims compromise Plaintiffs' hard-earned reputation and status as the legitimate purveyor of official ***Porthault*** goods in the U.S. and critically damage DP-Design's luxury brand value in the domestic market.

**Defendants Astrance, DP-France, and/or DP-UK Defame DP-USA and Slander the Nature of DP-USA's Goods to U.S. Customers**

137. In furtherance of the second step in the Astrance Group's three-part smear, slander, and usurp offensive, Defendants set out to sabotage the Plaintiffs. It worked. In February 2024, while in a state of apparent shock, a New York customer sent an agitated email message to DP-USA's customer service representative, exclaiming in utter dismay:

> *When is there going to be a Special Sale of the* ***products*** *that are* ***actually made in France?*** *I have been flabbergasted ... after girlfriends of mine, on a trip to Paris, learned via the* ***new owners of the "actual worldwide" brand*** [Astrance, DP-France, and/or DP-UK]*, that you* [DP-USA] *are producing products in Eastern Europe,* ***sticking*** [on a] ***DP label without authorization*** *and, on top of that,* ***pricing of products with the same elevated price*** *as the French made products. This is shameful and a* ***total abuse of the confidence of your American customers****.*

(emphasis added).

138. On information and belief, agents or employees of DP-UK are conveying by word of mouth similar false and damaging statements to DP-USA's existing and potential customers as those communicated by the employees of DP-France and/or Astrance.

139. The malicious rumors that these customers had heard from the client-facing service representatives of Astrance, DP-France, and/or DP-UK were untrue. The Italian firm Olonia continues to produce supplies for DP-USA, as do other French vendors in DP-USA's restored supply chain. And DP-Design was and still is the sole owner of the ***Porthault*** brand and associated IP rights in the U.S., and DP-USA's ***Porthault*** products are the only authorized, licensed goods in the U.S.

140. Astrance's, DP-France's, and/or DP-UK's coordinated strategy—of holding DP-France out to be the "Official" or "One & Only D. Porthault," hence, the only legitimate purveyor of ***Porthault*** goods, and as the "new owners of the 'actual worldwide' brand"—was intentionally done to convey to consumers that DP-France is the brand owner and rightsholder in the U.S., while also affirmatively harming DP-Design's reputation and DP-USA's trade. Because, by implication, if Defendants were the true owners, then the inevitable flip-side of this falsity would be that DP-Design is not the sole and exclusive owner in the U.S. territory; DP-USA would not be the exclusive licensee in this territory; and DP-USA products would not be legitimate ***Porthault*** goods.

141. Similarly, on Instagram, as well as in many other public or administrative forums, DP-France deceptively held itself out as the originator or owner of the various well-known designs embodied on the depicted ***Porthault*** products, staking out those iconic designs as "our" creations, prints, designs, patterns, etc. or even "our savoir faire."[26] DP-France's misleading representations imply the illegitimacy of the business of DP-USA, the exclusive licensee of DP-Design, which

[26] Such an instance occurred in DP-France's Instagram post of May 16, 2025. References to DP-France's "savoir-faire" ring hollow when, on information and belief, it is producing only minimal quantities of goods from its Cambrai factory and it has ceased operations and rent payments at its only other French factory, the one located in Argentan.

business is to sell legitimate ***Porthault*** brand linens on which those designs and patterns appear. Potential U.S. customers who take DP-France's marketing claims at face value will likely doubt whether DP-USA is permitted to continue selling goods bearing those designs inaccurately claimed by DP-France as its creations. While DP-France profits from engineering these customers' misunderstanding, their misconception takes a toll on DP-Design's reputation as the exclusive rightsholder in the U.S. and on DP-USA's credibility as the exclusive purveyor of ***Porthault*** goods here.

142. The impact achieved by Defendants' deception is two-fold. Not only do potential U.S. customers start forming a positive association with DP-France, but they also begin to think pejoratively of DP-USA's products and their provenance. In a sad bit of irony, misinformed customers who have fallen prey to Astrance's and DP-France's calculated scheme now see, and even dismiss DP-USA's genuine ***Porthault*** products as counterfeits in the U.S., rather than the other way around.

143. As a result of Astrance's, DP-France's, and/or DP-UK's slanderous attacks on the legitimacy and credibility of DP-USA (and the provenance of its products and/or designs), Plaintiffs have lost the trust and "confidence" of many of its U.S. customers and both DP-Design's brand and DP-USA's branded products have been tarnished. In one fell swoop, Defendants have unfairly won over scores of U.S. customers in this niche market who may never shop with DP-USA again.

**Defendant DP-France's Misleading Attempts on Instagram to Pass Off DP-USA's Goods as DP-France's Own Cast a False Light on the Products and Resulted in Actual Consumer Confusion**

144. In furtherance of the third and last step of the Astrance Group's orchestrated strategy to starve, smear, and usurp their U.S. rivals, Defendant DP-France used its misleading Instagram account to contact U.S.-based designers and influencers (many of whom had large

followings comprising potential U.S. customers) and to brazenly take credit for the DP-USA-supplied ***Porthault*** goods that those designers and influencers were showcasing in their posts. In multiple instances, DP-France even altered portions of the original post to excise the designer's recognition of DP-USA and replaced it with a tag to DP-France's account instead. Some non-exhaustive examples, arranged in reverse-chronological order starting from the most recent offenses, are described below.

145. For instance, as recently as on July 17, 2025, DP-France mostly reproduced a December 13, 2024 post by a Greenville, South Carolina-based designer (@whitneymcgregor) that originally credited and tagged DP-USA's Instagram account as having supplied the ***Porthault*** brand bedsheets shown in the post, but DP-France ***edited the post to remove the tag to DP-USA's account and instead replaced it with DP-France's Instagram account***. (*see* **Figures 14a** *and* **14b**, *infra*)

146. The account for U.S.-based Whitney McGregor Designs faithfully credited DP-USA—by tagging DP-USA's Instagram account (@dporthaultparis)—for the ***Porthault*** brand goods that DP-USA supplied and that are displayed in its December 13, 2024 post.




**Figure 14a**: Screen-capture of designer's original Instagram post that credited DP-USA (@dporthaultparis) (annotation in yellow) on December 13, 2024

147. Against the original intent of this designer, however, DP-France's July 17, 2025 post altered the tag to reflect its own account (@dporthault.official) rather than DP-USA's. Potential customers in the U.S. who are seeing this post for the first time, including those who follow DP-France and any new followers of Whitney McGregor Designs since the original December 13, 2024 post, will form the mistaken belief that the designer intended to recognize or praise DP-France and/or that DP-France had supplied those bedsheets in the U.S. Yet neither is true. Relatedly, followers of Whitney McGregor Designs who had previously seen the December 13, 2024 post and are now seeing DP-France's subtly altered post of the same image, may become confused or misled as to the seemingly newly minted affiliation between the depicted ***Porthault*** bedsheets that DP-USA had supplied to the designer and DP-France's tagged Instagram account.




**Figure 14b**: Screen-capture of DP-France's July 17, 2025 Instagram post that removed designer's tag to DP-USA and replaced it with DP-France's tag (@dporthault.official) (annotation in yellow)

148. Further, in its July 17, 2025 post, DP-France thanked Whitney McGregor Designs for showing "our 'Pois de senteur' print." Despite DP-USA being the sole authorized distributor of ***Porthault*** linens within the U.S., DP-France published this post in a way that could mislead consumers into thinking that it sells and delivers ***Porthault*** bedsheets to the U.S., effectively promoting items sold by DP-USA as though they were DP-France's own offerings.

149. In a second, earlier instance, on July 15, 2025, DP-France mostly reproduced a May 29, 2024 post by a U.S. influencer and entertainer (@stealingjeffrey) that originally credited and tagged DP-USA's Instagram account as having supplied the ***Porthault*** brand cocktail napkins

shown in the post, but DP-France again edited the post to remove the tag to DP-USA's account and instead replaced it with DP-France's Instagram account. (*See* **Figure 15**, *infra*).




**Figure 15**: Screen-captures comparing designer's original Instagram post that credited DP-USA on May 29, 2024 against DP-France's doctored Instagram post that credited itself on July 15, 2025 (annotations in purple)

150. DP-USA follows this influencer on Instagram and the influencer routinely and faithfully credits DP-USA—by tagging DP-USA's Instagram account (@dporthaultparis)—for the ***Porthault*** brand goods that DP-USA supplied and that are displayed in its posts. Against the original intent of this influencer, however, DP-France's July 15, 2025 post altered the tag to reflect its own account (@dporthault.official) rather than DP-USA's. Potential customers in the U.S. who see this post, including those who follow the influencer and those who follow DP-France, will form the mistaken belief that the influencer intended to recognize or praise DP-France and/or that

DP-France had supplied those napkins in the U.S. Again, they would be deceived by DP-France on both counts.

151. In a third instance, on June 16, 2025, DP-France posted an image of a room interior with ***Porthault*** bedding. DP-France relayed a "[t]hank you" to another Greenville, South Carolina-based interior designer (@jennifernmckissick) for her composition of "our floral design," taking credit for the linens by stating "Bed linens by D. Porthault." DP-France made this post to mislead consumers to believe that DP-France may sell and ship such ***Porthault*** brand goods into the U.S., essentially advertising DP-USA's linens as DP-France's own. DP-France caused further confusion by interacting with Ms. McKissick in the comment section of the post, without clarifying its position as the European distributor of ***Porthault*** linens.



**Figure 16**: Screen-captures of DP-France's June 16, 2025 Instagram post

152. In a fourth instance, on June 12, 2025, DP-France posted a photo of a room that purportedly displayed "our Pois de Senteur print" and "our prints." DP-France's unauthorized reproduction of the photo failed to credit the photographer and the publisher of the book from

which the photo was taken. In contrast, the Carl family had negotiated an agreement with the photographer and the publisher for DP-USA to use it.

153. Further, in its June 12, 2025 post, DP-France thanked a Dallas, Texas-based interior designer (@cathykincaidinteriors) for "unveil[ing] a new side of our Maison." Despite DP-USA being the sole authorized distributor of ***Porthault*** linens within the U.S., DP-France published this post in a way that could mislead consumers into thinking that it now sells and delivers ***Porthault*** products to the U.S. through the "new side of our Maison," effectively promoting items sold by DP-USA as though they were DP-France's own offerings. Additionally, in the same post, DP-France tagged a Connecticut-based designer (@sisterparishdesign), which describes itself in its bio as "known for iconic 🇺🇸 designs," amplifying the confusion that the post already caused.




**Figure 17**: Screen-captures of DP-France's June 12, 2025 Instagram post

154. In a fifth instance, on May 30, 2025, DP-France posted an image of a bathroom with ***Porthault*** linens, tagging the post with a Manhattan, New York geotag. DP-France thanked the New York-based designer (@celerie) and New York-based interior decorating magazine

House Beautiful (@housebeautiful) for displaying "our creations" "in the heart of a New York apartment." Despite Defendants' knowledge that DP-France is restricted from selling ***Porthault*** goods in New York (or anywhere in the U.S.), DP-France still chose to take credit for DP-USA's product and marketplace, confusing consumers and diminishing the ***Porthault*** brand's goodwill. And, as with its other posts about U.S. designer installations, DP-France compounded its initial error by only tagging its own Paris store.



**Figure 18**: Screen-captures of DP-France's May 30, 2025 Instagram post

155. In a sixth instance, on May 28, 2025, DP-France posted a photo of a bathroom displaying a ***Porthault*** brand towel. DP-France thanked a Massachusetts-based designer (@laurenfornes) for her staging of the towel. DP-France went even further and interacted with Ms. Fornes in the comment section of the post, furthering Ms. Fornes' confusion regarding who she was speaking with.




**Figure 19**: Screen-captures of DP-France's May 28, 2025 Instagram post

156. In a seventh instance, on May 19, 2025, DP-France posted an image of a room staging ***Porthault*** bedding, tagging the post with a New York, New York geotag. DP-France gave a "heartfelt thank you" to a San Francisco, California-based design studio (@studiovolpe_sv) "for this wonderful staging of our Petits Trèfles and Cœurs Bleus bedding." DP-USA is the exclusive seller of the *Trèfles* Blue and *Coeurs* Blue linens in the United States. Yet, DP-France made this post to mislead consumers to believe that DP-France may sell and ship such ***Porthault*** brand goods into the United States, essentially advertising DP-USA's linens as DP-France's own.




**Figure 20**: Screen-captures of DP-France's May 19, 2025 Instagram post

157. In an eighth instance, on May 16, 2025, DP-France made a post in collaboration with a Dallas, Texas-based interior designer (@cathykincaidinteriors), thanking her for "bringing our creations to life" and displaying "our linen" and "trusting our savoir-faire . . ." This misleads consumers to believe that DP-France is an American distributor of ***Porthault*** goods, specifically in Texas.



**Figure 21**: Screen-captures of DP-France's May 16, 2025 Instagram post

158. In a ninth instance, on May 2, 2025, DP-France made a post in collaboration with American-based magazine Architectural Digest (@archdigest) displaying "D. Porthault bedding." This misleads consumers to believe that DP-France is an American distributor of ***Porthault*** goods.



**Figure 22**: Screen-captures of DP-France's May 2, 2025 Instagram post

159. In a tenth instance, on April 26, 2025, DP-France made a post in collaboration with Birmingham, Alabama-based Victoria Magazine (@victoriamagazine) displaying "our linens." This misleads consumers to believe that DP-France is the source of ***Porthault*** goods in the United States. Actual consumer confusion is exemplified by the designer (@marshamason2) for the Victoria Magazine photo commenting on the post "[t]hank you for the shout out, Porthault." DP-France then perpetuated the likelihood of other customers' confusion by affirmatively liking the American designer's comment, instead of clarifying that it was not legally allowed to sell ***Porthault*** goods in the United States.



**Figure 23**: Screen-captures of DP-France's April 26, 2025 Instagram post

160. In an eleventh instance, on April 25, 2025, DP-France posted an image of a room with ***Porthault*** linens in Manhattan, undeniably overlooking Central Park, tagging the post with a Central Park, New York geotag. DP-France thanked a San Francisco, California-based design studio (@studiovolpe_sv) and the American-based magazine Architectural Digest (@archdigest) "for sharing this inspiring interior," seemingly taking credit for the American ***Porthault*** linens.




**Figure 24**: Screen-captures of DP-France's April 25, 2025 Instagram post

161. In a twelfth instance, on April 20, 2025 DP-France posted an image displaying "our towels" in a New York bathroom, tagging the post with a Pound Ridge, New York geotag. DP-France thanked a Greenwich, Connecticut-based designer (@courageandco) for sharing the image, misleading consumers as to the source of the featured ***Porthault*** towels. The designer (@courageandco) further confirmed actual consumer confusion, as it commented on the post that "[a]ll we needed to do in designing this bathroom was to place a towel order with D. Portault [*sic*: Porthault] and give them a rack." Indeed, even the designer collaborating with DP-France assumed that it was interacting with DP-USA, and suggests that DP-France may have shipped and sold infringing goods into the United States to this designer. DP-France did nothing to dispel this confusion; instead, it liked the designer's comment without clarifying that it is not the lawful, authorized provider of ***Porthault*** goods in the United States.




**Figure 25**: Screen-captures of DP-France's April 20, 2025 Instagram post

162. In a thirteenth instance, on April 18, 2025, DP-France posted an image of a room with "vintage Porthault linens," thanking a Wiscasset, Maine-based designer Alexander Widener (@alexander_widener) for sharing, suggesting that DP-France was the source of the ***Porthault*** linens in the United States.




**Figure 26**: Screen-captures of DP-France's April 18, 2025 Instagram post

163. In a fourteenth instance, on April 12, 2025, DP-France shared an image from an Ocean Ridge, Florida-based photographer (@brantleyphoto) of a room in Chicago, Illinois, designed by a Palm Beach, Florida-based designer (@cindybgalvin) for an American luxury magazine, Modern Luxury (@modernluxury). A designer from the hometown of Plaintiff Bernard Carl had used American ***Porthault*** linens to stage a room, which was then photographed by another Floridian. Referring to the ***Porthault*** products in the photo, DP-France thanked the Florida-based photographer and expressed deep gratitude "to see our creations come to life in such inspiring interiors." By injecting itself into this mix of American photographers, designers, and magazines, DP-France improperly confuses and misleads consumers to believe that DP-France actually created and now sells the ***Porthault*** goods depicted in the images and to locations within the U.S.




**Figure 27**: Screen-captures of DP-France's April 12, 2025 Instagram post

164. In a fifteenth instance, on April 6, 2025, DP-France posted an image from Tennessee-based designers (@aafordinteriors) displaying "our patterns," tagging the post with a

Tennessee, USA geotag. This misleads consumers as to the source of the ***Porthault*** goods depicted in the image. The designers commented "[t]hanks for sharing our work," and rather than clarifying that DP-France is not the provider of ***Porthault*** goods in the United States, DP-France liked the comment and responded, "we love your interior design work," which only further adds to the substantial risk of consumer confusion.



**Figure 28**: Screen-captures of DP-France's April 6, 2025 Instagram post

165. These instances are not exhaustive nor isolated. The overall impression from the growing number of systematically misleading posts in DP-France's social media campaign is that high-end American designers use ***Porthault*** goods in luxury spaces within the U.S. and, erroneously, that these goods bear designs created by DP-France and are now being legitimately supplied by and available for purchase from DP-France in the U.S. exclusively, such as through Descamps' and DP-France's website, to which DP-France's Instagram (@dporthault.official) landing page directs its unsuspecting audience.

**<u>Defendant DP-France's Defamation of DP-USA's Genuine Product was Published to a Florida Resident</u>**

166. In the previously mentioned fourteenth instance of DP-France's offending Instagram posts, dated April 12, 2025, DP-France shared a photograph from an Ocean Ridge, Florida-based photographer (@brantleyphoto) depicting DP-USA's genuine ***Porthault*** linens. DP-France's post that falsely claimed that the depicted goods were sourced from DP-France ("We are deeply grateful to see our creations come to life in such inspiring interiors.") was not merely published nationwide, but it reached audiences based in Florida, including in this District. Namely, DP-France's post was addressed to the Ocean Ridge-based photographer ("Thank you @brantleyphoto for this poetic capture and your sensitive eye.").







**Figure 29**: Screen-captures of DP-France's April 12, 2025 Instagram post

167. DP-France's publication of the post and its transmission into Florida drew a reaction from the photographer's official account ("Liked by **brantleyphoto** and others"), confirming her receipt.

**Defendant DP-France's Collaboration on TikTok with an American Designer Also Resulted in Actual Consumer Confusion**

168. DP-France collaborated with well-regarded Maine-based TikToker, Alexander Widener (@alexander_widener), seemingly after having shipped to him in the United States a set of ***Porthault*** brand pillow shams. On May 10, 2025, Mr. Widener posted a 4-minute and 31-second video discussing the history of D. ***Porthault*** and showcasing a number of ***Porthault*** goods. At the end of the video, Mr. Widener stated that when he told "D. Porthault" that he was going to make this video, the company sent to him the set of shams. [27]

169. However, rather than direct Mr. Widener to DP-USA, on information and belief, DP-France opportunistically capitalized on the consumer's confusion and falsely held itself out as the official distributor of ***Porthault*** brand goods in the United States. In shipping these and other unlicensed deliveries to U.S.-based influencers, DP-France made unauthorized commercial use of the mark in DP-Design's exclusive territory. Even if DP-France gave out these goods for free, it was paying for product placement, at DP-Design's expense.

170. As a result of DP-France's deceptive acts and misleading omissions, Mr. Widener shared a video to his over 62,000 TikTok followers, garnering upwards of 220,000 views, 29,000 likes, 1,400 shares, and 500 comments, crediting the wrong brand and the wrong distributor in his region. Then, on Instagram, he posted a thank you to "@dporthault.official" for sending him the shams and tagged DP-France's account. This is likely to cause further customer confusion as he is directing his American follower base to DP-France's social media account instead of to DP-USA's.

---

[27] To the extent that DP-France or its agents sent a set of ***Porthault*** brand pillow shams marked by an identical or confusing similar mark to DP-Design's U.S. trademark, their delivery to the U.S. would constitute trademark infringement.




**Figure 30**: Screen-captures of Mr. Widener's Instagram story thanking and tagging @dporthault.official, DP-France's Instagram account

171. Subsequently, Mr. Widener messaged Plaintiff DP-USA's Instagram account to give a "big thank you to the French team [DP-France] for sending me the beautiful Voile Shams. I wanted to also share a video I made about the brand over on TikTok!" This demonstrates actual consumer confusion about whether Defendant DP-France is affiliated with or endorsed by Plaintiff DP-USA. It is not. Far from it, DP-France and the Astrance Group are out to destroy DP-USA.




**Figure 31**: Screen-capture of Mr. Widener's Instagram message to DP-USA

172. With DP-France having confused him as to the source or affiliation of the received ***Porthault*** brand goods, even a sophisticated purchaser like Mr. Widener was no longer able to distinguish between the two competing Instagram accounts and/or was misled into believing that DP-France was the French arm or an extension of DP-USA or its parent company.

**Defendant DP-France Publicly Displays and Sells Products that Reproduce Plaintiffs' Copyrighted Designs**

173. DP-France operates a physical storefront in Paris. At multiple points in time throughout 2024 and in early 2025, the store prominently displayed and featured ***Porthault*** brand goods bearing the *Mariage* design, whose U.S copyright and counterpart French common law copyright are owned by DP-Design.

174. At various times and without DP-Design's authorization, DP-France's Paris shop publicly displayed and offered for commercial distribution ***Porthault*** brand linens that reproduced DP-Design's copyright-protected *Fleurs d'Avril* design.



**Figure 31**: Photograph taken on September 29, 2024 inside DP-France's Paris shop showing public display and reproduction of DP-Design's *Fleurs d'Avril* design on ***Porthault*** brand product for sale

175. At various times and without DP-Design's authorization, DP-France's Paris shop publicly displayed ***Porthault*** brand tablecloths and bed linens that reproduced DP-Design's copyright-protected *Mariage* design.




**Figure 33**: Screen-capture of February 27, 2025 story on DP-France's Instagram account showing its Paris shop publicly displaying reproductions of DP-Design's copyrighted *Mariage* design

176. In addition to making infringing product sales that reproduced DP-Design's copyrighted designs to customers (some of whom are U.S.-based), DP-France's store has improperly distributed ***Porthault*** brand goods to customers in the U.S. for commercial purposes without Plaintiffs' authorization. In early 2024, for instance, DP-France's shop sent a shipment of ***Porthault*** brand bath towels and square hand towels to a U.S.-based purchaser in San Francisco. (Ex. 18 hereto). And in late 2024, DP-France shipped a box of ***Porthault*** brand goods bearing DP-Design's copyrighted *Fleurs d'Avril* design to a customer in New York City. (Ex. 19 hereto).

177. Even after the Plaintiff's March 5, 2025 cease and desist letter placed Defendants on notice of DP-France's unauthorized use of Plaintiffs' copyright-protected works, DP-France has not changed its marketing or sales practices. Undeterred, however, on June 25, 2025, DP-France announced on its Instagram account the commencement of a private sale.

178. On June 28 and again on June 29, 2025, DP-France posted images on its Instagram account displaying DP-USA's copyright-protected *Mariage* design and offering for sale, on discount, bedroom linens that bear the copyrighted design. In both posts, DP-France described the creative design as either "part of our exclusive private sale selection" (June 28) or simply "as part of our Private Sale Selection" (June 29).




**Figure 34**: Screen-captures of June 28 2025 post on DP-France's Instagram account publicly displaying reproductions of DP-Design's copyrighted *Mariage* design




**Figure 35**: Screen-captures of June 29, 2025 post on DP-France's Instagram account publicly displaying reproductions of DP-Design's copyrighted *Mariage* design stating they are "available in-store and online" (annotation in red)

179. The closing line of the June 29, 2025 post added that the *Mariage* design is "available in-store and online." DP-France's June 28 and 29, 2025 online advertisements were accessible to and accessed by individuals residing in Florida, including in this judicial District.

**Defendant DP-UK Publicly Displays and Sells Products that Reproduce Plaintiffs' Copyrighted Designs**

180. DP-UK operates a boutique shop inside Harrods department store in London. At multiple points in time throughout 2024 and in early 2025, the store prominently displayed and featured ***Porthault*** brand goods bearing the *Mariage* design, whose U.S copyright and counterpart U.K. common law copyright are owned by DP-Design.

181. On information and belief, DP-UK makes infringing product sales that reproduced DP-Design's copyrighted designs to customers (some of whom are U.S.-based).

182. On information and belief, in the same fashion that DP-France's store has improperly distributed ***Porthault*** brand goods reproducing Plaintiffs' copyright-protected designs to U.S. customers for commercial purposes without Plaintiffs' authorization (*see*, *e.g.*, Ex. 18 and Ex. 19), DP-UK also may have improperly sold and delivered infringing commercial goods to customers in the U.S.

183. Even after the Plaintiff's March 5, 2025 cease and desist letter placed Defendants on notice of DP-UK's unauthorized use of Plaintiffs' copyright-protected works, neither DP-UK nor DP-France has changed its marketing or sales practices.

184. On July 1 and July 4, 2025, DP-France posted images on its Instagram account displaying DP-USA's copyright-protected *Fleurs d'Avril* design and offering for sale bedroom linens reproducing imitations of the design. In both posts, DP-France described the print as "part of our Privileged Sale selection." Both of DP-France's posts were geotagged with the "Harrods" location, suggesting that DP-UK is offering these copyright-protected *Fleurs d'Avril* products for sale in its boutique at Harrods. This conclusion is reinforced by the closing line of the July 4, 2024 post adding that the *Fleurs d'Avril* collection is "now available in our boutique."




**Figure 36**: Screen-captures of July 1, 2025 post on DP-France's Instagram account publicly displaying reproductions of DP-Design's copyrighted *Fleurs d'Avril* design geotagged at DP-UK's "Harrods" location




**Figure 37**: Screen-captures of July 4, 2025 post on DP-France's Instagram account publicly displaying reproductions of DP-Design's copyrighted *Fleurs d'Avril* design, stating they were "now available in our boutique," and geotagging DP-UK's "Harrods" boutique location (annotations in red)

**<u>Defendants DP-France's and Descamps's Website Offers for Sale Products Bearing DP-Design's U.S. Trademark</u>**

185. In competition with DP-USA's website, DP-France offers products on its similar-looking website bearing the stylized inscription of DP-Design's D. PORTHAULT mark on the products' tags and insignia, exacerbating the confusion faced by consumers:



**Figure 38a**: Screen-capture of Terry Robe with pink finishing offered for sale on Defendants' website showing a white-colored stylized D. PORTHAULT mark against the teal blue neck tag[28]



**Figure 38b**: Screen-capture of Terry Robe with yellow finishing offered for sale on Defendants' website showing a white-colored stylized D. PORTHAULT mark against the teal blue neck tag[29]

[28]https://www.dporthault.fr/en/homewear/terry-robes/terry-robe-solid-white-with-pink-finishing-550g (second image of product on the English language version of DP-France's website) (last visited July 24, 2025).

[29] https://www.dporthault.fr/en/homewear/terry-robes/terry-robe-solid-white-with-yellow-finishing (second image of product on the English language version of DP-France's website (English version) (last visited July 24, 2025).

186. On information and belief, DP-France has sold and shipped competing products bearing such tags and insignia, which are confusingly similar to DP-Design's U.S. trademark, to consumers at delivery addresses in the United States, and within this District.

187. On or around February 8, 2024, DP-France sold twelve ***Porthault*** brand square hand towels and eight ***Porthault*** brand bath towels to a U.S. customer and proceeded to ship at least one box of such products to San Francisco, California. DP-France selected UPS as the courier. On information and belief, the towels were affixed with marks or insignia identical or confusingly similar to DP-Design's registered U.S.-trademark. As a result, mid-shipment, on February 20, 2024, mistaking DP-USA as the source of the labelled goods, UPS personnel reached out to DP-USA regarding customs information for the shipment. The customer subsequently confirmed that it had received the DP-France-shipped towels by February 27, 2024.

**Invoice**

| FROM | |
|---|---|
| **TaxID/EIN/VAT No.:** | **Waybill Number:** 1ZC3957V0429257403 |
| **Vendor Collect ID:** | **Shipment ID:** C3957VCHK3K |
| **Contact Name:** EXPEDITION | **Date:** 2024-02-08 |
| D.PORTHAULT | **Invoice No.:** |
| ZONE INDUSTRIELLE CANTIMPRE | **PO No.:** |
| VOIE DE LA BUSE | **Terms of Sale (Incoterm):** |
| FONTAINE NOTRE DAME 59400 | **Reason for Export:** |
| FR | |
| **Phone:** 0327829733 | **Other Government Agency License or Permit:** |

| SHIP TO | SOLD TO INFORMATION |
|---|---|
| **TaxID/VAT No.:** | **TaxID/VAT No.:** |
| **Contact Name:** [redacted] | **Contact Name:** |
| [redacted] | Same as Ship To |
| SAN FRANCISCO CA [redacted] | |
| US | |
| **Phone:** [redacted] | **Phone:** |

| UNITS | U/M | DESCRIPTION OF GOODS/PART NO. | HARM. CODE | C/T/O | UNIT VALUE | TOTAL VALUE | |
|---|---|---|---|---|---|---|---|
| 12 | PCS | CARRE EPONGE | | FR | 133.330000 | 1599.96 | EUR |
| 8 | PCS | DRAPS DE BAIN | | FR | 525.000000 | 4200.00 | EUR |

**Figure 39**: Excerpt from invoice from DP-France to a U.S. customer (Ex. 18)

188. Defendants used the entirety of DP-Design's trademark in commerce in the U.S. and without DP-Design's authorization. Moreover, the linens and textiles sold and delivered to the United States by DP-France were for the same class of goods protected by DP-Design's U.S. trademark and compete with the same fine linen products that DP-USA offers for sale domestically and to which DP-Design's U.S. trademark is affixed. Defendants Descamps and DP-France used the same sales methods as Plaintiffs' (online advertising via traditional website as well as additional marketing via Instagram) and employed the same sales channels direct to consumers (online purchase followed by postal delivery).

189. Further, Defendants did so with the intent to misappropriate the goodwill in the ***Porthault*** brand that had been built up the Plaintiffs. For example, by creating the competing Instagram account with a misleading handle (@dporthault.official) and identical profile name (*see* paragraphs 111 – 131, *supra*) and, on information and belief, having Astrance's, DP-France's, and/or DP-UK's employees engage in a word-of-mouth smear campaign against DP-USA to its U.S.-based customers (*see* paragraphs 137 – 140, *supra*). DP-France's competing Instagram account holds its owner out as the official seller of ***Porthault*** products and its posts direct the audience to DP-France's and Descamps' homepage, across the top of which "INTERNATIONAL SHIPPING" is conspicuously advertised without any caveats (screen-capture reproduced below).




**Figure 40**: Screen-capture from top portion of main page of Defendants' website

190. Despite the promise of international shipping and mischaracterization of DP-France being the "official" vendor for ***Porthault*** products, Defendants' online marketing fails to accurately state that the merchant is not an official licensee or rightsholder in the United States and may not legally ship infringing trademarked or copyrighted goods to the United States.

**<u>Defendants DP-France's and Descamps's Website</u>**
**<u>Reproduces and Publicly Displays Images of DP-Design's Copyrighted Designs and</u>**
**<u>Offers for Commercial Distribution Products that Reproduce Those Designs</u>**

191. In competition with DP-USA's website, DP-France offers products on its similar-looking website, on which products DP-Design's copyrighted designs are stitched or otherwise

reproduced, without Plaintiffs' authorization. In addition, to advertise and market those products to U.S. customers, DP-France website includes unauthorized reproductions and displays of DP-Design's copyrighted designs.

192. Despite the Astrance Group being repeatedly warned by Plaintiffs against publicly displaying or selling products that reproduce DP-Design's copyrighted *Fleurs d'Avril* design, for instance, in August and September 2023 during non-party D. Porthault Paris SAS's bankruptcy proceedings, and again in Plaintiff's March 5, 2025 cease and desist letter, DP-France continues to offer for sale and sells a large number of linens using that design and its website openly advertises them as such: "FLEURS D'AVRIL." [30] Two examples out of the eight or more unauthorized products include:




**Figure 41a**: Screen-capture of *Fleurs d'Avril* Boudoir Sham offered for sale on Defendants' website[31]

[30] As of the filing date of this complaint, the DP-France and Descamps website offers for sale at least the following linens with DP-Design's copyrighted *Fleurs d'Avril* design: Placemat; duvet cover (imperial yellow finishing); duvet cover (embroidered); pair of shams; boudoir sham; neckroll sham; napkin; and tissue box cover (hyperlinked pages last visited July 24, 2025).

[31] https://www.dporthault.fr/en/decorative-pillowcases/all-decorative-pillowcases/boudoir-sham-fleurs-davril-multicolor---embroidered (product page on the English language version of DP-France's website) (last visited July 24, 2025).




**Figure 41b**: Screen-capture of *Fleurs d'Avril* Neckroll Sham offered for sale on Defendants' website[32]

193. In at least one instance, between October 7, 2024 and November 1, 2024, DP-France shipped a box of goods bearing DP-Design's copyrighted *Fleurs d'Avril* design to a U.S. customer in New York, through the courier DHL Express. (Ex. 19) DP-France delivered this infringing shipment to the U.S. despite its co-defendants in the Astrance Group having been put on notice of DP-Design's copyright and Plaintiffs' exclusivity in the U.S. during non-party D. Porthault Paris SAS's bankruptcy proceedings in August and September 2023.

[32] https://www.dporthault.fr/en/decorative-pillowcases/all-decorative-pillowcases/neckroll-sham-fleurs-davril-multicolor---scallop (product page on the English language version of DP-France's website) (last visited July 24, 2025).



DHL ON DEMAND DELIVERY

IMPORT DUTY PAYMENT CONFIRMATION

Hello [redacted]

Thank you for paying the import duty due on your DHL Express shipment with waybill number 3188628704 from D.PORTHAULT.

To manage delivery or track your shipment, please click here.

PAYMENT DETAILS

| | |
|---|---|
| Amount Paid | USD 161.48 |
| Transaction ID | 143398331-5143921 |
| Payment Date | 11/1/2024 |

SHIPMENT INFORMATION

| | |
|---|---|
| Waybill No. | 3188628704 |
| Address | [redacted] NEW YORK NY NY NEW YORK NEW YORK [redacted] NEW YORK |

DHL Express - Excellence. Simply delivered.

DHL Express | Contact DHL | Privacy Notice

2024 © DHL International GmbH. All rights reserved.

**Figure 42**: Excerpt from waybill of shipment from DP-France to a U.S. customer (Ex. 19)

194. Additionally, Defendants' website prominently displays DP-Design's copyrighted *Mariage* design on its homepage, without Plaintiffs' authorization:




**Figure 43**: Screen-capture from bottom portion of main page of Defendants' website

195. Defendant DP-France also reproduced the *Mariage* design in images it used in posts and stories on February 22 and 27, 2025.

196. On February 22, 2025, DP-France advertised the *Mariage* design in an Instagram post showcasing a duvet and pillow shams, stating it is available for purchase at its boutique in Paris, France.




**Figure 44**: Screen-captures of February 22, 2025 post on Defendant DP-France's Instagram account displaying Plaintiff DP-Design's copyrighted *Mariage* design

197. Shortly thereafter, on February 27, 2025 DP-France posted a photograph showing a set of bet sheets, pillowcases, and a tablecloth, each bearing the same design, in an Instagram story.




**Figure 45**: Screen-capture of February 27, 2025 story on Defendant DP-France's Instagram account showing copies of Plaintiff DP-Design's copyrighted *Mariage* design

**Defendant DP-France Freeloads and Unfairly Competes with Plaintiff DP-USA by Sending Communications to Potential Customers that Embed Hyperlinks to DP-USA's Website Without Its Authorization**

198. The terms of use of DP-USA's website also prohibit third parties from linking to the website without permission, stating: "You may only provide a link to the DPorthaultparis.com website if expressly authorized in writing by D. PORTHAULT."[33]

199. In violation of these terms, however, in multiple instances, DP-France has sent marketing emails to potential customers with embedded hyperlinks to DP-USA's website. The

[33] DP-USA's website, "Terms" sub-page, https://www.dporthaultparis.com/pages/terms (last visited July 24, 2025).

stylized ***Porthault*** logo and the featured product would each contain a clickable link that would lead the user to DP-USA's website.

200. DP-France would send such emails during periods where DP-USA was not holding a special sale but when DP-France was holding such a sale. Potential customers who were interested in browsing and obtaining the items for a discount would be led to DP-USA's website to see the DP-USA's description of the product, but realize that the item was not "on sale" yet. On information and belief, these misled customers would become disillusioned with DP-USA and then try to acquire from DP-France the same item which DP-France's email promised was on sale.

201. As recently as January 9, 2025, DP-France advertised a special sale of up to 30% discount and embedded links to DP-USA's website in both the clickable ***Porthault*** logo and the clickable product image.




**Figure 46**: Screen-capture from DP-France's January 9, 2025 email containing two hyperlinks to DP-USA's website (annotations in red)

**<u>DP-France is the Alter Ego of One or Both Astrance Entities or of Joel Benillouche</u>**

202. Defendant Astrance Capital S.A. won the bid for non-party D. Porthault Paris SAS's assets in the 2023 bankruptcy proceedings, during which Joel Benillouche represented that he was the organization's Chairman. He is also listed as the Chairman of co-defendant Astrance Capital S.A.S. (*see* Ex. 4), which in turn is listed as the Chairman of DP-France. (*See* Ex. 4). The two companies even share the same registered headquarters and principal place of business, at 71 Av. Franklin D. Roosevelt, Paris (75008), France. (*See* Ex. 4 *and* Ex. 8). On information and belief, Astrance and Joel Benillouche has domination and control over DP-France, its operations, and its employees, including which employees to fire. (*See, e.g.*, paragraph 54, *supra*).

203. On information and belief, DP-France is not operated as a truly independent entity, but as a mere instrumentality of the Astrance entities or their Chairman, Joel Benillouche, who are using DP-France to further Joel Benillouche's own interests and an improper purpose. Here, under Astrance's and/or Joel Benillouche's direction, rather than peacefully co-existing with DP-USA or competing with it fairly and within the bounds of the law, DP-France began its hostile encroachment upon DP-USA's territory. On information and belief, DP-France was the instrumentality used to commit wrongful acts that intentionally sabotaged Plaintiffs' business, smeared and shamed Plaintiffs (*see* paragraphs 137 – 139, *supra*); to wrongfully attempt to starve and sever them from their suppliers (*see* paragraphs 68 – 83, *supra*); and to usurp their brand and business (*see* paragraphs 84 – 87, 123 – 136, and 140 – 165, *supra*), so that ultimately Joel Benillouche and his associates, through Astrance, may take over Plaintiffs' IP (*see* paragraph 49 and footnote 4, *supra*) in furtherance of reportedly what the two highest-level executives of Astrance publicly announced was their intention. (*See* paragraph 59, *supra*).

204. On information and belief, DP-France's parent corporation(s) owns all or majority of the capital stock of their subsidiary, DP-France. On information and belief, DP-France and

Astrance have common directors or officers (*see also* paragraph 202, *supra*) and common business departments and facilities. (*See* Ex. 4 *and* Ex. 8). On information and belief, the daily operations of Astrance Capital S.A.S. and DP-France are not kept separate (*see, e.g.*, Ex. 4 *and* Ex. 8) and Joel Benillocuhe decides which employees at DP-France to retain and who to dismiss. (*See* paragraph 54, *supra*). On information and belief, Astrance finances DP-France and subscribes to all the capital stock of the subsidiary or otherwise caused its incorporation.

205. On information and belief, DP-France is an undercapitalized shell and is running on a shoestring budget. (*See* paragraphs 54, 55, *supra*). On information and belief, Astrance pays the salaries and expenses and/or subsidizes the losses of DP-France, because it believed to be running at a loss and unable to pay rent at its Argentan factory or severance to multiple formerly dismissed employees. (*See* paragraphs 54, 55, *supra*). On information and belief, DP-France does not have business adequate to sustain its operations, because it has halted its printing operations at Argentan, has inadequate sales to sustain its operations at Cambrai, and has already had to reduce its staffing costs in its only recently opened Paris store. (*See* paragraphs 54, 55, *supra*). On information and belief, DP-France is now operating without active employees in its design studio, which was previously non-party D. Porthault Paris SAS's bread-and-butter. (*See* paragraphs 54, 55, *supra*).

206. On information and belief, the directors or executives of DP-France do not act independently in its interest and instead take direction from Astrance executives and Joel Benillouche. (*See* paragraph 59, *supra*). On information and belief, Astrance executives[34] and

[34] In addition to being executives of Defendant Astrance Capital S.A., Joel Benillouche and Florian Gayet also hold the positions at Astrance's French affiliate and co-defendant, Astrance Capital S.A.S., as its Chairman and Managing Director, respectively.

Joel Benillouche use DP-France's property as their own. (*See, e.g.*, paragraph 59, *supra* (stopping by to partake in the shop's champagne during workhours)).

**Defendants' Distributors Sell and Ship to the U.S. Linens that Bear DP-Design's U.S. Trademark and Reproduce DP-USA's Designs, Without Plaintiffs' Authorization**

207. Defendants, through their distributors, have sold and shipped competing products bearing tags and insignia confusingly similar to DP-Design's U.S. trademarks and incorporating DP-Design's copyrighted designs to consumers at physical delivery addresses in the United States, and within this District.

208. The Arlettie entities (hereinafter, "Arlettie") operate an online storefront[35] accessible in this District and, on information and belief, act as one of DP-France's distributors that has offered for sale, sold, and shipped unauthorized goods to the U.S., including to this District, which goods directly and unfairly compete with DP-USA's sales of goods covered by DP-Design's trademarks and DP-Design's copyrighted designs.

209. Arlettie previously conducted online sales of ***Porthault*** brand products, such as the *Trèfles* Terry, on or around May 24, 2024. Then, as recently as April 2025, a query on Google revealed that Arlettie was again promoting its online sales of "D. Porthault" products and made the items available for purchase on at least the 10th and 11th of April, 2025.




**Figure 47**: Screen-capture of a search hit from Google search for "Arlettie" and "Porthault"

210. Arlettie's website prominently featured a stylized version of the D. PORTHAULT mark (*see*, *e.g.*, Ex. 20 *and* Ex. 21 hereto), discussed the goods in connection with "D. Porthault"

[35] https://www.arlettie.com/us/en (last visited July 24, 2025).

(Ex. 20), and did not restrict or warn customers located in the U.S. against accessing its online sales site or from purchasing from the site on April 10th or 11th.[36]

**The house is getting a makeover!**

Owners of a lingerie boutique in the heart of Paris, Daniel and Madeleine Porthault ventured into the world of household linens. Departing from traditional white linen, the couple embraced a new style: printed sheets adorned with haute couture details! The success was immediate, and the Maison quickly became synonymous with audacity and refinement. For over a century, D. Porthault has been enhancing the interiors of bedrooms, dining rooms, bathrooms, and wardrobes.

**Figure 48**: Excerpt from Ex. 20 (annotated with red underlining)

211. In its April 2025 sale event alone, Arlettie designated over 400 discrete items[37] covered by DP-Design's U.S. trademarks in international classes 24 and 25, including pillow cases, towels, tablecloths, napkins, place mats, sheets, and robes, as being associated with the ***Porthault*** brand (under the site's "PORTHAULT" collection) and offered them for sale to international customers, including to consumers in the U.S. (Ex. 22 hereto).

212. Purchasers from the United States were not barred from or otherwise restricted from browsing, selecting for purchase, and then completing payment for items in Arlettie's "PORTHAULT" collection, in orders to be fulfilled by DP-France. U.S. consumers were free to navigate both the French and English versions of the shopping cart and the checkout screens on

---

[36] DP-France, through its distributor, was selling terrycloth towels into the U.S. while DP-France was mounting its attack in France against Bignon-Dervaux, a supplier of terrycloth to DP-USA. *See* ¶¶ 69 – 75, 81, *supra*.

[37] This number does not account for multiple selectable sizes or other variations, which further increase the actual number of unauthorized goods that were offered for sale and actually sold and delivered to the U.S. For example, a pillowcase of cotton voile material with a violet, red and yellow floral pattern was listed as an individual item (Reference PO0425-3667056068339) but could be purchased in three sizes, small 30x40 cm, rectangular 50x90cm, or reading 53.5x⌀13 cm[*sic*] dimensions. (Ex. 23 hereto).

DP-France's distributor's online sales site and complete their purchases there. (Ex. 24 (French), Ex. 25 (English), Ex. 26 hereto, and Ex. 27 hereto).




**Figure 49**: Excerpt from Arlettie's Confirmation of Porthault Order No. #577570 (Ex. 27)

213. Arlettie prefaced each of these shipments (via the courier DHL Express) with an email notification to its customer, announcing: "Your order Porthault has been shipped!" and including the Waybill number as the package's tracking number.

214. At least one such Porthault order (#577553) was shipped from France on April 24, 2025 and delivered to its destination address in Washington, D.C. on April 28, 2025. It contained a pillowcase with a violet, red and yellow floral pattern, made of cotton percale, was sized 50x70 cm, and described by Arlettie as being part of the "PORTHAULT" collection.

215. A second such Porthault order (#577560) was shipped from France on April 24, 2025 and delivered to its destination address in New York on April 25, 2025. It contained a pillowcase with a grassy, fern-like pattern made of cotton voile, was sized 30x40 cm, and described by Arlettie as being part of the "PORTHAULT" collection.

216. A third such Porthault order (#577570) was shipped from France on May 6, 2025 and delivered to its destination address in Miami, Florida on May 8, 2025. This order included (i) a pillowcase with a violet, red and yellow floral pattern, (ii) a bath towel with a green and blue

floral design, and (iii) a bedsheet with the blue floral pattern. Arlettie described each of these items as being part of the "PORTHAULT" collection. On May 5, 2025, the U.S. purchaser also received a gratuitous message from Arlettie by email thanking him for his purchase: "Thank you for your interest in Arlettie and for your recent order **D. Porthault** n°577570." (emphasis added)



**Order number**

| | | |
|---|---|---|
| | PORTHAULT<br>Louise pillow case in cotton voile - Violet, Red & Yellow<br>SIZE: 30x40 | $56.00 |
| | PORTHAULT<br>Lilac Bath Universe - Blue<br>SIZE: Wavy face square | $35.00 |
| | PORTHAULT<br>Mer de Chine fitted sheet in cotton voile - Blue<br>SIZE: Queen 240x320 | $130.00 |

| | |
|---|---|
| SUBTOTAL | $221.00 |
| SHIPPING (EXPRESS COURIER (AIR)) | $20.00 |
| **TOTAL**<br>SALES TAX OF $15.47 USD INCLUDED<br>SHIPPING TAX OF $1.40 USD INCLUDED | **$257.87** |

**Figure 50**: Screen-capture of Porthault Order No. #577570 through Arlettie

217. Similar orders (#577604 and #577580) were shipped from France and delivered to their destination address in Austin, Texas in late April. These contained bath towels and guest towels and were similarly described by Arlettie as being part of the "PORTHAULT" collection. Still another order containing unauthorized ***Porthault*** brand goods from Arlettie was delivered to New Jersey.

218. To each of these items that DP-France's distributor had shipped to the United States and to this District, DP-France had affixed one or more tags bearing the ***Porthault*** mark, whether written as "D. ***Porthault***," alone or in combination with the additional word, "PARIS."




**Figure 51a**: Photo of "D. ***Porthault***" tag sewn onto bedsheet delivered to Miami




**Figure 51b**: Photo of "D. ***Porthault***" tag sewn on pillowcase delivered to Miami




**Figure 51c**: Photo of "D. ***Porthault*** PARIS" tag affixed to pillowcase delivered to Miami




**Figure 51d**: Photo of "D. ***Porthault*** PARIS" tag affixed to sheet delivered to New Jersey

219. DP-France's unauthorized use of identical or near identical marking on the same type of goods that DP-USA sells will confuse U.S. customers as to the true origin of the goods. Their confusion will be compounded when faced with the striking—nearly indistinguishable—similitude between the well-known designs copyrighted by DP-Design and used by DP-USA legitimately on products here at home and the patterns appearing on the gray-market goods produced by DP-France and shipped by its distributor to purchasers in the U.S.

220. Even after Arlettie's advertised sales event was over, multiple items (such as bedsheets in various sizes and either fitted or flat) designated by Arlettie to be within the "PORTHAULT" collection appeared to remain available for purchase on its website, although each item experienced a modest price drop since its initial placement into the U.S. consumer's online shopping cart. (Ex. 28 (April 29, 2025) and Ex. 29 hereto (April 11, 2025)).

221. Arlettie consistently undercut the prices on DP-USA's website for the same products and usurped customer demand.

**COUNT I: Tortious Interference with Business Relations**

222. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

223. For decades, DP-USA maintained business partnerships in Europe, critical to DP-USA's supply chain. One longstanding business relationship was (and still is) with Olonia, DP-USA's primary source of printed fabrics. Another important relationship was with Bignon-Dervaux, DP-USA's primary vendor for cutting and sewing terrycloth.

224. DP-France targeted DP-USA's vendors who supplied key components in its various supply chains. DP-France knew of these business relationships and intentionally interfered with these business relationships with the goal of blocking DP-USA from purchasing goods, services, or inventory from its supply chain vendors.

225. For example, DP-France constantly issued legal threats to DP-USA's European supply chain vendors, many of which are small companies, to cease their business dealings with DP-USA. DP-France threatened to file meritless copyright infringement suits against DP-USA and its French and Italian suppliers (and did file at least one such lawsuit in France). DP-France anticompetitively asserts several French common law copyrights, which, on information and belief, are already expired. If DP-France were to succeed on its meritless claims, the threatened disruption to DP-USA's supply chain would impact two-thirds of DP-USA's product sales.

226. Bignon-Dervaux relied on DP-USA for more than half its business, but had to end its relationship with DP-USA and declared bankruptcy after succumbing to DP-France's litigation tactics and seizures of inventory. As a result of DP-France's disruption to DP-USA's supply chain, DP-USA was unable to secure critical materials for several months. Beyond lost sales from the episodic delays of supplies at different phases of the supply chains at various times beginning in August of 2023 through most of 2024, leading on and off to DP-USA's lack of inventory, DP-

USA incurred actual damages associated with finding and securing an alternative supplier; higher material costs, higher shipping costs, restoring its supply chain; costs from shipping delays, reassuring vendors that DP-France's infringement claims in Europe were meritless; and opposing DP-France's meritless lawsuits in Lyon and Paris, with expenditures in excess of $200,000.

227. Other longtime suppliers, wary of suffering the same undeserved fate as Bignon-Dervaux at DP-France's hands, have expressed reluctance to continue supplying DP-USA or apologetically reduced the volume. One has discontinued its dealings with DP-USA altogether. All of these changes resulted in actual damages to DP-USA and substantial expenses incurred to restore its supply chain and resume normalcy. But for DP-France's intentional interference with DP-USA's supply chain, DP-USA would still be doing business with these suppliers.

228. Astrance and DP-France, with the assistance of Descamps, also tortiously interfered with DP-USA's relationship with its printed fabric supplier in Italy, Olonia. DP-France asserted that Olonia's prints for DP-USA infringed French copyrights that had expired, such as the *Les Trèfles* and *Les Cœurs* designs. And in addition to lawsuits for injunctive relief and monetary damages, Astrance threatened Olonia with a boycott. Namely, because the Astrance-controlled Vincenzo Zucchi group and its subsidiaries (including Descamps) were also customers of Olonia, if Olonia continued to fill orders for DP-USA, then the Vincenzo Zucchi entities would sever their ties with Olonia.

229. Although Olonia managed to navigate Defendants' threats, the delays that they caused to Olonia's production reduced DP-USA's available inventory in the months preceding DP-USA's historically high-volume January and June sales periods. As a result of DP-France's, Descamps's, and Astrance's disruption to DP-USA's supply chain, DP-USA was unable to secure printed fabrics for its bed and table linens, accessories, and other products for many months.

Depleted inventory for much of the first half of 2024 severely impacted DP-USA's sales during both semi-annual sales periods. In addition, DP-USA incurred actual damages associated with countering and exposing DP-France's groundless threats, persuading Olonia to resume production, costs from shipping delays, and restoring DP-USA's supply chain, with expenditures in excess of $200,000.

230. Defendants' cutting off DP-USA from the key components in both the printed fabric and the terrycloth supply chains resulted in inventory shortfalls and severe disruptions to DP-USA's business in the last half of 2023 and throughout 2024. Defendants' blockage resulted in DP-USA's suffering its first full-year loss (negative earnings) over the past decade. The havoc wreaked by DP-France and Astrance on DP-USA's two primary supply chains caused about $1 million in lost sales in the second half of 2023 and about $2 million in lost sales in 2024. In addition to lost earnings of about USD three million through the end of 2024, Plaintiffs have suffered losses to their corporate market value in excess of USD ten or twelve million from Defendants' misconduct.

231. In both France and Italy, DP-France's, Astrance's, and Descamps's interference with DP-USA's historic supply chain was intentional and unjustified; and it ultimately harmed the domestic U.S. customer base. There is no legitimate purpose for DP-France's litigation and threats of litigation, as DP-France loses no business from the work of this particular supply chain whose production is sold only in the U.S., where DP-Design holds exclusive rights to all ***Porthault***-related trademarks and copyrights, and where DP-France knows it cannot legally sell any goods with those trademarks or copyrighted designs.

232. Additionally, the ***Porthault*** trademark is not applied at any stage in the supply chain until DP-USA's semi-finished or unfinished goods have left France enroute to the U.S., so DP-France cannot claim infringement of any trademark.

233. Although Defendants ultimately failed to starve DP-USA according to Joel Benillouche's and his fellow Astrance executive's plan, Plaintiffs nonetheless suffered heavy losses. These losses include historic losses suffered by reason of not having inventory or merely reduced inventory to sell; as well as long-term losses arising from damage to the credibility and legitimacy of DP-USA and its products, which will continue to impact the long-term value of DP-USA's goodwill. As a result of Defendants' actions to disrupt and threaten DP-USA's business, operations, supply chain, and commercial opportunities, DP-USA suffered irreparable harm and damages, including loss of corporate market value. DP-USA also suffered the loss of past and future business due to Defendants' interference.

**COUNT II: Injurious Falsehood (Trade Libel / Commercial Disparagement)**

234. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

235. Defendant DP-France knowingly asserted falsehoods relating to alleged infringement by DP-USA and its European suppliers—and by their products—of certain French common law copyrights that have expired or otherwise fallen into the public domain. DP-France has been unable or unwilling to demonstrate that the designs it accuses DP-USA and its suppliers of infringing are still protected in the present day by a valid French common law copyright.

236. DP-France communicated these false accusations to multiple suppliers of DP-USA and even managed to shutter one shop forever.

237. DP-France knew or reasonably should have known that these falsehoods would likely induce those suppliers not to deal with DP-USA. Especially after DP-France's legal

proceedings against Bignon-Dervaux quickly forced that supplier into insolvency, DP-France should have reasonably known that its threats, however meritless, would likely induce other suppliers to stop dealing with DP-USA.

238. As a direct result of the false statements that DP-France published, at least one supplier, who remains solvent, has discontinued its dealing with DP-USA. DP-France's groundless accusations of French copyright infringement played a material and substantial part in inducing that supplier not to deal with DP-USA. Two other suppliers refused to continue dealing with DP-USA without guarantees.

239. Plaintiffs incurred actual damages as a direct and proximate result of DP-France's injurious falsehoods. The loss of one supplier and the added cost to Plaintiffs of providing reassurances to other suppliers and disputing DP-France's meritless infringement claims in Europe, with expenditures in excess of $200,000, were directly and proximately caused by DP-France's defamatory threats. As a result of DP-France's groundless attack on DP-USA's supply chain, DP-USA was unable to secure critical materials for several months. DP-USA incurred costs to reroute and reestablish its supply chain, higher material costs, higher shipping costs, and costs from shipping delays. Further, DP-USA's loss of sales on the affected terrycloth product lines are estimated to have been as much as $2 million, including as much as $400,000 in lost sales to Florida. In addition to lost earnings over both product lines of about USD three million through the end of 2024, Plaintiffs have suffered losses to their corporate market value in excess of USD ten or twelve million from Defendants' misconduct.

240. On information and belief, the Astrance Group acted with actual malice, by intentionally plotting to starve the Plaintiffs until the American companies folded and their IP was up for sale, and then acting in furtherance of the plot. The Astrance Group's goal was to block

DP-USA from purchasing goods, services, or inventory from its supply chain vendors and to undermine Plaintiffs' IP rights in jurisdictions where Plaintiffs enjoyed exclusivity, such as in the U.S. and Hong Kong. DP-France slandered and libeled DP-USA and its suppliers with this evil motive in mind, either with ill will or at least reckless disregard or gross indifference as to the rights of others.

241. For instance, in its public statement to the Hong Kong Intellectual Property Department, DP-France falsely and with reckless and gross disregard of the rights of others, held itself out as the sole owner of the ***Porthault*** brand around the world and, turning the truth on its head, accused DP-Design of "falsely claim[ing] itself to be the true owner of the brand." (Ex. 9, ¶¶ 2, 10). DP-France further denigrated DP-USA's official website as being illegitimate. (*Id.* ¶ 9).

242. DP-France's false public statements are accessible to and have been accessed by individuals residing in Florida, including in this District. Customers or potential customers in the U.S., including in Florida, who have seen DP-France's spurious claims are likely to be confused as to whether DP-France holds the exclusive rights in the U.S. and decide not to purchase from Plaintiffs in the future.

243. As a direct result of the false, willful, and wanton statements that DP-France published, Plaintiffs have also incurred costs defending DP-France's meritless challenge to Plaintiff DP-Design's trademark in Hong Kong in cancellation proceedings there.

244. In another documented instance, an email message to DP-USA's customer service from an unnerved and shocked New York customer in early February 2024 revealed that client-facing agents of Astrance, DP-France, and/or DP-UK had been disseminating highly damaging

and shocking lies to DP-USA's U.S.-based customers, and that word was getting around in their social circle:

> *When is there going to be a Special Sale of the products that are actually made in France? I have been flabbergasted ... after girlfriends of mine, on a trip to Paris, learned via the* ***new owners of the "actual worldwide" brand*** [Astrance, DP-France, and/or DP-UK], *that* ***you*** [DP-USA] ***are producing products in Eastern Europe****,* ***sticking*** [on a] ***DP label without authorization*** *and, on top of that, pricing of products with the same elevated price as the French made products. This is shameful and a total abuse of the confidence of your American customers.*

(emphasis added).

245. On information and belief, Astrance, DP-France, and/or DP-UK had been recklessly or willfully feeding potential U.S. customers with a string of bald lies: that DP-USA did not legitimately own the brand; that the Defendants were the "new owners" of the "actual worldwide brand"; and that DP-USA moved production of its goods to Eastern Europe.

246. The false message that Defendants conveyed to DP-USA's potential customers was that DP-USA was allegedly making and selling goods of inferior quality (purportedly from Eastern Europe); that its goods and labels were unauthorized counterfeits; and that DP-USA was overcharging for pirated goods.

247. Defendants Astrance, DP-France, and/or DP-UK knowingly asserted falsehoods relating to DP-Design's legitimately held rights, and to the quality and origin of manufacture of its exclusive licensee's DP-USA's products.

248. Astrance, DP-France, and/or DP-UK communicated these false accusations to multiple U.S.-based customers or potential customers of DP-USA to further its ill motive of sabotaging and toppling DP-USA to obtain its IP. On information and belief, one or more of these customers were Florida-based.

249. Astrance, DP-France, and/or DP-UK knew or reasonably should have known that these falsehoods would likely induce those customers not to deal with or buy from DP-USA.

250. As a direct result of the false statements that Astrance, DP-France, and/or DP-UK disseminated, at least one incensed customer and her friends appear to have discontinued their business with DP-USA. Astrance's, DP-France's, and/or DP-UK's groundless accusations of DP-USA's lack of authorization to use the mark, relocating its production to Eastern Europe, and price-gauging, are outrageous and played a material and substantial role in inducing that customer and her friends not to deal with or buy from DP-USA in the future.

251. Plaintiffs incurred actual damages as a direct and proximate result of Astrance's, DP-France's, and/or DP-UK's injurious falsehoods. DP-USA incurred costs and expenditures in correcting the record and countering Astrance's, DP-France's, and/or DP-UK's targeted disinformation campaign. Moreover, DP-USA has suffered historic losses suffered by reason of not having inventory or merely reduced inventory to sell; as well as long-term losses arising from damage to the credibility and legitimacy of DP-USA and its products, which will continue to impact the long-term value of DP-USA's goodwill, as evidenced by its misinformed customer unfairly criticizing DP-USA for the supposed "shameful and a total abuse of the confidence of your American customers."

252. As these examples demonstrate, and on information and belief, the Astrance Group acted with actual malice, by intentionally plotting to starve and smear the Plaintiffs until the American companies folded and their IP was up for sale, and then acting in furtherance of that plot. The Astrance Group's goal was to misdirect and divert potential customers from purchasing goods from DP-USA and to undermine the goodwill that Plaintiffs' had accrued in the jurisdictions where Plaintiffs enjoyed exclusivity, such as in the U.S. Astrance, DP-France, and/or DP-UK

slandered DP-USA to its U.S. customers with this evil motive in mind, either with ill will or at least reckless disregard or gross indifference as to the rights of others.

253. In addition to their actual damages, including lost profits, in amounts to be proven at trial, Plaintiffs are entitled to punitive damages and attorneys' fees for Astrance's, DP-France's, and/or DP-UK's libelous and slanderous statements.

**COUNT III: Commercial (Business) Defamation by Astrance, DP-France, DP-UK, and Joel Benillouche**

254. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

255. Multiple defendants have defamed DP-Design, DP-USA, and DP-USA's licensed products in multiple instances.

256. Around or just before February 2024, client-facing employees of Astrance, DP-France, and/or DP-UK had been feeding harmful lies to potential U.S. customers of DP-USA, namely, that DP-USA did not legitimately own the brand; that the Defendants were the "new owners" of the "actual worldwide brand"; and that DP-USA had moved the production of its goods from vendors in Southern and Western Europe to Eastern Europe. The false take-away that Defendants impressed on DP-USA's potential customers was that DP-USA was allegedly making and selling goods of inferior quality or undesirable origin; that its goods and labels were unauthorized counterfeits; and that DP-USA was overcharging for pirated goods.

257. According to the New York customer to whom Astrance's and DP-France's message had been repeated:

> *When is there going to be a Special* ***Sale of the products that are actually made in France?*** *I have been flabbergasted … after girlfriends of mine, on a trip to Paris, learned via the* ***new owners of the "actual worldwide" brand*** [Astrance, DP-France, and/or DP-UK]*, that* ***you*** [DP-USA] ***are producing products in Eastern Europe****,* ***sticking*** [on a] ***DP label without authorization*** *and, on top of that,* ***pricing of products***

> ***with the same elevated price as the French made products.*** *This is shameful and a total abuse of the confidence of your American customers.*

(emphasis added).

258. To the contrary, DP-USA's goods have been and continue to be made throughout Europe by the finest of European artisans, mostly in France and Italy. DP-USA is authorized by the official brand owner DP-Design to affix the ***Porthault*** label on those goods in the U.S. DP-USA is not overcharging for its goods or compromising their craftsmanship, which has been consistently equal to or better than that of its former French affiliate.[38] Defendants Astrance's and/or DP-France's assertions to the contrary are false and misleading.

259. On information and belief, agents or employees of DP-UK are conveying by word of mouth similar false and damaging statements to DP-USA's existing and potential customers as those communicated by the employees of DP-France and/or Astrance.

260. Because Defendants' disseminated falsehoods relate to DP-Design's legitimately held rights and its licensee's authorization to do trade in and sell these goods, and to the quality and origin of manufacture of DP-USA's products, the Defendants' statements are defamatory *per se*. Further, loss or damages to the Plaintiffs are conclusively presumed when Defendants' misconduct is *per se* defamatory, as is each of the three cases above.

261. Moreover, Astrance, DP-France, and/or DP-UK made these false statements intentionally and knowingly. Defendants knew that most of DP-USA's goods were made in France

[38] This, despite the Astrance Group's underhanded efforts to sabotage the quality of DP-USA's products and render it more difficult for DP-USA to support European craftmanship. *See* ¶¶ 69 – 83, *supra*. Because there are still European workshops and suppliers who are willing to stand up against DP-France's, Descamps's and Astrance's misguided threats of lawsuits and boycotts—with the proper explanation and assurances from DP-USA that the threats lack merit—the restoration of DP-USA's supply chain proved Joel Benillouche's prophecy of DP-USA's demise within 24 months false, rather than self-fulfilling. *See* ¶ 49 and n.4, *supra*.

and Italy, because they were engaged in lawsuits and pressure tactics against DP-USA's suppliers in those countries. At the very least, even if Defendants were taking a premature victory lap from having temporarily sidelined Olonia and Bignon-Dervaux, Defendants acted recklessly. Olonia eventually (and justifiably) brushed off Defendants' groundless threats of a European IP lawsuit or the secondary boycott by Astrance, DP-France, and Descamps and its affiliates; and DP-USA managed to reassure its remaining European vendors to resume production.

262. But for all of Plaintiffs' efforts to mitigate damages, it may already be too late to remedy the damage already done. As the email message from the distraught and outraged New York customer confirms, DP-USA has irreparably lost significant amounts of goodwill based on the slander that originated from the Defendants and that targeted U.S.-based customers.

263. The founder's family had brought its treasured brand to American shores where, over the past two decades under the conscientious stewardship of the Carl family, the domestic business flourished and the brand accrued considerable goodwill with its U.S. customers and aspiring potential customers. In 2018, the Carl family sponsored a book on the history of PORTHAULT, its unique products, and the role of the U.S. businesses in the ongoing development and organic growth of the brand.

264. Within less than a year of seizing control of some of non-party D. Porthault Paris SAS's European assets, Defendants Astrance, DP-France, and/or DP-UK had already begun their campaign to poison the minds of DP-USA's ardent U.S. patrons and to try to convert the previously coveted brand into a "shameful" business. DP-USA, its reputation, its business, and its products, have been wronged.

265. Astrance, DP-France, and/or DP-UK also defamed Plaintiffs with their primary motive being to injure them. This motive is confirmed by the communications between Astrance's

Chairman and its CEO at their early September 2023 meeting where, on information and belief, they plotted to starve the Plaintiffs' American companies until they folded and their IP was up for sale. Astrance's client-facing agents and those of DP-France and/or DP-UK acted in furtherance of this plot—to smear the Plaintiffs—with both ill will and the desire to harm.

266. This type of defamation—such as the slanderous or libelous statements in all three of the instances above, which are *per se* actionable—coupled with the Defendant's intent to injure Plaintiffs, authorizes the assessment of punitive damages even without a finding of compensatory damages.

267. Next, in 2023, Defendant Joel Benillouche, communicated to various third parties that Plaintiffs' U.S. business would fail and the U.S. IP rights vest in the French company within 24 months. He knowingly asserted these and other falsehoods relating to Plaintiffs' lack of ownership of the ***Porthault*** brand in relevant jurisdictions, to Mr. Agostinelli of the Rhône group, to other bidders, and to the administrator of the 2023 bankruptcy of non-party D. Porthault Paris SAS.

268. In another instance, Defendant DP-France knowingly repeated these falsehoods to the Hong Kong Intellectual Property Department and the public at large, and further asserted the illegitimacy of DP-USA's website. Indeed, DP-France claimed that it itself was the sole and rightful owner of the brand "around the world," in effect recognizing no jurisdiction where Plaintiffs would have any rights. (Ex. 9, ¶¶ 2, 8-10).

269. Joel Benillouche's and DP-France's statements were false. DP-Design's exclusive rights in both the U.S. and in Hong Kong may be traced back to the Porthault family in their agreement with Bernard Carl in 2005, and through the assignments by the predecessors-in-interest

of DP-Design. And DP-USA's website is the official website for the brand in the U.S., as DP-USA is DP-Design's exclusive licensee.

270. DP-France communicated these false and defamatory statements in public submissions to the Hong Kong Intellectual Property Department. DP-France's false public statements are accessible to and have been accessed by individuals residing in Florida, including in this District.

271. DP-France made these false statements intentionally and knowingly, or at the very least recklessly, because it knows of and has cited to the same May 20, 2005 agreement before. DP-France's false statements were defamatory *per se*, tending to injure DP-Design in its trade (as the true IP rightsholder who DP-France claims is not) and to injure DP-USA in its trade (as the operator of the official U.S. website that DP-France claims is illegitimate). Those statements also cast a shadow on the legitimacy and authenticity of the goods sold by DP-USA in the U.S. market.

272. DP-France defamed Plaintiffs with its primary motive being to injure them. This motive is confirmed by the communications between Astrance's Chairman and its CEO at their early September 2023 meeting where, on information and belief, they plotted to starve the Plaintiffs' American companies until they folded and their IP was up for sale. DP-France acted in furtherance of this plot—to usurp the Plaintiffs' IP—with both ill will and the desire to harm.

273. As a direct result of the false statements that DP-France published, Plaintiffs have incurred costs defending DP-France's meritless challenge to Plaintiff DP-Design's trademark in Hong Kong in cancellation proceedings there. Customers or potential customers in the U.S., including in Florida, who have seen DP-France's spurious claims are likely to be confused as to whether DP-France holds the exclusive rights in the U.S. and decide not to purchase from Plaintiffs in the future.

274. Defendant Joel Benillouche too made his false statements intentionally and knowingly, or at the very least recklessly. On information and belief, he knows of the May 20, 2005 agreement, through which Astrance attempts to trace DP-France's rights. His false statements were defamatory *per se*, tending to injure DP-Design and DP-USA in its trade (as the true IP rightsholder who DP-France claims is not), to call into doubt their solvency.

275. Joel Benillouche defamed Plaintiffs with his primary motive being to injure them. This motive is confirmed by the communications between him and Florian Gayet at their early September 2023 meeting where, on information and belief, they plotted to starve the Plaintiffs' American companies until they folded and their IP was up for sale. Joel Benillouche acted in furtherance of this plot—to smear and sabotage Plaintiffs—with both ill will and the desire to harm.

276. As a direct result of the false statements that Joel Benillouche disseminated during the 2023 bankruptcy bidding process, the administrator refused to present Plaintiff DP-USA's bid to the French court. DP-USA lost the opportunity to fairly bid on some of the European assets that Astrance now claims.

277. In the alternative, to the extent Joel Benillouche's, Astrance's, DP-France's, and/or DP-UK's false statements—alleging that DP-Design does not own the trademark rights to the brand and that DP-USA's website is not the official website for the brand's authentic goods—are not defamatory on their face, extrinsic facts establish that these same falsehoods are defamation *per quod*. These facts include, but are not limited to: (i) the page title or name of DP-USA's website, as viewed from a Google search, is "D Porthault: Official Website"; (ii) that the May 20, 2005 agreement between the Porthault family and the Carl family and the subsequent assignments between Plaintiffs' predecessors-in-interest to DP-Design and DP-USA firmly established DP-

USA's role as the official and exclusive vendor of the ***Porthault*** brand in the U.S.; (iii) that DP-USA markets itself as the exclusive distributor of the sole owner of the rights to the brand in the U.S; (iv) that DP-Design and DP-USA had been operating in the U.S. market and exercising their exclusive rights here long before DP-France came into existence; (v) that, as the exclusive licensee of DP-Design, DP-USA distributes genuine ***Porthault*** brand products on its official website and is the only entity authorized to do so in the U.S; and (vi) that DP-France's public denials of DP-Design's ownership of the trademark and of DP-USA's legitimate operation of its official sales site for its valid trademarked goods directly contradict DP-Design's and DP-USA's claims of exclusivity, harms DP-Design's reputation and goodwill; hence, compromises DP-USA's business and trade.

278. Plaintiffs have suffered actual damages and expenditures from being shut out of the bidding process despite its negotiation efforts with the creditors and having painstakingly put together a proposal that would have saved all or nearly all of the jobs at D. Porthault Pasis SAS. Plaintiffs also suffered actual damages and cost in opposing DP-France in public proceedings, correcting the record, in corrective advertising, and otherwise counteracting Astrance's, DP-France's, and/or DP-UK's widely disseminated disinformation, including DP-France's false and misleading marketing campaign and Defendants' targeted smear campaign to select circles of U.S.-based shoppers.

279. In addition to their actual damages and compensatory damages, including lost profits, in amounts to be proven at trial, Plaintiffs are entitled to punitive damages for Joel Benillouche's, Astrance's, DP-France's, and/or DP-UK's defamatory statements.

**COUNT IV: Defamation by Implication by DP-France**

280. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

281. Defendant DP-France's Instagram account bio describes itself as the "Official Account from France," but its social media activity focuses predominantly on ingratiating itself with North American designers on a weekly basis for showcasing products supplied by DP-USA.

282. DP-France's Instagram posts purposefully target U.S.-based designers and their followers who are comprised of U.S. consumers, and these posts are accessible to and have been accessed by individuals residing in Florida, including in this District. DP-France's April 12, 2025 post, for example, was addressed to the Ocean Ridge-based photographer, and drew her reaction upon her reading it.

283. DP-France created a defamatory implication by omitting material facts from its Instagram account bio and omitting other material facts from its advertisements on social media directed to the U.S. audience nationwide, including to those consumers in Florida.

284. First, DP-France's many public and misleading claims on its Instagram about "our floral design," "our patterns," "our creations", and "our savoir-faire" collectively imply that Defendants, rather than DP-USA or DP-Design, were responsible for creating and authoring the iconic designs underlying the ***Porthault*** products depicted in DP-France's Instagram posts. And that is untrue. By claiming those designs are its own, DP-France's claims are defamatory and damaging to DP-USA and its licensor, DP-Design. It is an assault on Plaintiffs' exclusivity in the U.S. market and sows doubt in the minds of the U.S. consumer as to whether DP-USA can legitimately sell any ***Porthault*** linens that bear those designs, and whether DP-USA legitimately acquired that right from the creators of those designs. DP-France's U.S.-directed, duplicitous Instagram content compromises DP-USA's ability to conduct business and compromises the

inherent quality and nature of DP-USA's genuine ***Porthault*** goods in the minds of the consumers misled by DP-France.

285. The false implication suggested by DP-France's deliberate miswording would be contradicted by the inclusion of any of the following facts that DP-France improperly omits: Namely, that (i) DP-France was not the creator, owner or originator of the depicted designs that it claims as its own; (ii) DP-USA, in its capacity as the official distributor and exclusive licensee of the sole owner of the brand in the U.S. (*i.e.*, DP-Design), is authorized to supply goods that bear the designs depicted in DP-France's posts; and (iii) DP-USA is the "One & Only" legally authorized D. ***Porthault*** vendor in the U.S.

286. Second, despite claiming to be the "Official Account from France," DP-France omitted from its Instagram account bio the material fact that DP-France cannot ship official ***Porthault*** products from France to the U.S., the largest market. In the same vein, the https://www.dporthault.fr website (co-owned with Descamps)—to which the Instagram bio page directs its viewers—conspicuously claims to offer "INTERNATIONAL SHIPPING" without disclaiming Defendants' lack of authorization to ship to the U.S.




**Figure 54**: Screen-capture from top portion of main page of Defendants' website




**Figure 55**: Screen-capture of Defendant DP-France's previous Instagram account landing page

287. DP-France does ship internationally, but it predominantly operates in the EU, and is it not permitted to ship any ***Porthault*** brand goods to any jurisdiction where Plaintiffs hold the exclusive rights, such as the U.S. and certain Asian territories. DP-France may call itself the Official vendor in France, but "from France" is misleading, especially because there are so many markets in which DP-France is ***not*** an official vendor for the brand and to which it ***may not*** legally ship official ***Porthault*** brand goods "from France." And DP-France is certainly not "The One & Only D. Porthault Fine Linens," when DP-Design holds the exclusive rights in so many territories and larger markets in the world, including the U.S. market that DP-France's Instagram activity is aggressively targeting.

288. Third, piecing together DP-France's published half-truths and its feigned praise to U.S.-based artists and influencers on Instagram for showcasing "our towels," "our linen," "our . . . bedding" the implication is that Defendants, rather than DP-USA, were responsible for supplying the elegant and prestigious linens depicted in the American designers' works, subsequently repurposed by DP-France. But those ***Porthault*** linens were not supplied by DP-France. The misfortune of DP-USA's legitimate goods being erroneously associated with—or worse, claimed

by—DP-France's goods is defamatory and damaging to DP-USA and its licensor, DP-Design. DP-France's U.S.-directed comments through Instagram attack Plaintiffs' exclusivity in the U.S. market and cast doubt in the minds of the U.S. consumer as to whether or not DP-USA is any longer the official vendor in the U.S. It also compromises the inherent quality and nature of DP-USA's genuine ***Porthault*** goods in the minds of the consumers misled by DP-France.

289. The false implication suggested by DP-France's artifice and sleight of hand would be contradicted by the inclusion of any of the following facts that DP-France improperly omits: Namely, that (i) DP-France was not the supplier of the ***Porthault*** products depicted in the images that DP-France was praising; (ii) it was DP-USA, in its capacity as the official distributor and exclusive licensee of the sole owner of the brand and related trademark(s) in the U.S. (*i.e.*, DP-Design), that supplied the actual goods; (iii) DP-France is not an official distributor of ***Porthault*** goods in the U.S. (much less the "One & Only") and is not legally authorized to do so; (iv) DP-France is not endorsed by, sponsored by, or affiliated with DP-USA or DP-Design; (v) DP-France's rights do not extend to the U.S.; and (vi) DP-France is not the "Official" D. ***Porthault*** vendor "around the world"[39] or "'worldwide.'"[40]

290. DP-France's defamation by implication is all the more damaging in the context of existing customers of DP-USA; in particular, those U.S.-based designers that DP-France contacted and tagged in its posts on Instagram. The vast majority of these designers are actual customers of DP-USA who had received trademarked goods from DP-USA. Without warning, these customers are confronted by an unfamiliar account belonging to DP-France that uses the famous D. PORTHAULT mark and D. ***Porthault*** PARIS tradename, yet praises them for displaying or

[39] *See* ¶ 85, *supra*.

[40] *See* ¶¶ 137 – 140, *supra*.

celebrating DP-USA's goods. From this DP-France-instigated interaction, if the contacted U.S. designers take at face value DP-France's representations of being "The One & Only" and "Official" seller of ***Porthault*** brand fine linens, then whether they come to the erroneous conclusion that DP-USA is no longer or never was the authorized exclusive distributor in this country, or that DP-USA is selling lower quality or counterfeit goods with unauthorized designs or labels, either conclusion harms DP-USA's goodwill and its ability to carry on its business.

291. DP-France's deceptive and defamatory statements to new, potential customers similarly injures Plaintiffs. DP-France's Instagram account has over 500 followers. The U.S.-based influencers, designers, and magazines that DP-France targeted on Instagram have many more followers. All of these followers are potential customers to whom DP-France's posts were published. Potential customers in the U.S., including in Florida, who have seen DP-France's posts and interactions with these American designers and influencers, would mistakenly believe that the depicted genuine ***Porthault*** brand goods bearing the iconic ***Porthault*** designs, actually supplied by DP-USA in its capacity as the official vendor in the U.S., were instead supplied by or affiliated with DP-France. Unless these potential U.S. consumers recognized the Instagram poster as an imposter, they would be misled and incorrectly assume that DP-France is the "official" seller of ***Porthault*** fine linens in their territory. Presented with DP-France's misinformation, these customers may decide not to purchase authentic products from DP-USA in the future.

292. Further fueling their confusion is DP-France's follow-up interaction on Instagram with the several U.S.-based influencers who reacted to DP-France's initial subterfuge. On April 6, 2025, when the designer based in this District "liked" DP-France's post, DP-France did not provide the disclaimer that it was DP-USA that had supplied the product. On April 20, when the U.S.-based designer thanked DP-France for its post, DP-France did not disavow the fact that it was

not the source for the featured product. On April 26, when the U.S.-based magazine thanked DP-France for its post, DP-France merely liked the comment and sent back three heart-shaped emojis. On May 28, when a U.S.-based studio thanked DP-France for its post, DP-France liked the comment and sent back one heart-shaped emoji. And on June 16, 2025, after a U.S.-based designer thanked DP-France for its post, DP-France liked the comment and sent back five heart-shaped emojis. Tellingly, in each of these five instances, DP-France avoided clarifying that it was not the entity that had supplied the ***Porthault*** product, despite its praise for the product implying that it was. Instead, DP-France used each precious second chance to stay mum and maintain the ruse. It simply ran with it.

293. From its squandering each of these five golden opportunities for redemption, it is clear that DP-France's selective omissions are deliberate and unapologetic. Unchecked, DP-France's abuses have grown more frequent.

294. DP-France crafted and executed this scheme of reverse-passing off of DP-USA's goods on DP-France's frequent Instagram posts with its primary motive being to injure the Plaintiffs. This motive is confirmed by the statements between Astrance's Chairman and its CEO at their early September 2023 meeting where, on information and belief, they plotted to starve the Plaintiffs' American companies until they folded and their IP was up for sale. DP-France acted in furtherance of this plot with ill will and a desire to harm the Plaintiffs.

295. In addition to actual damages, Defendants' defamatory acts and false claims—of its authorship of the iconic ***Porthault*** designs that legitimately appear on DP-USA's products—have undermined the legitimacy and exclusivity of Plaintiffs' ongoing business in the U.S. have directly and proximately caused reputational harm, losses to both present and future business, lost

customers, lost potential customers, lost sales, lost profits, loss of competitive advantage, loss of goodwill, and loss of corporate market value.

296. Defamation by implication, which is a species of defamation, authorizes the assessment of punitive damages when Defendants intended to injure Plaintiffs, as they did here.

297. In addition to their actual damages and compensatory damages, including lost profits and loss of corporate market value, *inter alia*, in amounts to be proven at trial, Plaintiffs are entitled to punitive damages for DP-France's defamation by implication.

**COUNT V: Violation of Florida False and Misleading Advertising Statute (Fla. Stat. § 817.41)**

298. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

299. As part of the Astrance Group's three-part offensive to starve, smear, and usurp their U.S. rivals, Defendants Astrance, DP-France and Descamps committed numerous acts of false and misleading advertising that violated Fla. Stat. § 817.41.

300. Defendants made various misrepresentations of material fact in its online advertising and self-promotion, including but not limited to: (i) misrepresenting DP-France as the "One & Only D. ***Porthault*** Fine Linens"; (ii) advertising that DP-France and Descamps are the "Official" sellers of ***Porthault*** goods without disclaiming territories exclusive to Plaintiff DP-Design; (iii) advertising and offering "INTERNATIONAL SHIPPING" without disclosing that it cannot lawfully ship goods bearing ***Porthault***-related trademarks or copyrighted designs to the U.S.; (iv) altering and distorting third-party promotions of DP-USA and its products so as to champion DP-France and its products instead; [41] (v) soliciting U.S. customers through email

[41] Such an instance occurred in DP-France's Instagram post on July 15, 2025, with respect to the U.S. promoter's May 29, 2024 post. (*see* **Figures 14** and **51**, *supra*, and surrounding paragraphs)

communication that used switch-and-bait tactics that directed customers to DP-USA's product descriptions (without DP-USA's authorization) and misled those customers as to the discounted pricing advertised by DP-France; (vi) engaging in a pervasive campaign on social media that falsely claims authorship of iconic ***Porthault*** designs on goods,[42] thereby implying that DP-USA is not authorized to use those designs and calling into question the legitimacy of Plaintiffs' exclusive right to operate the ***Porthault*** brand-related business in the U.S.; (vii) attempting to take credit for authentic domestic ***Porthault*** goods supplied by Plaintiff DP-USA by "liking" or sharing posts by or about American designers or other consumers in the U.S. and/or thanking those posters; (viii) affirmatively ratifying and profiteering from instances of actual confusion as to the source of ***Porthault*** goods by American designers and other consumers in the U.S. rather than correcting the consumers' mistake, thereby encouraging the throngs of followers of those mistaken consumers (oftentimes well-known celebrities or Internet personalities) on Instagram to perpetuate the same mistake; and (ix) holding Astrance, DP-France, and/or DP-UK out as the "new owners of the 'actual worldwide' brand" to U.S. customers.

301. In each of the above cases, Defendants made misrepresentations of material fact. First, DP-France is not the one and only D. ***Porthault*** vendor nor are Astrance, DP-France, and/or DP-UK the "owners of the 'actual worldwide' brand," because Defendants (including Descamps) have no right to sell and ship ***Porthault*** brand goods to the U.S., where DP-Design and its exclusive licensee DP-USA are the sole, official purveyor of such goods. Next, the third-party U.S. customers who praised the DP-USA-supplied products in their Instagram posts did not intend to

---

[42] Such instances occurred in DP-France's Instagram posts on at least April 6 ("***our*** patterns"), April 12 ("***our*** creations"), May 16 ("***our*** creations" and "***our*** savoir faire"), May 30 ("***our*** creations"), June 12 ("***our*** prints" and "***our*** Pois de Senteur print"), June 16 ("***our*** floral design"), and July 17, 2025 ("***our*** 'Pois de senteur' print") (emphases added).

praise DP-France and it was dishonest for DP-France to forge and retag their posts in a way to suggest their sponsorship of DP-France. Similarly, it was dishonest of DP-France to advertise products on sale for 30% discount in its January 9, 2025 email to U.S. customers but send those customers to DP-USA's website where the products were not discounted. It was also dishonest of DP-France to attribute the iconic ***Porthault*** designs to itself, as well as the palm off the actual goods depicted in those Instagram posts as its own, because DP-USA had supplied those goods and DP-France did not author or create the designs they bore. It was dishonest of DP-France to plant doubt and confusion in the U.S. audience by thanking DP-USA's customers for showcasing goods that DP-France did not supply. On information and belief, Defendants' misrepresentations were intentional.

302. Defendants knew or should have known of their statements' falsity, as Plaintiffs have repeatedly warned Defendants DP-France and Astrance to put them on notice of their false and misleading statements, culminating in the cease and desist letter dated March 5, 2025. Defendants know that they are not the authorized distributor for ***Porthault*** brand goods in the U.S. and that they are not an official sponsor of those products in the U.S. Defendants know that DP-Design is the exclusive rightsholder of the ***Porthault*** brand in the U.S. Undeterred, however, Defendants continue to falsely hold themselves out as the official ***Porthault*** vendor—even to its U.S. audience on social media—and have engaged in deceitful practices, such as reverse passing off on Instagram, or unlawful practices, such as selling and delivering infringing goods to the U.S. in competition with DP-USA and frequently at prices far below DP-USA's posted retail prices, to attract followers in the U.S. and compete for market share in a geographic trade area that is exclusive to Plaintiffs.

303. Defendants intended that consumers would rely on these misrepresentations and for these misrepresentations to alter customer purchasing behavior to the detriment of Plaintiffs. DP-France and Descamps used their online store in combination with DP-France's Instagram account activity to mislead potential and existing DP-USA customers into believing that there is a legitimate business relationship between DP-USA and DP-France. [43]

304. In particular, Defendants intended for its misrepresentations to induce consumers to associate DP-France with the supply of legitimate ***Porthault*** goods in the U.S. and to induce potential customers in the U.S. to purchase from DP-France instead of from DP-USA. For months, DP-France repeatedly and systematically targeted the U.S. audience by sharing posts of stagings from U.S. locations and/or by U.S. designers and photographers. There, DP-France misleadingly claimed authorship of many iconic ***Porthault*** designs. Further, DP-France thanked those U.S. personalities and social media users for those stagings and implicitly took credit for supplying the depicted ***Porthault*** goods in the U.S. And tellingly, DP-France deliberately chose to not correct the record when actual consumer confusion ensued. Instead, it leaned in and embraced the confusion by liking or thanking the consumers who mistook DP-France for DP-USA. The only reasonable inference from their actions and selective omissions is that Defendants intended to mislead consumers and profit from the confusion that Defendants had stoked.

305. On information and belief, as a result of Defendants' falsehoods, designers and other consumers in the U.S. have actually reasonably relied upon, and were misled by, these false

[43] While Defendants fostered a positive association of themselves with potential U.S. customers, it conversely misled pre-existing U.S. customers about the quality, authenticity, and legitimacy of DP-USA's supply of ***Porthault*** goods in the U.S. At least one incensed New York customer, who felt strongly enough to leave a written message in DP-USA's inbox, relying on Astrance's and DP-France's deception, renounced buying from DP-USA. Defendants' deliberate and calculated misconduct has cost DP-USA not only the sale, but its credibility.

advertisements and promotions, into believing that DP-USA is not the legitimate source of ***Porthault*** brand goods in the U.S. and/or is not permitted to use those iconic designs that DP-France claims it authored. Some misled U.S. customers have received and accepted unauthorized goods sent by DP-France or its distributors, on information and belief, purchasing from DP-France's or its distributors' websites, and/or purchasing from DP-France directly through B2B transactions. Other consumers also could justifiably rely upon and be similarly misled by DP-France's previous posts, doctored re-postings, and future posts on social media.

306. In at least one instance proving actual reliance, around April 20, 2025, a designer in Connecticut received ***Porthault*** brand towels. In another instance, around May 10, 2025, a designer in Maine received a set of ***Porthault*** brand pillow shams. In each of these instances, Defendants either improperly shipped or wrongfully took credit for supplying the ***Porthault*** goods to the U.S. customer.

307. In the misguided expansion of their digital and physical footprint in the U.S., Defendants' online marketing strategy misused DP-Design's ***Porthault*** trademark and copyrighted designs to sow confusion in the marketplace and improperly suggest DP-France and its goods are in some way related to, connected to, affiliated with, authorized by, endorsed by, or otherwise sponsored by Plaintiffs. Far from that, however, Defendant DP-France is a competitor to Plaintiff DP-USA in the sale of similar (if not identical) goods to which the Defendants' misleading advertisements, self-promotion, and offers for sale relate.

308. Defendants' actions and omissions have directly and proximately caused Plaintiff DP-Design's mark to lose its effectiveness in designating its licensee's official goods exclusively in the U.S.; and have also confused consumers as to the origin of DP-France's competing

unauthorized goods. Plaintiffs DP-Design and DP-USA have been injured in their goodwill and reputation by Defendants' actions.

309. Plaintiffs suffered and continue to suffer injury as a result, including but not limited to DP-USA's loss of business, loss of customers, loss of potential customers, loss of sales, loss of profits, and loss of corporate market value, and DP-Design's loss of goodwill, reputational harm, and trademark dilution.

**COUNT VI: Federal False Advertising (Lanham Act, 15 U.S.C. § 1125(a))**

310. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

311. Defendants DP-France and Descamps have engaged in false advertising with respect to their goods, and associated services in shipping those goods, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

312. Defendants made various false and/or misleading statements in its advertising, including but not limited to: (i) falsely representing DP-France as the "One & Only D. ***Porthault*** Fine Linens"; (ii) the misleading advertising of it being the "Official" seller of ***Porthault*** goods and ability to offer "INTERNATIONAL SHIPPING" without disclosing that it cannot lawfully ship goods bearing ***Porthault***-related trademarks or copyrighted designs to the United States; (iii) doctoring and rewriting third-party promotions of DP-USA and its goods so that they falsely promote DP-France instead; (iv) soliciting U.S. customers through literally false advertisements via email communications that misuse without permission another's source-distinguishing product materials and purported pricing; (v) holding itself out as the creator, owner, or originator of the designs and patterns depicted on the ***Porthault*** goods supplied by DP-USA, by misleadingly claiming those are "our patterns" on social media platforms whose content increasingly targets

U.S. customers and designers;[44] (vi) holding itself out as the exclusive owner of the ***Porthault*** brand and supplier of ***Porthault*** goods in the U.S., especially in the many instances where the goods depicted in DP-France's posts were supplied domestically by DP-USA, on social media platforms whose content increasingly targets U.S. customers and designers; and (vii) holding itself, Astrance, and/or DP-UK out as the "new owners of the 'actual worldwide' brand" to U.S. customers.

313. DP-France's "One & Only D. ***Porthault*** Fine Linens" self-description, previously visible on the landing page of its Instagram account (@dporthault.official) and as its description in Google search results, was literally false. (*See* **Figures 12** and **13** at pp. 52 and 53, *supra*, and surrounding paragraphs). This advertisement was accessible to and accessed by those in the U.S. DP-France is not and cannot be the one and only D. ***Porthault*** store for fine linens because DP-Design has the territorial rights to the brand and associated IP in the U.S. and DP-USA is its exclusive licensee.

314. Next, without any disclaimer that shipping from France to the U.S. is prohibited, the conspicuous "INTERNATIONAL SHIPPING" banner on DP-France's and Descamps' website is at best ambiguous but implicitly conveys a false impression. Meanwhile, DP-France's frequent Instagram posts, comments, sharing, and liking activity that selectively target U.S.-based designers or locations—coupled with DP-France's confusing and misleading Instagram account[45] handle (@dporthault.official), which account holds itself out as the official ***Porthault*** vendor—are

[44] Such instances occurred in DP-France's Instagram posts on at least April 6 ("***our*** patterns"), April 12 ("***our*** creations"), May 16 ("***our*** creations" and "***our*** savoir faire"), May 30 ("***our*** creations"), June 12 ("***our*** prints" and "***our*** Pois de Senteur print"), June 16 ("***our*** floral design"), and July 17, 2025 ("***our*** 'Pois de senteur' print") (emphases added).

[45] DP-France's Instagram account features a link that directs the audience to the website displaying the misleading banner, "INTERNATIONAL SHIPPING."

misleading in their context and/or likely to deceive consumers into believing that Defendants have legally supplied and can legally supply ***Porthault*** brand goods depicted in those posts or on the website into the U.S. territory. These advertisements were accessible to and accessed by those in the U.S. The deceptive and misleading nature of DP-France's advertisements as being the "Official" ***Porthault*** seller that offers "INTERNATIONAL SHIPIPNG" was exacerbated by DP-France's failure to clear up instances of the consumers' mistaken attribution of DP-USA's goods to DP-France.

315. Defendants' statements have the capacity to deceive, and actually managed to deceive, U.S. consumers acting reasonably under the circumstances. Some customers in the U.S. have confused genuine goods supplied by Plaintiffs as having originated from Defendants. Other customers in the U.S. have confused unauthorized goods supplied by the Defendants as having originated from Plaintiffs. Some designers in the U.S. have communicated with DP-France under the mistaken belief that they were interacting with DP-USA.

316. The deception had a material effect on consumers' purchasing decisions by misleading them into believing that DP-France was authorized by or was in fact DP-USA, or that DP-France's goods were officially endorsed by, originated from, or were otherwise affiliated with DP-USA, or vice-versa, and could sell and deliver to the U.S.

317. In a third scenario, in at least two instances on July 15 and 17, 2025, DP-France made marketing posts on the Instagram platform where it substantially replicated previous posts by U.S.-based third-party customers of DP-USA who had praised and promoted DP-USA's ***Porthault*** products and had tagged or included hyperlinks to DP-USA's Instagram account or webpage. DP-France's posts, however, repurposed these U.S. customer promotions by rewriting and replacing the internal tags to refer to DP-France's Instagram account instead, thereby falsely

changing the apparent sponsorship of those U.S. customers to DP-France's products in the eyes of the public and to many other potential U.S. customers. (*See* **Figures 14a**, **14b**, and **15** at pp. 59 and 60, *supra*, and surrounding paragraphs). Potential customers duped by DP-France's fabricated posts would be led to erroneously believe that the original posters, the U.S. influencers, are sponsoring or promoting DP-France's products. This will have a material effect on their purchasers' decisions. These advertisements too were accessible to and accessed by those in the U.S.

318. In a fourth scenario, DP-France circulated advertising that was literally false, such as in its January 9, 2025 email communication to potential customers, including those in the U.S. DP-France's email claimed certain goods were on sale and discounted up to 30%, but the embedded hyperlinks in the email would take the user to DP-USA's website where the goods were not on sale. This has a material effect on the consumer, who would likely be disappointed that DP-USA's goods were not on sale; rather than buy from DP-USA, the consumer would likely find his or her way back to DP-France's website where the desired product was being discounted and purchase from DP-France instead. DP-France's material deceit had a high likelihood of injuring DP-USA's reputation and sales to U.S. customers.

319. In some other scenarios, customers falling victim to DP-France's deception are likely to believe that the iconic ***Porthault*** designs on DP-USA's goods were authored by or exclusive to DP-France (when it claims those designs as "our" creations, prints, patterns, or designs, etc.) and thereafter purchase DP-France's competing goods. In still other scenarios, those deceived or misled customers are likely to believe—and base their purchasing decisions on the mistaken belief—that DP-USA's goods are improperly using the well-known designs that DP-France claims as "our" creations, prints, patterns, or designs, etc., thereby erroneously concluding

that DP-USA's authentic, authorized goods are instead illegitimate or counterfeits. Here, Defendants' misleading representations and online activity relate to inherent qualities and characteristics of the linens and home goods, *i.e.*, their affiliation with Plaintiffs' tradenames, trademarks, and copyrights; their authenticity and official authorization by the brands' ambassador in the U.S. (without which the consumers would suspect the goods to be pirated or counterfeit), thereby materially affecting the consumers' purchasing decisions.

320. DP-France's and Descamps' misleading advertising and Defendants' promotional statements misrepresented, the nature, characteristics, and origin of the goods at issue, and such representations were made in interstate commerce. Defendants communicated these misleading representations, via their website and social media account, to consumers throughout Florida and the United States.

321. Defendants' actions and omissions have directly and proximately caused Plaintiff DP-Design's mark to lose its effectiveness in designating its licensee's official goods exclusively in the U.S.; and have confused consumers as to the origin of DP-France's competing unauthorized goods. Plaintiffs DP-Design and DP-USA have been injured in their goodwill and reputation by Defendants' actions.

322. Plaintiffs suffered injury as a result, including but not limited to DP-USA's loss of business, loss of customers, loss of potential customers, loss of sales, loss of profits, and loss of corporate market value, and DP-Design's loss of goodwill, reputational harm, and trademark dilution.

## COUNT VII: Reverse Passing Off (Lanham Act, 15 U.S.C. § 1125(a)) by DP-France

323. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

324. In furtherance of the final prong of Defendants' strategy to starve, smear, and usurp their U.S. rivals, DP-France, through its Instagram posting, sharing, liking, and comments therein, has misrepresented DP-USA's goods as its own. By thanking U.S.-based Instagram posters in connection with goods supplied by Plaintiff DP-USA, or otherwise taking credit for Plaintiffs' designs and work in the U.S., DP-France attempts to "pass off" Plaintiffs' authentic ***Porthault*** goods in commerce as DP-France's. Some of the more recent examples are highlighted herein.

325. Two particularly egregious back-to-back instances of DP-France's sleight of hand occurred on July 15 and 17, 2025. DP-France deliberately doctored images previously posted by U.S. designers, influencers and entertainers (@whitneymcgregor and @stealingjeffrey) that properly credited DP-USA for the ***Porthault*** brand goods displayed in their May 29 and December 13, 2024 posts (*see*, *e.g.*, **Figure 52a**, *infra*), respectively, by tagging DP-USA's Instagram account (@dporthaultparis).




**Figure 52a**: Screen-capture of designer's original Instagram post that credited DP-USA (@dporthaultparis) (annotation in yellow) on December 13, 2024

326. In reproducing the image from these U.S.-based influencer's 2024 posts, however, DP-France intentionally altered the tag to reflect its own account (@dporthault.official) rather than DP-USA's. (*see* **Figures 52b** *and* **53**, *infra*).




**Figure 52b**: Screen-capture of DP-France's July 17, 2025 Instagram post that removed designer's tag to DP-USA and replaced it with DP-France's tag (@dporthault.official) (annotation in yellow)




**Figure 53**: Screen-captures comparing designer's original Instagram post that credited DP-USA on May 29, 2024 against DP-France's doctored Instagram post that credited itself on July 15, 2025 (annotations in purple)

327. The prints and cocktail napkins depicted in the above posted images were purchased from and supplied by DP-USA, not from DP-France. And it was not the designers' and influencers' intention to credit or tag DP-France. Rather, the original 2024 posts properly recognized and accurately tagged DP-USA as the purveyor of the pictured ***Porthault*** goods. With its unabashed, revisionist attempt, however, DP-France would mislead the target U.S. audience, its own followers, and the U.S. designers' and influencers' followers, into believing that these U.S.-based Instagram account holders were actually promoting DP-France and that DP-France had supplied those prints and napkins, despite the opposite being true.

328. Additionally, as early as April 6, 2025, DP-France posted an image from Tennessee-based designers (@aafordinteriors) displaying "***our*** patterns" (emphasis added).

Similarly, on April 12, 2025, DP-France shared an image that allegedly captured "***our*** creations" (emphasis added), but that image was made by an Ocean Ridge, Florida-based photographer (@brantleyphoto) of a room in Chicago, Illinois furnished with American ***Porthault*** linens. Shortly after, on April 20, 2025, DP-France shared an image displaying "***our*** towels" (emphasis added) in a New York bathroom. Then, on April 26, 2025, DP-France made a post in collaboration with Birmingham, Alabama-based Victoria Magazine (@victoriamagazine) displaying "***our*** linens" (emphasis added). And again, on May 16, 2025, DP-France made a post in collaboration with a Dallas, Texas-based interior designer (@cathykincaidinteriors) "bringing ***our*** creations to life" and displaying "***our*** linen" and "trusting ***our*** savoir-faire . . ." (emphasis added). DP-France's calculated actions and statements mislead the U.S. audience and potential customers as to the source of the ***Porthault*** goods depicted in the posts, *i.e.*, misrepresenting to the American consumer base that DP-France had supplied those goods or was affiliated with the true supplier, DP-USA.

329. DP-France never truthfully mentioned DP-USA as the source for any of the ***Porthault*** goods pictured in any of these Instagram posts.

330. Contemporaneously, on April 18, 2025, DP-France posted an image of a room with "vintage Porthault linens," thanking a Wiscasset, Maine-based designer (@alexander_widener) for sharing it. Similarly, on May 19, 2025, DP-France made a New York-geotagged post including an image of a room staging ***Porthault*** bedding, wherein DP-France gave a "heartfelt thank you" to a San Francisco, California-based design studio (@studiovolpe_sv) "for this wonderful staging of ***our*** Petits Trèfles and Cœurs Bleus bedding" (emphasis added). Later that month, on May 30, 2025, in another New York-geotagged post, DP-France thanked the New York-based designer (@celerie) for displaying DP-USA's ***Porthault*** brand towels and gushed: "We are always moved

by to see ***our*** creations live on, embraced in new contexts, and become part of your most personal moments." (emphasis added). DP-France's calculated actions and statements suggest that DP-France was the source of those ***Porthault*** linens in the U.S. or was affiliated with the true supplier, DP-USA.

331. Additionally, in a short span of one week, between June 10 to 16, 2025, DP-France made two more self-serving posts on Instagram that targeted American designers in its ongoing attempt to pass off DP-USA's genuine ***Porthault*** goods for DP-France's and imply sponsorship between the two competing entities. On June 12, referring to a photo depicting DP-USA's ***Porthault*** bed linens, DP-France thanked a Dallas, Texas-based interior designer (@cathykincaidinteriors) for "unveil[ing] a new side of ***our*** Maison" and displaying "***our*** prints" and "***our*** Pois de Senteur print" (emphasis added).[46] And on June 16, for her staging of DP-USA's curtains and bed linens, DP-France relayed its thanks to a Greenville, South Carolina-based interior designer (@jennifernmckissick) for "this vibrant yet serene composition, where ***our*** floral design finds its natural home." (emphasis added). DP-France signed this June 16 post "Bed Linens by D. Porthault" and, rather than clear up the designer's confusion when she reacted to its post, DP-France sent back to her five heart-shaped emojis. DP-France had the opportunity to dispel her confusion and indicate that it was not the exclusive distributor in the U.S. and not the supplier of the ***Porthault*** goods depicted in the designer's staging, but decided to double-down on its deception.

332. In each of the above instances, any legitimate ***Porthault*** products depicted in the Instagram posts would have originated from and been supplied by Plaintiff DP-USA with the

---

[46] Similarly, DP-France's July 17, 2025 Instagram post thanked a Greenville, South Carolina-based designer for displaying "***our*** 'Pois de senteur' print" (emphasis added).

authorization of Plaintiff DP-Design.[47] Despite genuine products having originated from Plaintiffs, DP-France falsely designated the origin of those goods—as having come from DP-France instead—by falsely taking credit for their creation and provision.

333. DP-France's repeated false designations of the depicted items' origins have already caused and are likely to further cause U.S. consumer confusion. Many American designers or other consumers in the U.S. were misled by DP-France's Instagram activities into confusing DP-France as the source of the DP-USA's goods. In many of the preceding instances, for example, in response to DP-France's April 6 and April 26, 2025 Instagram posts, the identified designers reacted by expressing: "[t]hanks for sharing our work" and "[t]hank you for the shout out, Porthault," respectively, without realizing that the French entity DP-France was not authorized to distribute the depicted ***Porthault*** goods in the United States.

334. Tellingly, rather than dispel these consumers' confusion and clarify that it was not authorized to deal or distribute ***Porthault*** products in the U.S., DP-France instead chose to capitalize on the confusion by affirmatively "liking" the mistaken designers' comments. DP-France has orchestrated a marketing campaign on social media that purposefully blurs the distinction between the parties and seeks to appropriate DP-USA's authentic products as its own. DP-France intentionally delivers its promotional messaging in such a way that is likely to mislead and confuse consumers as to the source, origin, affiliation, approval, or sponsorship of the goods depicted in the U.S.-based posts.

335. Plaintiffs have been harmed and continue to be harmed by DP-France's deliberate acts and omissions on social media that falsely designate genuine ***Porthault*** products from DP-

[47] Conversely, unauthorized ***Porthault*** products that originated from Defendants would infringe DP-Design's U.S. trademark rights.

USA, and marked by DP-Design's U.S. trademark, as having originated from DP-France instead. Confused and misled designers as well as their followers on Instagram are mistakenly associating DP-France with the supply of ***Porthault*** goods in the U.S. This costly and exponentially compounding mistake, engineered and encouraged by DP-France, usurps market demand from Plaintiffs in spite of Plaintiff DP-Design's exclusive rights throughout this territory.

336. DP-France is engaged in and continues to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages in addition to compensatory damages for, *inter alia*, Plaintiffs' lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, price erosion, DP-France's gross profits, and for actual damages, including *inter alia*, the cost of corrective advertising, and Plaintiffs' attorneys' fees. DP-France's calculated and systematic conduct, even after having been placed on notice by Plaintiffs, further warrants a finding that this is an exceptional case.

**COUNT VIII: Violation of Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*)**

337. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

338. As part of the Astrance Group's three-part offensive to starve, smear, and usurp their U.S. rivals, Defendants Astrance and DP-France committed numerous acts that violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. §§ 501.201 *et seq.*

339. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

340. A deceptive act under FDUTPA includes any representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, to the consumers' detriment.

341. Engaging in tradename or trademark infringement is considered an unfair and deceptive trade practice that constitutes a FDUTPA violation. Accordingly, the same facts supporting a claim of tradename or trademark infringement support a cause of action under the FDUTPA. Defendants' deceptive acts and practices have injured customers and potential customers in the U.S., who either viewed or received marked goods and were confused as to their source. Actual consumer confusion occurred on at least April 20 and 26, 2025 on the Instagram platform; on or around May 10, 2025 on the TikTok platform; and again on the Instagram platform later in May 2025. Defendants' deceptive acts and practices and their misuse of DP-Design's ***Porthault*** trademark or confusingly similar or identical marks in Defendants' marketing materials and social media outreach that target the U.S. audience are likely to continue to result in consumer confusion.

342. Defendant DP-France also engaged in a nationwide scheme on social media to co-opt the well-known iconic ***Porthault*** designs on DP-USA's legitimate products as having been authored or created by DP-France and to pass off DP-USA's genuine ***Porthault*** goods as DP-France's own.[48] Accordingly, the same facts supporting the claims of defamation by implication and reverse passing off support a cause of action under the FDUTPA.

[48] Ironically, after DP-France and Astrance having maligned the quality of DP-USA's premium products and the legitimacy of DP-Design's brand to Plaintiffs' U.S. customers in early 2024 (*see* ¶¶ 137 – 140, *supra*), DP-France turned around and took credit for DP-USA's high quality ***Porthault*** goods in DP-France's social media campaign beginning in the second quarter of 2025.

343. Defendants' deceptive acts and marketing practices have injured customers and potential customers U.S., including those in Florida and in this District, who viewed DP-France's posts and were confused as to the source of the ***Porthault*** goods depicted in the photos therein. Actual confusion by an Ocean Ridge, Florida-based resident occurred on at least April 12, 2025.

344. Defendant DP-France, singly or in concert with Astrance and/or DP-UK, has also engaged in deceptive conduct by, *inter alia*: (i) misrepresenting DP-France as the "One & Only D. ***Porthault*** Fine Linens" and "Official" source of ***Porthault*** goods; (ii) misleadingly holding DP-France out on Instagram as the official seller of ***Porthault*** goods without disclaiming territories in which Plaintiffs are the exclusive rightsholders; (iii) misappropriating DP-USA's intellectual property; (iv) misleading consumers as to DP-France having originally created and authored the iconic designs by the founders' family and that appear on DP-USA's legitimate products; (v) creating consumer doubt as to whether DP-USA's legitimate products may properly bear those iconic designs that DP-France claims to be its own; (vi) misleading consumers and creating confusion as to the origin and source of DP-France's products; (vii) in the other direction, creating consumer confusion as to the origin and source of DP-USA's legitimate products, as having been supplied by DP-France;[49] (viii) altering and distorting third-party promotions of DP-USA so as to champion DP-France instead; [50] (ix) purposefully deciding against correcting instances of actual

[49] Such instances occurred in DP-France's Instagram posts on at least April 6 ("our patterns"), April 12 ("our creations"), April 20 ("our towels"), April 26 ("our linens"), May 16 ("our creations" and "our linens" and "our savoir faire"), May 19 ("our Petits Trèfles and Cœurs Bleus bedding"), May 30 ("our creations"), June 12 ("a new side of our Maison"; "our prints"; "our Pois de Senteur print"), June 16 ("our floral design"), and July 17, 2025 ("our 'Pois de senteur' print").

[50] Such instances occurred in DP-France's Instagram posts on July 15 and July 17, 2025, with respect to the U.S. promoters' May 29 and December 13, 2024 posts, respectively. (*see* **Figures 14a**, **14b**, **15**, **52a**, **52b** *and* **53**, *supra*, and surrounding paragraphs)

consumer confusion and even ratifying the consumers' mistakes;[51] (x) failing to disclose that they are neither the rightful distributor of ***Porthault*** brand goods in the U.S. nor authorized to sell or ship such goods in the United States; (xi) just the opposite, affirmatively suggesting that they are legally authorized to supply such goods in the U.S; [52] (xii) spreading false reports that DP-USA is supplying unauthorized, inferior, overpriced goods in the U.S., thereby slandering DP-USA and DP-Design to U.S. customers and their social circles; and (xiii) threatening a secondary group boycott between and among DP-France, Descamps and its sister companies against Olonia, a common supplier to both them and to DP-USA, unless Olonia discontinued supplying DP-USA.

345. Defendants' offending conduct has substantially affected Florida's trade and commerce. Astrance's and DP-France's threatened boycott against Olonia caused significant interruption and delay of getting critical materials from Italy into DP-USA's hands for its printed fabrics supply chain. This disruption, coupled with DP-France's interference with Bignon-Dervaux, severely reduced inventory and deprived U.S. consumers, including those in Florida (DP-USA's second largest domestic market) of ***Porthault*** brand printed fabric products for multiple quarters, starting from late 2023 throughout at least the first half of 2024.

346. Defendants' conduct is all the more unfair, anticompetitive, and egregious, because the historical documentation needed to disprove the basis of their threatened claims against DP-USA's suppliers—the sales records from non-party D. Porthault Paris SAS and its European predecessors, *e.g.*, SNDPF's, showing the earliest dates of sale of each of DP-France's allegedly copyright-protected designs—is in DP-France's sole possession and custody and, therefore, by

---

[51] Such instances occurred in DP-France's Instagram posts on at least April 6, April 20 and April 26, as well as on May 28, and June 16, 2025.

[52] Such instances occurred in DP-France's Instagram posts on at least April 6, 12, 18, 20, 25, and 26, and May 2, 16 and 19, as well as on May 28 and 30, and June 12 and 16, 2025.

extension, in Astrance's control. And Defendants have been withholding it despite DP-USA's and its suppliers' requests.

347. Contemporaneously, but for Defendants' deception and unfair trade practices, U.S. consumers (including those in Florida) would not have looked to purchase from DP-France or its distributors the competing and infringing products, or been confused by the sudden appearance of an illegitimate distributor encroaching on DP-USA's exclusive sales region and claiming authorship or attribution of the iconic ***Porthault*** designs on DP-USA's products.

348. Had American consumers known that DP-France (or any of the other Defendants) was a separate, unaffiliated entity from DP-USA, the sole lawful United States distributor and licensee of DP-Design's copyrighted designs, the ***Porthault*** trademark, and the D. ***Porthault*** PARIS tradename or mark in the U.S., these consumers would not do business with Defendants to furnish their homes in the U.S.

349. Defendants' deceptive and unfair trade practices have caused and will continue to cause American consumers to confuse the source and origin of ***Porthault*** brand goods. Some have even mistakenly purchased DP-France-sourced products or received such unauthorized goods believing them to be supplied or sponsored by DP-USA.

350. The U.S. consumer is not the only one to have suffered injury at the hands of Defendants' deceptive acts and practices. Defendants' insidious and pervasive marketing methods are directed to the American audience, misuse the ***Porthault*** tradename in a manner that misleads potential customers and actual customers here, and are unfair to Plaintiffs' legitimate domestic business. Plaintiff DP-USA is aggrieved because Defendants' infringement has led to actual consumer confusion about Plaintiffs' business and the quality of ***Porthault*** brand goods in Co-Plaintiff DP-Design's exclusive territory, which results in loss of customers, potential customers,

sales, and profits from its American consumer base. Similarly, DP-Design is aggrieved by Defendants' deceptive acts and practices, which result in loss of goodwill and effectiveness of its mark. In addition, Plaintiffs have suffered reputational harm.

351. To carry out their starve, smear, and usurp strategy, Defendants engaged in uncompetitive business practices that have adversely affected and will continue to adversely affect Florida residents. Plaintiff DP-Design and its licensee DP-USA are entitled to their actual damages, including lost profits, in amounts to be proven at trial.

**COUNT IX: Copyright Infringement (Copyright Act, 17 U.S.C. §§ 101, *et seq.*)**

352. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

353. DP-Design is the owner of valid copyrights of two-dimensional artwork, including: *Fleurs d'Avril* (Registration No. VA0002372615) and *Mariage* (Registration No. VA0002374272) (together, the "Registered Copyrighted Works"). A true and correct copy of the *Fleurs d'Avril* and *Mariage* Copyright Registrations are attached as Exs. 3 and 4 respectively.

354. Defendants DP-France and Descamps have infringed, and are continuing to infringe, DP-Design's Registered Copyrighted Works by reproducing, copying, displaying, selling, licensing, and otherwise distributing the Registered Copyrighted Works without authorization, in violation of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

355. Defendants' infringement includes, but is not limited to: (i) online offers to sell linens that reproduce DP-Design's copyright-protected *Fleurs d'Avril* design; (ii) advertising and prominently displaying reproductions of DP-Design's copyright-protected *Mariage* design on DP-France's and Descamps' co-owned website and/or on DP-France's social media account(s); (iii) reproducing DP-Design's copyright-protected *Mariage* design in photos in DP-France's catalogs (*e.g.*, Ex. 30 hereto); (iv) and Defendants' marketing, selling, and distribution of goods infringing

the Registered Copyrighted Works to U.S. customers through the website or other distribution channels (including at least one delivery between October 7 and November 1, 2024 via DHL Express). Further, DP-France's Instagram account is largely directed to a U.S. audience and, on February 27, 2025, DP-France marketed bedsheets, pillowcases, and a tablecloth each printed and embroidered with DP-Design's *Mariage* design by posting a photographic reproduction of the design in its Instagram story.

356. Even after receiving DP-USA's March 5, 2025 cease and desist letter, DP-France continued to publicly display and commercially market the *Mariage* and *Fleurs d'Avril* designs in its Instagram posts and at both DP-France's and DP-UK's retail sales points. On June 28 and 29, 2025, DP-France advertised on Instagram that bedroom linens bearing the *Mariage* design were "available in-store and online." DP-France's online advertisements reached individuals residing in Florida, including in this judicial District. And on July 1 and 4, 2025, DP-France advertised its sale of bedroom linens bearing the *Fleurs d'Avril* design and their availability on the same trade channels.

357. In at least one earlier instance, between October 7, 2024 and November 1, 2024, DP-France sold and shipped goods bearing DP-Design's copyrighted *Fleurs d'Avril* design to a U.S. customer in New York, through the courier DHL Express. DP-France delivered these goods to the U.S. despite Astrance having been put on notice in August and September 2023 during the French bankruptcy proceedings that DP-Design held the U.S. copyright rights to *Fleurs d'Avril*.

358. Defendants have no license or any other form of permission from Plaintiffs to commercially copy, sell, or distribute the Registered Copyrighted Works.

359. Defendants' acts of infringement in the United States are willful, deliberate, and committed with disregard of Plaintiff DP-USA's lawful rights in the Registered Copyrighted Works, pursuant to the Copyright Act, 17 U.S.C. § 504.

360. Defendants' actions of copyright infringement in the United States have occurred, and continue to occur, within the statute of limitations period, pursuant to the Copyright Act, 17 U.S.C. § 507.

361. As a direct and proximate result of the infringements alleged herein, Plaintiff DP-Design and its licensee DP-USA are entitled to their actual damages and to Defendants' profits in amounts to be proven at trial, which are not currently ascertainable, under 17 U.S.C. § 504(b). Alternatively, Plaintiffs are entitled to maximum statutory damages of $150,000 for each copyright infringed, or in such other amounts as may be proper under 17 U.S.C. § 504(c).

362. Plaintiffs are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

363. As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff DP-Design's rights in the Registered Copyrighted Works. Plaintiffs are entitled to permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

**COUNT X: Trademark Infringement (Lanham Act, 15 U.S.C. § 1114) by DP-France**

364. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

365. Through use and registration, DP-Design owns the U.S. trademark for D. PORTHAULT (Registration No. 2808276) (again, "***Porthault*** trademark") and the pending U.S. trademark application (Serial No. 98187655) for the stylized mark "D. ***Porthault*** PARIS."

366. DP-Design's registered ***Porthault*** trademark has incontestability status. As an incontestable trademark, its validity, registration, ownership, and owner's right to its exclusive use in the U.S. are conclusively presumed.

367. DP-Design's registered ***Porthault*** trademark is distinctive throughout the U.S. and the state of Florida. Plaintiffs used this mark in these respective geographic territories before Defendants began using the mark.

368. Defendant DP-France's use of "D. PORTHAULT" (or "D. ***Porthault***") as a label or indicator of origin for the linens, textiles, and other goods sold and shipped to the U.S. is confusingly similar to DP-Design's ***Porthault*** trademark, in appearance, sound, connotation, and overall commercial impression.

369. Neither DP-Design nor any other Plaintiff has authorized Defendant DP-France to use the ***Porthault*** trademark in U.S. commerce. Despite the lack of authorization, Defendant has used the entirety of DP-Design's ***Porthault*** trademark commercially within the United States, in connection with goods in a class protected by DP-Design's U.S. trademarks and that competes with DP-USA's sales of similar and/or identical fine linen products that are properly marked. Further, Defendant DP-France has sold these competing goods that improperly bear DP-Design's ***Porthault*** trademark by using the same marketing methods and through the same trade channels, which exacerbates the risk of consumer confusion to the detriment of Plaintiffs and their U.S. customer base. (Ex. 18). DP-France's courier, UPS, has confused DP-USA as the source of the infringing goods as they crossed the U.S. border. On February 20, 2024, UPS personnel contacted DP-USA to provide supplemental information for U.S. Customs on a shipment of ***Porthault*** brand bath towels and square hand towels that DP-France had sold and sent to a U.S. customer in San Francisco, California.

370. Defendant's unauthorized use of "D. PORTHAULT" or "D. ***Porthault***," singly or in combination with other words, in connection with commercial sales and deliveries to the United States has resulted and will continue to result in confusion in the U.S. market and in DP-France's unfairly and unlawfully benefitting from the goodwill inherent in DP-Design's ***Porthault*** trademark, and Plaintiffs' ***Porthault*** brand in the U.S.

371. Defendant's unauthorized use of DP-Design's ***Porthault*** trademark on competing goods is likely to cause confusion or mistake with the authorized DP-USA's ***Porthault*** goods (to which DP-Design's ***Porthault*** trademark is, by contrast, legitimately affixed), or to deceive as to source, affiliation, or sponsorship with Plaintiffs, in violation of the Lanham Act, 15 U.S.C. § 1114.

372. Defendant has used DP-Design's ***Porthault*** trademark in commerce in the U.S., to designate the origin of the labelled competing goods. Around May 2025, Defendant DP-France shipped ***Porthault*** brand pillow shams to an American designer in Maine. In February 2024, Defendant shipped ***Porthault*** brand bath towels to a U.S. customer in San Francisco, California. Defendant also repeatedly uses the ***Porthault*** trademark in advertisements that target the U.S. market on its and Descamps' website and on its Instagram. Additionally, Defendant DP-France uses the ***Porthault*** trademark without DP-Design's permission on competing goods that are sold and/or delivered to the U.S. by DP-France or its distributors, such as Arlettie.

373. Defendant DP-France's acts are deliberate and intended to confuse the public as to the source of its goods and to injure DP-USA's competing goods sales and reap the benefit of the accrued goodwill associated with DP-Design's ***Porthault*** trademark and Plaintiffs' ***Porthault*** brand in the U.S. DP-France continued its sales and promotional efforts targeting the U.S. market despite repeated correspondence from Plaintiffs warning DP-France to cease and desist.

374. As a direct and proximate result of Defendant's willful and unlawful conduct, Plaintiffs have been damaged and will continue to suffer damage to its business and reputation unless Defendant DP-France is restrained by this Court from infringing DP-Design's registered ***Porthault*** trademark. In fact, Plaintiffs have already been injured by actual consumer confusion as to the source or affiliation of certain ***Porthault*** brand goods received in the U.S., such as on April 20 (set of bath towels) or around May 10, 2025 (set of pillow shams). Plaintiffs will continue to suffer injury as the throngs of Instagram followers of consumers who have been confused by Defendant's actions are then similarly misled and unwittingly perpetuate the confusion themselves.

375. In light of the foregoing, Plaintiffs are entitled to injunctive relief prohibiting Defendant DP-France from shipping or delivering goods bearing—or otherwise using in the U.S.—"D. PORTHAULT" or "D. ***Porthault***" or any marks or phrases identical and/or confusingly similar thereto for any purpose, and to recover from Defendant all actual damages and compensatory damages, including but not limited to Plaintiffs' lost earnings, lost profits, lost corporate market value, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, and price erosion that Plaintiffs have sustained and will continue to sustain as a result of such infringing acts, and attorneys' fees, and all gains, gross profits, and advantages obtained by Defendant as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117.

376. Defendant's conduct also warrants a finding that this is an exceptional case.

**COUNT XI: Common Law Trademark Infringement**

377. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

378. Plaintiffs appropriated common law trademark rights in the D. PORTHAULT mark[53] as well as the stylized D. ***Porthault*** PARIS mark in commerce in the state of Florida and throughout the U.S. long before Defendants adopted and commenced use of identical or confusingly similar marks on competing goods in the same trade area(s).

379. Prior to Defendants' unauthorized use of the same, Plaintiffs DP-Design and DP-USA first adopted and made actual use of the D. PORTHAULT mark as well as the D. ***Porthault*** PARIS tradename or mark in the U.S. market, including Florida and this District, as a means of establishing goodwill and reputation in the linen business. DP-Design's principal place of business is located in Palm Beach, Florida. For decades, Plaintiffs used these ***Porthault*** trademark and D. ***Porthault*** PARIS tradename or mark throughout the geographic trade area to identify and denominate goods that DP-USA offered in the covered classes and to distinguish those goods from similar ones offered or marketed by others.

380. Through its association with such goods and decades of use by Plaintiffs and/or their predecessors-in-interest, Plaintiffs' inherently distinctive trademarks and tradename also acquired a special significance as the name of the goods marketed by Plaintiff DP-USA throughout the U.S., including Florida and this District. Plaintiff DP-Design's ***Porthault*** trademark and Plaintiffs' D. ***Porthault*** PARIS tradename are distinctive within the U.S. as an indicator,

---

[53] DP-Design's registered D. PORTHAULT mark enjoys incontestability status. As an incontestable trademark, its validity, registration, ownership, and owner's right to its exclusive use in the U.S. are conclusively presumed.

descriptor, identifier, or denominator of Plaintiffs as the source of the associated linens and home goods.

381. It was well after Plaintiffs began using the ***Porthault*** trademark and D. ***Porthault*** PARIS tradename with DP-Design's authorization in and throughout the U.S., including in this District, that Defendants subsequently commenced using marks identical and confusingly similar to the ***Porthault*** trademark on similar goods in U.S. commerce in the same geographic area in which Plaintiffs had already established their trademark and tradename.

382. Defendant DP-France's competing linen products, each tagged or labeled with an identical or confusingly similar ***Porthault*** mark or D. ***Porthault*** PARIS mark, have been sold and shipped into the U.S. to designers and other consumers, including to consumers in this District, either directly or indirectly through its distributors, such as Arlettie. Defendants DP-France and Descamps use substantially similar advertising and marketing strategies (including a website with the same look and feel as Plaintiff DP-USA's and an Instagram account resembling DP-USA's in name and appearance) and similar distribution channels to market and deliver into the hands of U.S. consumers.

383. Defendant DP-France's unauthorized use of Plaintiffs' ***Porthault*** mark or D. ***Porthault*** PARIS mark in advertising, distribution, offering for sale, and sale in the U.S. of the same type of goods offered by Plaintiff DP-USA is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of its services. Consumer confusion is inevitable. In fact, multiple instances of actual confusion by American designers and other consumers in the U.S. have occurred, as documented on Defendant DP-France's Instagram pages and some consumers' TikTok videos. For example, in separate instances on April 20 and 26, and again in May 2025, designers and potential customers of Plaintiff DP-USA corresponded or collaborated with DP-

France under the mistaken impression that they were doing business with Plaintiff DP-USA, directly or indirectly. After one such collaboration with DP-France in May 2025, the American designer even thanked DP-USA, as if to say the former was an authorized branch of the latter.

384. Moreover, DP-France's misuse of the ***Porthault*** and D. ***Porthault*** PARIS marks was committed with the willful intent to cause confusion. DP-France knew or should have known that it had no legal right to use the DP-Design's marks in the U.S. Yet, DP-France continued its sales and promotional efforts targeting the U.S. market despite repeated correspondence from Plaintiffs warning DP-France and its affiliates to cease and desist.

385. In light of the foregoing, Plaintiffs are entitled to injunctive relief prohibiting Defendant DP-France from shipping or delivering goods bearing—or otherwise using in the U.S.—the ***Porthault*** trademark or D. ***Porthault*** PARIS mark or tradename or any marks or phrases identical and/or confusingly similar thereto for any purpose, and to recover from Defendant all damages, including but not limited to Plaintiffs' lost earnings, lost profits, lost corporate market value, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, and price erosion that Plaintiffs have sustained and will continue to sustain as a result of such infringing acts, and attorneys' fees, and all gains, gross profits, and advantages obtained by Defendant as a result thereof, in an amount not yet known, as well as the costs of this action.

386. Plaintiffs are further entitled to exemplary and punitive damages by reason of DP-France's willful, reckless, deliberate, and intentional conduct.

**COUNT XII: Trademark Dilution (Lanham Act, 15 U.S.C. § 1125(c))**

387. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

388. DP-Design's ***Porthault*** trademark and D. ***Porthault*** PARIS mark are distinctive and famous marks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The ***Porthault*** trademark and D. ***Porthault*** PARIS mark are famous throughout the world, as the ***Porthault*** brand has existed for over one hundred years and is a well-respected, high-end producer of luxury linens.

389. DP-Design's ***Porthault*** trademark has been protected in the United States by a valid U.S. trademark at least since its registration date of January 27, 2004. Further, the mark enjoys incontestability status. As an incontestable trademark, its validity, registration, ownership, and owner's right to its exclusive use in the U.S. are conclusively presumed.

390. Around 2023, Defendants DP-France, Descamps, and Arlettie began making unauthorized use of DP-Design's famous ***Porthault*** trademark and D. ***Porthault*** PARIS mark with offers for sale and sales to the United States as well as ongoing advertising efforts that target the United States market and its domestic audience.

391. The ***Porthault*** trademark and D. ***Porthault*** PARIS mark held by DP-Design became distinctive and famous prior to the Defendants' unauthorized use of the same or confusingly similar marks and acts, as alleged herein.

392. The U.S.-directed sales and commercial advertising by Defendant DP-France on Instagram, on its and Descamps' co-owned website, and on Arlettie's website made unauthorized use of the DP-Design's famous ***Porthault*** trademark and D. ***Porthault*** PARIS mark. The lack of a prominent, express disclaimer on each of these platforms against shipping and delivery of

products bearing the famous trademark to the U.S. further dilute the mark's fame and the U.S. brand's goodwill.

393. The similarity (if not identicality) of DP-France's and Arlettie's infringing goods with DP-Design's famous marks in the U.S. is likely to cause dilution by blurring. U.S. consumers are likely to associate DP-France's and Arlettie's goods for authentic ***Porthault*** goods that DP-Design has exclusively licensed DP-USA to carry.

394. Defendants' acts in the United States, as alleged herein (*see* paragraphs 364 – 386 (preceding Counts X and XI), *supra*), have diluted (by blurring) and will, unless enjoined, continue to dilute and are likely to dilute the distinctive quality of Plaintiff DP-Design's famous marks and Plaintiffs' associated famous brand.

395. The similarity (if not identicality) of DP-France's and Arlettie's infringing goods with DP-Design's famous marks in the U.S. is also likely to cause dilution by tarnishment. U.S. consumers risk associating DP-USA's authentic ***Porthault*** goods with the unlicensed goods from DP-France, which may differ in nature, quality, or other characteristics.

396. Defendants' acts in the United States, as alleged herein (*see* paragraphs 364 – 386 (preceding Counts X and XI), *supra*), have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish DP-Design's ***Porthault*** trademark and D. ***Porthault*** PARIS mark and Plaintiffs' associated brand by undermining and damaging the valuable goodwill associated therewith.

397. Defendants' acts in the United States (*see* paragraphs 364 – 386 (preceding Counts X and XI), *supra*), as alleged herein, are intentional and willful, in violation of Section 43(c)(1) of the Lanham Act.

398. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are permanently enjoined from committing and continuing to commit such acts.

399. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully, and deliberately, justifying the assessment of exemplary damages in addition to compensatory damages for, *inter alia*, Plaintiffs' lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, price erosion, Defendants' gross profits, and for actual damages, including *inter alia*, the cost of corrective advertising, and Plaintiffs' attorneys' fees.

400. In view of the many repeated attempts at resolution by Plaintiffs; the rebuff by Defendants thereof; the Plaintiffs' notice and warnings to Defendants; and the ongoing knowing, willful and deliberate nature of Defendants' infringement despite the notice and repeated warnings, Defendants' conduct warrants a finding that this is an exceptional case.

**COUNT XIII: Common Law Trademark Dilution**

401. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

402. Fla. Stat. § 495.151 permits common law owners of famous marks to bring antidilution claims. Plaintiff DP-Design's ***Porthault*** trademark and D. ***Porthault*** PARIS mark are strong, distinctive, and famous marks within and throughout the United States, *i.e.*, the geographic trade area, including within this District. Through its renown and many years of brand cultivation within the U.S., Plaintiff's ***Porthault*** trademark and D. ***Porthault*** PARIS mark have become symbols of consumer loyalty and goodwill rather than merely indicators of supplier identity.

403. After Plaintiff's ***Porthault*** trademark and D. ***Porthault*** PARIS mark became famous in the U.S. (including in Florida), [54] Defendants DP-France and Arlettie began making commercial use of the marks within the same geographic trade region(s). Defendant DP-France's and Arlettie's competing linen products, each tagged or labeled with an identical or confusingly similar ***Porthault*** mark or D. ***Porthault*** PARIS mark, have been sold and shipped into the U.S. to designers and other consumers, including to consumers in this District, either directly or indirectly through its distributors, such as Arlettie.

404. In addition to its unauthorized sales of competing goods to this trade area, Defendant DP-France has specifically targeted the U.S. market with the aim of blurring the distinction between the opposing entities' tradenames, their respective distribution channels, their respective sales territories, and their marked goods. Recently, DP-France (i) adopted a competing Instagram page with a confusing account handle (@dporthault.official); (ii) engaged in a pervasive campaign on social media to increase their relevance to and presence in the United States despite the exclusive rights to the ***Porthault*** brand in this territory resting in Plaintiff DP-Design's hands; (iii) attempted to take credit for Plaintiffs' design work and Plaintiff DP-USA's domestic goods by "liking" or sharing posts by or about American designers or other consumers in the U.S. and/or thanking those posters; and (iv) affirmatively ratified and profited from instances of actual confusion as to the source of ***Porthault*** goods by American designers and other consumers in the U.S. rather than correct the consumers' mistakes, thereby encouraging the throngs of followers of those mistaken consumers (oftentimes well-known celebrities or Internet personalities) on Instagram to perpetuate the same mistakes.

---

[54] DP-Design's registered D. PORTHAULT mark enjoys incontestability status. As an incontestable trademark, its validity, registration, ownership, and owner's right to its exclusive use in the U.S. are conclusively presumed.

405. These acts and omissions by Defendants DP-France and Arlettie in their marketing and commercial use of marks identical or confusingly similar to Plaintiff DP-Design's ***Porthault*** trademark in association with competing goods is likely to injure Plaintiffs' business reputation in the U.S. and cause dilution of the famous marks' distinctive quality. Indeed, American designers and other consumers in the U.S. were actually confused as to the source of the competing goods supplied by DP-France, so as to impair the value of DP-USA's genuine articles.

406. Unchecked, DP-France's and Arlettie's increasingly flagrant actions and advertising that target the U.S. audience will continue to weaken Plaintiff DP-Design's distinctive and famous trademarks and cause diminution of goodwill and consumer loyalty towards the ***Porthault*** brand that Plaintiffs built up in the U.S. DP-Design's rights and its exclusive licensee DP-USA's business reputation have already suffered actual weakening and injury—as opposed to the mere likelihood of the marks' dilution or injury to reputation—as a result of the targeted smear campaigns by DP-France, DP-UK, and/or Astrance. A potential DP-USA customer from New York mistook Astrance, DP-France, and/or DP-UK to be the new owners of the brand and erroneously called DP-USA's application of the ***Porthault*** mark on its genuine goods "shameful and a total abuse of the confidence of your American customers."

407. DP-France and Arlettie each knew or should have known that it had no legal right to use the DP-Design's famous marks in Florida and in the U.S.

408. Defendants' alleged activities have harmed Plaintiffs, who have suffered, *inter alia*, lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, price erosion, Defendants' gross profits, as well as actual damages, including *inter alia*, the cost of corrective advertising and Plaintiffs' attorneys' fees.

409. Plaintiffs are entitled to permanent state-wide injunctive relief to restrain and enjoin Defendants' continuing and further acts that are likely to dilute the distinctive quality or reputation of Plaintiffs' marks or tradename.

410. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully, and deliberately, justifying the assessment of exemplary damages.

**COUNT XIV: Federal Unfair Competition (Lanham Act, 15 U.S.C. § 1125(a)(1)(A))**

411. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

412. Plaintiffs have common law and federal trademark rights in the D. PORTHAULT mark and D. ***Porthault*** PARIS mark which is uniquely associated with DP-USA and DP-Design as a source of the goods and services offered in connection with those trademarks.

413. Plaintiffs have not authorized Defendants to use DP-Design's D. PORTHAULT mark in the U.S., and Defendants' use of the identical or substantially and/or confusingly similar mark(s) has resulted and will continue to result in Defendants unfairly and unlawfully benefitting from the goodwill inherent in DP-Design's ***Porthault*** trademark and D. ***Porthault*** PARIS tradename and Plaintiffs' associated ***Porthault*** brands. And the Defendants are not merely benefiting but also undermining DP-USA's reputation and goodwill.

414. Plaintiffs have not authorized Defendant DP-France, singly or in concert with other Defendants, to sell products bearing marks identical or substantially and/or confusingly similar to DP-Design's ***Porthault*** trademark or D. ***Porthault*** PARIS tradename or mark into the U.S., or offer such products for sale to the U.S.

415. Defendants' continued use of the D. PORTHAULT mark in commerce in the United States, or in marketing directed to the United States and its designers and influencers, whether singly or in combination with other words, is confusingly similar to the Plaintiffs' use of

the ***Porthault*** trademark or D. ***Porthault*** PARIS tradename or mark, in appearance, sound, connotation, and overall commercial impression, and constitutes unfair competition.

416. Defendants' continued use of the D. PORTHAULT mark in commerce in the U.S., or in marketing directed to the U.S. and its designers and influencers, whether singly or in combination with other words, has caused and will continue to cause confusion or mistake with Plaintiff DP-Design's ***Porthault*** trademark or D. ***Porthault*** PARIS tradename or mark, or to deceive consumers as to authorship and source of DP-USA's products and the designs they bear, as well as Defendants' affiliation with or sponsorship by Plaintiffs, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

417. Plaintiffs have been damaged and will continue to be damaged by Defendants' infringement in an amount to be determined at trial.

418. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been and will continue to be irreparably injured and damaged, and unless Defendants have been enjoined by this Court, Plaintiffs will continue to suffer harm to their name, reputation, and goodwill. This harm constitutes an injury for which Plaintiffs have no adequate remedy at law.

419. Upon information and belief, Defendants have acted willfully, deliberately, and intentionally and with bad faith to usurp Plaintiff DP-Design's rights, making this an exceptional case, and Defendants should be held liable for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT XV: Common Law Unfair Competition

420. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

421. As part of the Astrance Group's three-part offensive to starve, smear, and usurp their U.S. rivals, Defendants Astrance, DP-France, and Descamps committed numerous acts that violated Florida's unfair competition laws.

422. Plaintiffs allege several bases that, whether taken alone or in combination, support Plaintiffs' common law claim of unfair competition by Defendants. These independent bases include tradename or trademark infringement, trademark dilution, false advertising or false description of goods, false designation of origin, palming off, unlicensed use of DP-Design's copyrighted materials as well as photos of the interior of Bernard Carl's house to imply an affiliation with Plaintiffs, and/or plagiarism by Defendants.

423. Plaintiffs DP-Design and DP-USA first adopted and used the ***Porthault*** trademark and D. ***Porthault*** PARIS tradename in Florida and in this District, as a means of establishing goodwill and reputation in the linen business. In addition, DP-Design is the owner of the federal trademark for D. PORTHAULT (Registration No. 2808276 at the U.S. Patent and Trademark Office) (again, "***Porthault*** trademark") and the pending trademark application for the stylized mark "D. ***Porthault*** PARIS."

424. For decades, Plaintiffs used the ***Porthault*** mark throughout these geographic trade areas across and throughout the United States to identify and denominate goods that DP-USA offered in the covered classes and to distinguish those goods from similar ones offered or marketed by others. Through its association with such goods and decades of use by Plaintiffs and/or their predecessors-in-interest, Plaintiff DP-Design's inherently distinctive trademark also acquired a special significance as the name of the goods marketed by Plaintiff DP-USA throughout the U.S., including Florida and this District.

425. DP-Design's ***Porthault*** trademark is distinctive within the U.S. as an indicator, descriptor, identifier, or denominator of Plaintiffs as the source of the associated linens and home goods. The ***Porthault*** trademark is not merely distinctive but famous, as the ***Porthault*** brand is over 100 years' old and considered to be amongst the most elite linen brands in the world.

426. Defendant DP-France has used and continues to use identical or confusingly similar marks to identify similar goods marketed by it in competition with Plaintiffs in the U.S. and in this District, *i.e.*, DP-France has and continues to commit trademark infringement through its acts of selling, offering to sell or promoting the sale of goods bearing the ***Porthault*** trademark to potential customers in the U.S. The same facts supporting a claim of tradename or trademark infringement support a cause of action for unfair competition.

427. As a result of Defendant DP-France's repeated and increasingly flagrant actions, customer confusion of source or as to the sponsorship of the goods offered or to be offered by DP-France is likely or inevitable. In fact, Defendants' actions on the Instagram social media platform have already caused actual consumer confusion in the United States as to the source of the received goods in multiple instances, such as on April 20 and on around May 10, 2025. That additional designers or other consumers in the U.S. will suffer confusion and be led to purchase DP-France's goods in the belief that they are the goods of DP-USA, or to deal with Defendants thinking they are dealing with Plaintiffs, will be the natural and probable result of Defendant DP-France's actions. Such consumer confusion will proliferate and accelerate, given the network effect and the large number of followers who follow the confused designer(s).

428. In addition, DP-France's actions, singly or in concert with Descamps' and/or Astrance's, has caused consumer confusion as to the source of its goods, including but not limited to: (i) reproducing and displaying photos of the interior of Bernard Carl's home as well as DP-

Design's copyright-protected designs, such as *Mariage*, in photos prominently featured on Defendants' co-owned website and its catalogs (*e.g.*, Ex. 30) to imply an affiliation with or endorsement by Plaintiffs; (ii) falsely claiming the authorship of iconic ***Porthault*** designs in marketing communications; (iii) offering for sale on Defendants' website products that reproduce DP-Design's copyright-protected designs, such as *Mariage* and *Fleurs d'Avril*[55] without paying royalties for either the use or the sale; (iv) linking to DP-USA's website from DP-France's marketing emails to potential customers, thereby free riding on DP-USA's authorship, efforts, and goodwill in developing and maintaining its brand and official website that supports its brand; (v) violating the terms of use of DP-USA's website; (vi) sending out the hyperlinked marketing emails when DP-France was holding a special discount sale to undercut DP-USA's undiscounted prices and otherwise undermining DP-USA's relationship with its customers or potential customers; (vii) reproducing photos in DP-France's marketing materials or on Defendants' website without negotiating a license with the publisher or photographer; (viii) spreading false reports with Astrance and/or DP-UK that DP-USA is supplying unauthorized, inferior, overpriced goods in the U.S., thereby slandering DP-USA and DP-Design to U.S. customers and their social circles; and (ix) threatening with Astrance a secondary group boycott between and among DP-France, Descamps, and its sister companies against Olonia, a common supplier to both them and to DP-USA, unless Olonia discontinued supplying materials to DP-USA. Defendants Astrance's and DP-France's threatened boycott (with co-defendant Descamps's and its affiliates' participation)

[55] As of the filing date of this complaint, the DP-France and Descamps website offers for sale at least the following linens with DP-Design's copyrighted *Fleurs d'Avril* design: Placemat; duvet cover (imperial yellow finishing); duvet cover (embroidered); pair of shams; boudoir sham; neckroll sham; napkin; and tissue box cover (hyperlinked pages last visited July 24, 2025).

against Olonia was based on groundless claims of infringement of several invalid or expired copyrights in France.

429. Defendants' antics with Olonia caused significant interruption and delay of getting critical materials from Italy into DP-USA's hands for its printed fabrics supply chain. This disruption severely reduced inventory and deprived U.S. consumers, including those in Florida (DP-USA's second largest domestic market) of ***Porthault*** brand printed fabric products for months, starting from late 2023 throughout at least the first half of 2024.

430. Defendants' conduct is all the more unfair, anticompetitive, and egregious, because the historical documentation needed to disprove the basis of their threatened claims against DP-USA's suppliers—the sales records from non-party D. Porthault Paris SAS and its European predecessors, *e.g.*, SNDPF's, showing the earliest dates of sale of each of DP-France's allegedly copyright-protected designs—is in DP-France's sole possession and custody and, therefore, by extension, in Astrance's control. And Defendants have been withholding it despite DP-USA's and its suppliers' requests.

431. Additionally, in a post on DP-France's Instagram account dated June 12, 2025 which reproduced a photo of a bedroom staged by U.S. designer Cathy Kincaid, DP-France neglected to seek permission from the rightsholder and failed to credit the photographer and the publisher of the book from which DP-France excerpted the photo. In contrast, the Carl family had to negotiate such an agreement from the photographer and the publisher before making use of the same photo. Because DP-France did not incur the same costs in its unauthorized use of the same photo, DP-France unfairly competed with the Plaintiffs' use.

432. DP-France, singly or jointly with other Defendants, is liable for common law unfair competition in an amount to be determined at trial.

**COUNT XVI: Contributory Copyright Infringement by Descamps and Astrance**

433. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

434. DP-Design is the owner of valid and registered copyrights of two-dimensional artwork, including: *Fleurs d'Avril* and *Mariage*.

435. After multiple requests, the most recent on March 5, 2025, Plaintiffs informed Defendants that DP-France was infringing DP-Design's copyrights and to promptly cease and desist its infringing activities and to confirm its compliance in writing by April 5, 2025. Defendants failed to respond to the March 5, 2015 cease and desist letter and failed to discontinue the infringement.

436. Despite their actual and constructive knowledge that DP-France's marketing materials (including its website) and various products reproduce DP-Design's copyrighted visual works *Mariage* and *Fleurs d'Avril*, to date, Descamps has not removed images or product offerings from DP-France's website or otherwise taken any action to prevent DP-France from continuing to advertise and sell those products.

437. Instead, Descamps has continued to maintain DP-France's website in a way that prominently displays the *Mariage* design in various images and promotes and offers for sale products that reproduce the *Fleurs d'Avril* design.

438. Defendant DP-France has infringed, and is continuing to infringe, DP-Design's Registered Copyrighted Works by reproducing, copying, displaying, selling, and otherwise distributing the Registered Copyrighted Works without authorization, in violation of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

439. In at least one instance, between October 7, 2024 and November 1, 2024, DP-France sold and shipped goods bearing DP-Design's copyrighted *Fleurs d'Avril* design to a U.S. customer in New York, through the courier DHL Express.

440. Defendants have no license or any other form of permission from Plaintiffs to commercially copy, sell, or distribute the Registered Copyrighted Works.

441. The foregoing activity constitutes direct infringement by DP-France in violation of 17 U.S.C. §§ 106 and 501, *et seq*.

442. Descamps and Astrance are liable as contributory copyright infringers for the direct infringements by DP-France.

443. Descamps and Astrance have had actual and constructive knowledge of DP-France's acts of direct infringement since at least March 5, 2025, the date of the cease and desist letter. Descamps actively maintains the website for DP-France and claims the web content as its own.[56] Astrance has control over both DP-France and Descamps and their respective operations.

444. By failing to take any action to prevent further infringement even after having been placed on notice, Descamps and Astrance have knowingly caused, materially contributed to, and/or intentionally induced the unlawful reproduction and distribution of DP-Design's Copyrighted Works.

445. Descamps's and Astrance's infringement has been willful, intentional, and purposeful.

446. As a direct and proximate result of the infringements alleged herein, Plaintiff DP-Design and its licensee DP-USA are entitled to their actual damages and to Defendants' profits in

[56] DP-France's website, "Legal information" sub-page, https://www.dporthault.fr/en/legal-information (last visited July 24, 2025) (under sub-heading "PROPRIÉTÉ INTELLECTUELLE").

amounts to be proven at trial, which are not currently ascertainable, under 17 U.S.C. § 504(b). Alternatively, Plaintiffs are entitled to maximum statutory damages of $150,000 for each copyright infringed, or in such other amounts as may be proper under 17 U.S.C. § 504(c).

447. Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

448. As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff DP-Design's rights in the Registered Copyrighted Works. Plaintiffs are entitled to permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

## **COUNT XVII: Vicarious Copyright Infringement by Descamps, Astrance, and Joel Benillouche**

449. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

450. DP-Design is the owner of valid and registered copyrights of two-dimensional artwork, including: *Fleurs d'Avril* and *Mariage*.

451. After multiple requests, the most recent on March 5, 2025, Plaintiffs informed Defendants that DP-France was infringing DP-Design's copyrights and to promptly cease and desist its infringing activities and to confirm its compliance in writing by April 5, 2025. Defendants failed to respond to the March 5, 2015 cease and desist letter and failed to discontinue the infringement.

452. Despite Descamps' actual and constructive knowledge that DP-France's marketing materials (including its website) and various products reproduce DP-Design's copyrighted visual works *Mariage* and *Fleurs d'Avril*, to date, Descamps has not removed images or product offerings

from DP-France's website or otherwise taken any action to prevent DP-France from continuing to sell those products.

453. Instead, Descamps has continued to maintain DP-France's website in a way that prominently displays the *Mariage* design in various images on their website and promotes and offers for sale products that reproduce the *Fleurs d'Avril* design.

454. Defendant DP-France has infringed, and is continuing to infringe, DP-Design's Registered Copyrighted Works by reproducing, copying, displaying, selling, and otherwise distributing the Registered Copyrighted Works without authorization, in violation of the Copyright Act, 17 U.S.C. §§ 101 et seq.

455. In at least one instance, between October 7, 2024 and November 1, 2024, DP-France sold and shipped goods bearing DP-Design's copyrighted *Fleurs d'Avril* design to a U.S. customer in New York, through the courier DHL Express.

456. Defendants have no license or any other form of permission from Plaintiffs to commercially copy, sell, or distribute the Registered Copyrighted Works.

457. The foregoing activity constitutes direct infringement by DP-France in violation of 17 U.S.C. §§ 106 and 501, *et seq*.

458. Defendants Descamps, Astrance, and Joel Benillouche each are liable as vicarious copyright infringers for the direct infringements by DP-France.

459. Descamps, Astrance, and Joel Benillouche have had actual and constructive knowledge of DP-France's acts of direct infringement since at least March 5, 2025, the date of the cease and desist letter. Descamps actively maintains the website for DP-France and claims the web content as its own. Astrance also has full ownership and corporate control over DP-France and its operations.

460. Based on its ownership notice,[57] Descamps purportedly has the legal and practical right and ability to supervise and control DP-France's infringing activities that occur through the use of its website and, at all relevant times, have had a financial interest in, and derived a financial benefit from, the infringing use of those platforms and/or website.

461. Astrance, like Joel Benillouche (as the puppeteer and head of the Astrance Group), also has the legal and practical right and ability to supervise and control DP-France's infringing activities that occur through the use of its social media platforms and its website and, at all relevant times, has had a financial interest in, and derived a financial benefit from, the infringing use of those platforms and/or website.

462. On information and belief, Descamps, Astrance, and Joel Benillouche each derives a direct or indirect financial benefit from DP-France's infringement of the Registered Copyrighted Works through DP-France's sales and distribution products that reproduce the Registered Copyrighted Works.

463. Descamps', Astrance's, and Joel Benillouche's conduct has been purposeful, intentional, or at least willfully blind as to DP-France's infringement.

464. Descamps, Astrance, and Joel Benillouche are each vicariously liable to fully compensate Plaintiffs for the harm caused by DP-France's direct infringement.

465. Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

466. As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate

[57] DP-France's website, "Legal information" sub-page, https://www.dporthault.fr/en/legal-information (last visited July 24, 2025) (under sub-heading "PROPRIÉTÉ INTELLECTUELLE").

remedy at law. Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff DP-Design's rights in the Registered Copyrighted Works. Plaintiffs are entitled to permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

467. In view of the many repeated attempts at resolution by Plaintiffs; the rebuff by Astrance and the Astrance Group thereof; the Plaintiffs' notice and warnings to Astrance and the Astrance Group; and the ongoing knowing, willful and deliberate nature of DP-France's infringement despite the notice and repeated warnings, Defendants' conduct warrants a finding that this is an exceptional case.

**COUNT XVIII: Trademark Infringement (Lanham Act, 15 U.S.C. § 1114) by Arlettie**

468. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

469. Through use and registration, DP-Design owns the U.S. trademark for D. PORTHAULT (Registration No. 2808276) (again, "***Porthault*** trademark") and the pending U.S. trademark application (Serial No. 98187655) for the stylized mark "D. ***Porthault*** PARIS."

470. Singly or in concert with DP-France, Arlettie has offered for sale and sold household linens to U.S. customers and delivered the goods to the U.S. during multiple sales events.

471. On these sales and shipments, Arlettie has used the marks "D. PORTHAULT" or "D. PORTHAULT PARIS" as a label or indicator of origin for the linens and other competing goods delivered to the U.S. Those marks are identical or confusingly similar to DP-Design's trademark, in appearance, sound, connotation, and overall commercial impression.

472. After multiple requests, the most recent on March 5, 2025, Plaintiffs informed Defendants that Arlettie was infringing DP-Design's trademark and to promptly cease and desist

DP-France's making sales to the U.S. through Arlettie. Defendants failed to respond to the March 5, 2015 cease and desist letter and Arlettie failed to discontinue making infringing sales.

473. In multiple instances, the most recent series having occurred between April 24 and May 8, 2025, Arlettie shipped infringing goods to Florida, New Jersey, New York, Texas, and Washington, D.C.

474. Neither DP-Design nor any other Plaintiff has authorized Arlettie to use DP-Design's trademark in commerce. Despite the lack of authorization, Arlettie used the entirety of DP-Design's ***Porthault*** trademark commercially within the United States, in connection with goods in a class protected by DP-Design's U.S. trademark and that competes with DP-USA's sales of similar and/or identical fine linen products that are properly marked. Further, Defendants have sold these competing goods that improperly bear DP-Design's ***Porthault*** trademark by using the same marketing methods and through the same trade channels, which exacerbates the risk of consumer confusion to the detriment of Plaintiffs and their U.S. customer base.

475. Arlettie's unauthorized use of "D. PORTHAULT" or "D. ***Porthault***," singly or in combination with other words, in connection with commercial sales and deliveries to the United States has resulted and will continue to result in confusion in the U.S. market and in Arlettie's unfairly and unlawfully benefitting from the goodwill inherent in DP-Design's ***Porthault*** trademark and Plaintiffs' ***Porthault*** brand in the U.S.

476. Arlettie's unauthorized use of DP-Design's ***Porthault*** trademark on competing goods is likely to cause confusion or mistake with the authorized DP-USA's ***Porthault*** goods (to which DP-Design's ***Porthault*** trademark is, by contrast, legitimately affixed), or to deceive as to source, affiliation, or sponsorship with Plaintiffs, in violation of the Lanham Act, 15 U.S.C. § 1114.

477. Arlettie's acts are deliberate and intended to confuse the public as to the source of its goods and to injure DP-USA's competing goods sales and reap the benefit of the accrued goodwill associated with DP-Design's ***Porthault*** trademark and Plaintiff's ***Porthault*** brand in the U.S. Despite repeated correspondence from Plaintiffs warning DP-France and Astrance to stop their distributors—specifically identifying Arlettie as one of them—from selling and shipping to the U.S. (*see, e.g.*, Ex. 1), Arlettie continued its sales and promotional efforts targeting the U.S. market.

478. Additionally, Arlettie's highly discounted prices consistently undercut DP-USA's retail prices by a substantial amount, thereby completely usurping customer demand for the respective product(s). Arlettie's deliveries to the U.S. do not appear to have paid duties and they merely pass the shipping costs onto the U.S. customers.

479. As a direct and proximate result of Arlettie's willful and unlawful conduct, Plaintiffs have been damaged and will continue to suffer damage to its business and reputation unless Arlettie is restrained by this Court from infringing DP-Design's ***Porthault*** trademark.

480. In light of the foregoing, Plaintiffs are entitled to injunctive relief prohibiting Arlettie from shipping or delivering goods bearing—or otherwise using in the U.S.—"D. PORTHAULT" or "D. ***Porthault***" or any marks or phrases identical and/or confusingly similar thereto for any purpose, and to recover from Arlettie all actual damages and compensatory damages, including Plaintiffs' lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, and price erosion that Plaintiffs have sustained and will continue to sustain as a result of such infringing acts, and attorneys' fees, and all gains, gross profits, and advantages obtained by Arlettie as a result

thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117.

**COUNT XIX: Contributory Trademark Infringement by DP-France**

481. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

482. Through use and registration, DP-Design owns the U.S. trademark for D. PORTHAULT.

483. On information and belief, DP-France supplies and provides Arlettie with ***Porthault*** brand goods labelled with marks identical or confusingly similar to DP-Design's trademark. On information and belief, DP-France intentionally induces and knowingly facilitates Arlettie's engaging in directly infringing activities, offers for sale, sales, and delivery of infringing goods to the U.S. during multiple sales events periodically held by Arlettie.

484. Arlettie has used the marks "D. PORTHAULT" or "D. PORTHAULT PARIS" as a label or indicator of origin for the linens, textiles, and other competing goods sold and delivered to the U.S. Arlettie has used those marks in commerce. Those marks are identical or confusingly similar to DP-Design's trademark, in appearance, sound, connotation, and overall commercial impression.

485. After multiple requests, the most recent on March 5, 2025, Plaintiffs informed Defendants that Arlettie was infringing DP-Design's trademark and to promptly cease and desist DP-France's making sales to the U.S. through Arlettie. Defendants failed to respond to the March 5, 2015 cease and desist letter and failed to discontinue making infringing sales.

486. On information and belief, DP-France continued to supply and provide infringing products to Arlettie and induced or encouraged its offers to sell, sales, distributions, and deliveries

to the U.S. despite multiple warnings by the Plaintiffs and the March 5, 2025 cease and desist letter that specifically referenced Arlettie and its sales.

487. In multiple instances, the most recent series having occurred between April 24 and May 8, 2025, Arlettie shipped infringing goods to Florida, New Jersey, New York, Texas, and Washington, D.C.

488. Neither DP-Design nor any other Plaintiff has authorized Arlettie to use DP-Design's trademark in commerce.

489. The foregoing activity constitutes direct trademark infringement by Arlettie in violation of 15 U.S.C. §1114.

490. Defendant DP-France's conduct constitutes contributory infringement.

491. DP-France has had actual and constructive knowledge of Arlettie's acts of direct infringement since at least March 5, 2025, the date of the cease and desist letter.

492. By failing to take any affirmative action to restrict Arlettie's infringing shipments, or refrain from supplying Arlettie with infringing goods, or otherwise prevent further infringement, DP-France has knowingly caused, materially contributed to, and/or intentionally induced the unlawful commercial use of DP-Design's trademark.

493. DP-France's infringement has been willful, intentional, and purposeful.

494. Plaintiff DP-Design and its licensee DP-USA have been damaged and continue to suffer damage as a result of DP-France's contributing to and inducing Arlettie's directly infringing activities.

495. There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by DP-France's contributory infringement. Plaintiffs are without an adequate remedy at

law to redress such acts, and will be irreparably damaged unless DP-France is enjoined from committing and continuing to commit such acts.

496. DP-France is engaged in and continues to engage in the alleged activities knowingly, willfully, and deliberately, justifying the assessment of exemplary damages in addition to compensatory damages for, *inter alia*, Plaintiffs' lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, price erosion, DP-France's gross profits, and for actual damages, including *inter alia*, the cost of corrective advertising, and Plaintiffs' attorneys' fees.

497. In view of the many repeated attempts at resolution by Plaintiffs; the rebuff by Defendants thereof; the Plaintiffs' notice and warnings to Defendants; and the ongoing knowing, willful and deliberate nature of Defendants' infringement despite the notice and repeated warnings, Defendants' conduct warrants a finding that this is an exceptional case.

**COUNT XX: Contributory Trademark Infringement by Descamps and Astrance**

498. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

499. Through use and registration, DP-Design owns the U.S. trademark for D. PORTHAULT.

500. Defendant DP-France has used the marks "D. PORTHAULT" or "D. PORTHAULT PARIS" as a label or indicator of origin for the linens, textiles, and other competing goods sold and delivered to the U.S. DP-France has used those marks in commerce. Those marks are identical or confusingly similar to DP-Design's trademark, in appearance, sound, connotation, and overall commercial impression.

501. By supplying a website to DP-France, Defendant Descamps intentionally induces and knowingly facilitates DP-France's engaging in directly infringing activities, offers for sale, sales, and deliveries of infringing goods to the U.S.

502. After multiple requests, the most recent on March 5, 2025, Plaintiffs informed Defendants that DP-France was infringing DP-Design's trademark and to promptly cease and desist DP-France's making offers for sale and sales to the U.S. Defendants failed to respond to the March 5, 2015 cease and desist letter and failed to discontinue DP-France's infringing activities.

503. Despite their actual and constructive knowledge that DP-France's marketing materials (including its website) and various products use DP-Design's trademark, to date, Descamps has not removed images or marked product offerings from DP-France's website or otherwise taken any action to prevent DP-France from continuing to advertise and sell those products.

504. Instead, Descamps continued to maintain DP-France's website and host web content that offered for sale infringing products for international shipment despite multiple warnings by the Plaintiffs and the March 5, 2025 cease and desist letter that specifically referenced DP-France and its sales.

505. On information and belief, in multiple instances, such as around February 2024 and May 2025, DP-France shipped infringing goods to San Francisco, California and to Maine respectively.

506. Neither DP-Design nor any other Plaintiff has authorized DP-France to use DP-Design's trademark in commerce.

507. The foregoing activity constitutes direct trademark infringement by DP-France in violation of 15 U.S.C. §1114.

508. Descamps and Astrance are liable as contributory infringers for the direct infringements by DP-France.

509. Descamps and Astrance have had actual and constructive knowledge of DP-France's acts of direct infringement since at least March 5, 2025, the date of the cease and desist letter. Descamps actively maintains the website for DP-France and claims the web content as its own.[58] Astrance has control over both DP-France and Descamps at their respective operations.

510. By failing to take any action to remove the infringing products from being offered for sale on DP-France's website or otherwise prevent further infringement even after having been placed on notice, Descamps and Astrance have knowingly caused, materially contributed to, and/or intentionally induced the unlawful commercial use of DP-Design's trademark.

511. Descamps's and Astrance's infringement has been willful, intentional, and purposeful.

512. Plaintiff DP-Design and its licensee DP-USA have been damaged and continue to suffer damage as a result of Defendants' contributing to and inducing DP-France's directly infringing activities.

513. There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' contributory infringement. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

---

[58] DP-France's website, "Legal information" sub-page, https://www.dporthault.fr/en/legal-information (last visited July 24, 2025) (under sub-heading "PROPRIÉTÉ INTELLECTUELLE").

514. Descamps and Astrance are engaged in and continue to engage in the alleged activities knowingly, willfully, and deliberately, justifying the assessment of exemplary damages and compensatory damages for, *inter alia*, Plaintiffs' lost corporate market value, lost earnings, lost profits, lost market share, lost competitive advantage, lost brand value, loss of mark's distinctiveness, price erosion, Defendants' gross profits, and for actual damages, including *inter alia*, the cost of corrective advertising, and Plaintiffs' attorneys' fees.

515. In view of the many repeated attempts at resolution by Plaintiffs; the rebuff by Defendants thereof; the Plaintiffs' notice and warnings to Defendants; and the ongoing knowing, willful and deliberate nature of Defendants' infringement despite the notice and repeated warnings, Defendants' conduct warrants a finding that this is an exceptional case.

**COUNT XXI: Vicarious Trademark Infringement by Astrance and Joel Benillouche**

516. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

517. Through use and registration, DP-Design owns the U.S. trademark for D. PORTHAULT.

518. Defendant DP-France has used the marks "D. PORTHAULT" or "D. PORTHAULT PARIS" as a label or indicator of origin for the linens, textiles, and other competing goods sold and delivered to the U.S. DP-France has used those marks in commerce. Those marks are identical or confusingly similar to DP-Design's trademark, in appearance, sound, connotation, and overall commercial impression.

519. On information and belief, in multiple instances, such as around February 2024 and May 2025, DP-France shipped infringing goods to San Francisco, California and to Maine respectively.

520. Neither DP-Design nor any other Plaintiff has authorized DP-France to use DP-Design's trademark in commerce.

521. The foregoing activity constitutes direct trademark infringement by DP-France in violation of 15 U.S.C. §1114.

522. Defendants Astrance and Joel Benillouche are each vicariously liable for the direct infringements by DP-France.

523. Astrance and Joel Benillouche each has had actual and constructive knowledge of DP-France's acts of direct infringement since at least March 5, 2025, the date of the cease and desist letter. Astrance has full ownership and corporate control over DP-France and its operations. And as Chairman of Astrance, Joel Benillouche also has full corporate control over DP-France and its operations.

524. Astrance, like Joel Benillouche (the puppeteer and head of the Astrance Group), has the legal and practical right and ability to supervise and control DP-France's infringing activities that occur through the use of its social media platforms and its website and, at all relevant times, have had a financial interest in, and derived a financial benefit from, the infringing use of those platforms and/or website.

525. On information and belief, Astrance and Joel Benillouche each derives a direct or indirect financial benefit from DP-France's infringement of DP-Design's trademark through DP-France's sales and deliveries of products labeled by an identical or confusingly similar mark.

526. Astrance's and Joel Benillouche's conduct has been purposeful, intentional, or at least willfully blind as to DP-France's direct infringement.

527. Plaintiff DP-Design and its licensee DP-USA have been damaged and continue to suffer damage as a result of DP-France's directly infringing activities.

528. Astrance and Joel Benillouche are each vicariously liable to fully compensate Plaintiffs for the harm caused by DP-France's direct infringement.

529. In view of the many repeated attempts at resolution by Plaintiffs; the rebuff by Astrance and the Astrance Group thereof; the Plaintiffs' notice and warnings to Astrance and the Astrance Group; and the ongoing knowing, willful and deliberate nature of DP-France's infringement despite the notice and repeated warnings, Defendants' conduct warrants a finding that this is an exceptional case.

**COUNT XXII: Infringement of French Common Law Copyrights by DP-France and Descamps (Intellectual Property Code Art. §§ L-111-1, *et seq.*)**

530. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

531. Both the U.S. and France are signatories to the Berne Convention. When DP-USA first created or commissioned and published the original works of authorship of *Mariage* and *Fleurs d'Avril* in the U.S. between 2014 and 2019, DP-USA also gained copyright protection over each of those works under French common law.

532. Co-plaintiff DP-Design is, by assignment from DP-USA in 2020, the rightful owner of the valid U.S. copyrights to *Mariage* and *Fleurs d'Avril*, as well as the valid counterpart French common law copyrights in the same works, respectively.

533. DP-France operates a physical store in Paris, an Instagram account (@dporthault.official), and a website co-hosted by co-defendant Descamps. DP-France's Instagram posts and stories and the website co-hosted by Descamps are both accessible to and have been accessed by individuals residing in France.

534. In operating each of these three instrumentalities, DP-France directly or indirectly copied, displayed, and distributed reproductions of the copyright-protected works, *Mariage* and

*Fleurs d'Avril*, without DP-Design's authorization and in violation of DP-Design's exclusive rights of representation and reproduction (including translation, adaption, transformation, reworking, and/or reproduction by other means), authorship, integrity, and paternity (right against false attribution and right of attribution), in violation of the French Intellectual Property Code ("FIPC"), Art. § L-122-1, *et seq*. For example, in late September 2024, DP-France's Paris store prominently displayed on its shelf products for sale that bore the *Fleurs d'Avril* design; and in late February 2025, the store prominently displayed and marketed products that bore the *Mariage* design. And in late June and early July 2025, DP-France advertised on its Instagram account that it was carrying and selling products that reproduce each of these two copyright-protected designs as part of its "Privileged Sale selection" or "Private Sale Selection." These posts were accessible by and have been accessed by individuals residing in France.

535. In operating, hosting, managing, and holding itself out as the owner of the assets displayed on the website, Descamps directly or indirectly copied, displayed, and distributed reproductions of the copyright-protected works, *Mariage* and *Fleurs d'Avril*, without DP-Design's authorization and in violation of DP-Design's exclusive rights of representation, reproduction, authorship, integrity, and paternity (right to object to false attribution and right to attribution), in violation of FIPC Art. §§ L-122-1, *et seq*.

536. DP-Design and its exclusive licensee DP-USA have been damaged and are entitled to compensation from DP-France and Descamps (including an accounting of Defendants' profits) under FIPC Art. § L-331-1-3, and in any event no less than the amount of royalties that would have been payable if the infringers had first requested authorization to use the infringed copyrights.

**COUNT XXIII: Infringement of UK Common Law Copyrights by DP-UK, DP-France, and Descamps (Copyright, Designs and Patents Act (1988) §§ 1, *et seq.*)**

537. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

538. Both the U.S. and the U.K. are signatories to the Berne Convention. When DP-USA first created or commissioned and published the original works of authorship of *Mariage* and *Fleurs d'Avril* in the U.S. between 2014 and 2019, DP-USA also gained copyright protection over each of those works under English common law.

539. Co-plaintiff DP-Design is, by assignment from DP-USA in 2020, the rightful owner of the valid U.S. copyrights to *Mariage* and *Fleurs d'Avril*, as well as the valid counterpart U.K. common law copyrights in the same works, respectively.

540. DP-UK operates a physical shop in the Harrods department store in London.

541. In operating this instrumentality, DP-UK directly or indirectly copied, distributed, showed, publicly communicated, adapted, imported into or exported from the U.K., possessed in the course of business, offered for sale, and sold reproductions of the copyright-protected works, *Mariage* and *Fleurs d'Avril*, without DP-Design's authorization and in violation of DP-Design's exclusive rights of copying, issuing copies, showing, communicating to the public, adaption, authorship, integrity, and paternity in violation of the U.K.'s Copyright, Designs and Patents Act (1988) ("CDPA"), §§ 16, 17, 19 – 23, 77, 80, 84. For example, at various times in 2024 and 2025, DP-UK publicly displayed and sold products reproducing the *Mariage* design at its Harrods boutique. And, in early July 2025, DP-UK's Harrods location was advertised as carrying and selling products that reproduce the *Fleurs d'Avril* design as part of Defendants' "Privileged Sale selection" (July 4). These posts were accessible by and have been accessed by individuals residing in the U.K.

542. DP-France operates an Instagram account (@dporthault.official) and a website co-hosted by co-defendant Descamps. DP-France's Instagram posts and stories and the website co-hosted by Descamps are both accessible to and have been accessed by individuals residing in the U.K.

543. In operating these two instrumentalities, DP-France directly or indirectly copied, displayed, and distributed reproductions of the copyright-protected works, *Mariage* and *Fleurs d'Avril*, without DP-Design's authorization and in violation of DP-Design's exclusive rights of copying, issuing copies, showing, communicating to the public, adaption, authorship, integrity, and paternity in violation of CDPA §§ 16, 17, 19 – 23, 77, 80, 84. For example, in late June and early July 2025, DP-France advertised on its Instagram account that it was carrying and selling products that reproduce each of these two copyright-protected designs as part of its "Privileged Sale selection" or "Private Sale Selection." These posts were accessible by and have been accessed by individuals residing in the U.K.

544. In operating, hosting, managing, and holding itself out as the owner of the assets displayed on the website, Descamps directly or indirectly copied, displayed, and distributed reproductions of the copyright-protected works, *Mariage* and *Fleurs d'Avril*, without DP-Design's authorization and in violation of DP-Design's exclusive rights of copying, issuing copies, showing, communicating to the public, adaption, authorship, integrity, and paternity in violation of CDPA §§ 16, 17, 19 – 23, 77, 80, 84.

545. DP-Design and its exclusive licensee DP-USA have been damaged and are entitled to compensation from DP-UK, DP-France, and Descamps (in the form of Defendants' profits) under CDPA § 97.

546. The infringement by DP-UK, DP-France, and Descamps was flagrant pursuant to CDPA § 97(2) and therefore DP-Design and its exclusive licensee DP-USA are entitled to additional damages as the justice of the case requires.

**COUNT XXIV: Unjust Enrichment**

547. Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

548. DP-France has held itself out as the "One & Only D. ***Porthault*** Fine Linens" and "Official" seller of ***Porthault*** goods, knowing that it is not and free riding off of DP-USA's goodwill and famous mark.

549. Although DP-USA had previously permitted non-party D. Porthault Paris SAS to use some of DP-USA's website content, DP-USA terminated this permissive use when the Defendants acquired D. Porthault Paris SAS in 2023. DP-France was to create and host its own website. DP-France enlisted Descamps to create one, but the resulting website was the lookalike website that copied the look and feel of DP-USA's website and plagiarized substantial amounts of DP-USA's web content.

550. The terms of use of DP-USA's website prohibits others from misusing or misappropriating Plaintiffs' IP: "You may not reproduce, by any means or process (except as expressly provided herein), in full or in part, distribute, publish, transmit, create derivative works based on, modify or sell any such material contained on the DPorthaultparis.com website."[59]

551. DP-France and Descamps knowingly misused website content created by DP-USA to augment Defendants' website and promotional materials, in a manner that violated DP-USA's

---

[59] DP-USA's website, "Terms" sub-page, https://www.dporthaultparis.com/pages/terms (last visited July 24, 2025).

terms of use, targeted DP-USA's consumer base, and attempted to poach DP-USA's customers and prospective customers.

552. Additionally, the terms of use of DP-USA's website also prohibit third parties from linking to it without permission: "You may only provide a link to the DPorthaultparis.com website if expressly authorized in writing by D. PORTHAULT."[60]

553. In violation of these terms, however, in multiple instances and as recently as January 9, 2025, DP-France mass emailed customers and potential customers with advertisements that embedded hyperlinks to DP-USA's website. DP-France's email would include product photos that, when clicked, would take the email recipient to DP-USA's website. Similarly, the stylized ***Porthault*** logo in these emails from DP-France, when clicked, would also take the recipient to DP-USA's website. Potential customers who were interested in learning more about the advertised items would be led to DP-USA's website and be able to study DP-USA's thorough description of the item. DP-France's advertising thus piggybacked off of DP-USA's website creation and maintenance.

[60] DP-USA's website, "Terms" sub-page, https://www.dporthaultparis.com/pages/terms (last visited July 24, 2025).




**Figure 56**: Screen-capture from DP-France's January 9, 2025 email containing two hyperlinks to DP-USA's website (annotations in red)

554. DP-France has worked to deceive ordinary and unsuspecting customers by trading off of DP-USA's goodwill; establishing a lookalike website co-owned with Descamps; copying and "cribbing" from the original content from DP-USA's website; directly linking to DP-USA's website in its mass emails to customers and potential customers; and otherwise misusing DP-Design's famous trademark in the U.S.

555. DP-France knew that embedding links to DP-USA's website in DP-France's emails would lead a number of the email recipients to DP-USA's website. DP-France knew that the products advertised as being on discounted sale in its emails were not on discounted sale yet on DP-USA's website.

556. DP-France profited from knowingly sending potential customers to DP-USA's website outside of (sometimes, just before) DP-USA's special sales periods and juxtaposing DP-USA's undiscounted prices with DP-France's discounted prices of the advertised items. Much like selling a pirated version of an anticipated blockbuster the week before it premiers, DP-France's scheme was designed to usurp customer demand. Each sale that DP-France made in this fashion was an ill-gotten gain, wherein DP-France benefited at DP-USA's expense.

557. On information and belief, DP-France benefited not only by freeriding on DP-USA's description and marketing of the item, but also by undercutting DP-USA's undiscounted prices on the same or similar items.

558. DP-France had knowledge of, and sought, accepted, and retained the direct benefits conferred upon it by DP-USA's website and Plaintiffs' ***Porthault*** brand in the U.S.

559. DP-USA conferred these benefits on non-party D. Porthault Paris SAS (with restrictions on its use) and made the official DP-USA website accessible to the public (with restrictions on derivative use and linking). Subsequently, through DP-France's (and/or Descamps') voluntary misdoings and DF-France's violation of the terms of use on DP-USA's website, the Defendants reaped benefits. It would be unjust for DP-France or its Co-Defendants to retain these benefits without payment to DP-USA.

560. Defendants' conduct was with deceptive intent, as a direct and proximate result of which, Defendants have been unjustly enriched at DP-USA's expense.

561. Defendants' conduct has caused and will continue to cause DP-USA to suffer irreparable harm and, unless Defendants are restrained, DP-USA will continue to be damaged, because it lacks an adequate legal remedy.

562. It is against good equity and conscience to permit Defendants to retain any profits or other rewards from its conduct. In light of the foregoing, equity and good conscience require restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an Order:

a. Declaring that DP-Design's Registered Copyrighted Works and associated common law U.K. and French copyrights have been knowingly, willfully, and deliberately infringed by the Defendants;

b. Awarding to Plaintiffs actual damages and disgorgement of Defendants' profits from their infringements of the Registered Copyrighted Works and associated common law U.K. and French copyrights that were willful and deliberate, as provided by 17 U.S.C. § 504(b), the U.K.'s Copyright, Designs and Patents Act, and the French Intellectual Property Code; and/or, upon Plaintiffs' election prior to a final decision by the Court, statutory damages as provided by 17 U.S.C. § 504(c), in an amount to be determined at trial;

c. Declaring that DP-UK's, DP-France's and Descamps's copyright infringement was flagrant under the U.K.'s Copyright, Designs and Patents Act, and awarding Plaintiffs additional damages under its § 97(2) for such infringement;

d. For permanent injunctive relief enjoining each Defendant, and its agents, employees, officers, directors, representatives, successors and assigns, and all persons acting by, through, or in concert with any Defendant or Defendants, from using in commerce the DP-Design's Registered Copyrighted Works, or any designs identical, substantially indistinguishable, substantially similar, and/or confusingly similar thereto, in the copying, sale, marketing,

distribution, promotion, or display of such design or designs, in or into the United States; and from assisting or contributing to such use;

e. Declaring that DP-Design's registered D. PORTHAULT mark has been knowingly, willfully, and deliberately infringed by the Defendants according to the Lanham Act, 15 U.S.C. § 1114;

f. Declaring that Defendants used in commerce words, terms, names, and symbols identical or confusingly similar to DP-Design's registered D. PORTHAULT mark and unregistered *D.* ***Porthault*** PARIS tradename or mark; used false, deceptive or misleading advertising or misrepresentations of fact as to the nature, quality, characteristics, authenticity, and origin of Defendants' or Plaintiffs' competing goods; and otherwise engaged in unfair competition against Plaintiffs, in violation of the Lanham Act, 15 US.C. §§ 1114, 1125(a);

g. Declaring that DP-Design's registered D. PORTHAULT mark and unregistered *D.* ***Porthault*** PARIS tradename or mark are famous marks that have each been diluted by the Defendants according to the Lanham Act, 15 U.S.C. § 1125(c) and Fla. Stat. § 495.151;

h. Declaring that Defendants' violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c) were willful and deliberate;

i. Finding that this is an exceptional case under the Lanham Act, 15 U.S.C. § 1117(a);

j. Permanently enjoining each Defendant, and its agents, employees, officers, directors, representatives, successors and assigns, and all persons acting by, through, or in concert with any Defendant or Defendants, from using in commerce DP-Design's registered D. PORTHAULT mark and unregistered *D.* ***Porthault*** PARIS tradename or mark, or any marks, designs or designations identical, substantially indistinguishable, substantially similar, and/or confusingly similar thereto, in the manufacture, import, labelling, advertisement, marketing,

promotion, supply, distribution, offer for sale, or sale of any products which bear such mark or marks, in or into the United States; from assisting or contributing to such use; from making such use that is likely to dilute the distinctive quality or reputation of Plaintiffs' marks within the state of Florida or the United States; and from assisting or contributing to such dilution;

k. Declaring that Defendants have committed trademark infringement and dilution of Plaintiffs' D. PORTHAULT mark and *D.* ***Porthault*** PARIS tradename or mark under Florida common law; that Defendants have tortiously interfered with Plaintiffs' business relationships and expectancy; Declaring that Defendants engaged in deceptive trade practices and injured Plaintiffs and their customers, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; that Defendants have disseminated misleading advertising in violation of the Florida Misleading Advertising Statute, Fla. Stat. § 817.41; that Defendants engaged in unfair competition under Florida common law;

l. Declaring that Defendants' commission of common law trademark infringement and dilution, tortious interference, unfair competition, and other state law torts asserted by Plaintiffs, and Defendants' violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, and the Florida Misleading Advertising Statute, Fla. Stat. § 817.41, were willful and deliberate;

m. Assessing a civil penalty for each such violation by Defendants pursuant to Fla. Stat. § 501.2075;

n. Declaring that Defendants committed commercial defamation and trade libel, and defamation by implication, under Florida law, intentionally, recklessly, and with actual malice, ill will, and evil motive towards Plaintiffs;

o. Ordering that Defendants, their agents, employees, officers, directors, representatives, successors and assigns, and all persons acting by, through, or in concert with any Defendant or Defendants, to take affirmative steps to prevent any confusion that may be created by Defendants' unlawful activities, including, but not limited to, recalling from U.S. commerce any and all products, packaging, labels, advertisements, promotional materials, publications, broadcasts, or any other electronic media or social media that use or display the phrase "One & Only D. ***Porthault***," phrases that fail to explain that Defendants are not the "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-USA is not the exclusive or "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-Design is not the exclusive and legitimate rightsholder of the ***Porthault*** brand in the U.S. and/or worldwide, phrases that fail to explain that Defendants are not the authors, creators, or exclusive rightsholder over iconic ***Porthault*** designs (*e.g.*, "our designs," "our creations," "our patterns," "our prints," "our savoir-faire"), phrases that suggest Plaintiffs are not authorized to use iconic ***Porthault*** designs or distribute products bearing them in the United States, or phrases that reverse pass off goods supplied by DP-USA as instead being supplied, endorsed, sponsored by or affiliated with any Defendant, that is otherwise enjoined hereby;

p. Ordering that Defendants remove any and all offending websites, webpages, social media posts and comments or messages associated therewith, that plagiarize or reproduce content, materials, or photos from DP-USA's website or Bernard Carl's home; or that use or display the phrase "One & Only D. ***Porthault***," phrases that fail to explain that Defendants are not the "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-USA is not the exclusive or "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-Design is not the exclusive and legitimate

rightsholder of the ***Porthault*** brand in the U.S. and/or worldwide, phrases that fail to explain that Defendants are not the authors, creators, or exclusive rightsholder over iconic ***Porthault*** designs (*e.g.*, "our designs," "our creations," "our patterns," "our prints," "our savoir-faire"), phrases that suggest Plaintiffs are not authorized to use iconic ***Porthault*** designs or distribute products bearing them in the United States, or phrases that reverse pass off goods supplied by DP-USA as instead being supplied, endorsed, sponsored by or affiliated with any Defendant, that is otherwise enjoined hereby;

q. Permanently enjoining each Defendant, and its agents, employees, officers, directors, representatives, successors and assigns, and all persons acting by, through, or in concert with any Defendant or Defendants, from plagiarizing or reproducing content, materials, or photos from DP-USA's website or Bernard Carl's home; or from using or displaying the phrase "One & Only D. ***Porthault***," phrases that fail to explain that Defendants are not the "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-USA is not the exclusive or "Official" seller of ***Porthault*** brand goods in the U.S. and/or worldwide, phrases that suggest Plaintiff DP-Design is not the exclusive and legitimate rightsholder of the ***Porthault*** brand in the U.S. and/or worldwide, phrases that fail to explain that Defendants are not the authors, creators, or exclusive rightsholder over iconic ***Porthault*** designs (*e.g.*, "our designs," "our creations," "our patterns," "our prints," "our savoir-faire"), phrases that suggest Plaintiffs are not authorized to use iconic ***Porthault*** designs or distribute products bearing them in the United States, or phrases that reverse pass off goods supplied by DP-USA as instead being supplied, endorsed, sponsored by or affiliated with any Defendant, that is otherwise enjoined hereby;

r. An order requiring Defendants, their agents, employees, officers, directors, representatives, successors and assigns, and all persons acting by, through, or in concert with any

Defendant or Defendants, to engage in corrective advertising: (i) to correct their false statements asserting Defendants are the true "owners of the 'actual worldwide' brand" and are not over-pricing their goods; (ii) to retract their similarly defamatory allegations that Plaintiffs are not the true "owners of the 'actual worldwide' brand"; (iii) to retract their defamatory allegations that Plaintiffs are over-pricing their goods; (iv) to correct their misleading statements that claim or suggest authorship or creation of the iconic ***Porthault*** designs by Defendants (*e.g.*, "our designs," "our creations," "our patterns," "our prints," "our savoir-faire"); (v) to dispel confusion caused by their reverse passing off; and (vi) to dispel confusion caused by their unauthorized use of hyperlinks to DP-USA's website in communications to existing and potential customers.

s. Ordering that Defendants file with the Court and serve on counsel for Plaintiffs within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement setting forth in detail the manner and form in which Defendants have complied with any injunction that the Court may enter in this action;

t. Awarding to Plaintiffs injunctive relief and any and all compensatory and consequential damages (including but not limited to Plaintiffs' lost business, lost customers, lost earnings, reduced revenues, lost profits, other economic harm, harm to Plaintiffs' goodwill and reputation, loss of corporate market value, loss of market share, loss of competitive advantage, price erosion, loss of brand distinctiveness, trademark dilution); disgorgement of profits, unjustly derived gains, and cost savings; treble damages; and restitution, resulting from Defendants' intentional, willful, and wanton unlawful acts as described in this Complaint, in an amount to be determined at trial;

u. Awarding to Plaintiffs their actual damages (including but not limited to increasing costs, corrective advertising, delays, guarantees, and professional fees) in connection with

Defendants' commercial defamation and trade libel, and defamation by implication, and those pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211;

v. Awarding to Plaintiffs punitive damages in connection with Defendants' tortious interference, commercial defamation and trade libel, and defamation by implication, which were committed with actual malice, ill will, and evil motive towards Plaintiffs, and those pursuant to the Florida Misleading Advertising Statute, Fla. Stat. § 817.41;

w. Awarding to Plaintiffs exemplary damages and punitive damages in connection with their state law claims, on account of Defendants' willful misconduct, predatory scheme, malice towards Plaintiffs, and deceit of the public;

x. That Plaintiffs otherwise recover all of their costs, expenses, disbursements, expert fees, and attorneys' fees incurred in connection with this action, pursuant to the Lanham Act, 15 U.S.C. § 1117(a), the U.S. Copyright Act, § 505, the French Intellectual Property Code and the French Code of Civil Procedure Articles 695 and 700, and the U.K.'s Copyright, Designs and Patents Act, and English Civil Procedure Rule 44 (and its sub-paragraphs), on an indemnity basis (44.3(3)) if not standard basis (44.3(2)), Fla. Stat. § 501.211, the Florida Misleading Advertising Statute, Fla. Stat. § 817.41(6); under any other of the applicable statutes sued upon, and under any other applicable provision of law;

y. Awarding to Plaintiffs all other such relief available to it under the U.S. Copyright Act, the U.K.'s Copyright, Designs and Patents Act, the French Intellectual Property Code, and the Lanham Act;

z. That Plaintiffs be granted prejudgment and post-judgment interest; and

aa. Any other relief that the Court deems just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 25, 2025

Respectfully submitted,

*/s/ Elisa H. Baca*
Gino Cheng
Fla. Bar No. 1058009
Elisa H. Baca
Fla. Bar No. 1003009
Hamza B. Rashid
Fla Bar No. 1059041
GCheng@winston.com
Ebaca@winston.com
HRashid@winston.com
**WINSTON & STRAWN LLP**
200 S. Biscayne Blvd., 24th Floor
Miami, FL 33131
Tel.: (305) 910-0500
Fax: (305) 910-0505

Sean Anderson
SRanderson@winston.com
[PENDING PRO HAC ADMISSION]
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-5388
Fax: (212) 294-4700

Sara Susnjar
SSusnjar@winston.com
[PENDING PRO HAC ADMISSION]
**WINSTON & STRAWN LLP**
68 Rue du Faubourg Saint-Honroe
75008 Paris France
Tel: (+33) 1 53 64 82 82
Fax: (+33) 1 53 64 82 20

Attorneys for Plaintiffs' D. Porthault USA, LLC, D. Porthault Design Holdings, LLC, Porthault Holdings, LLC, and Bernard Carl